IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JERRY J. MATHIS,

*Plaintiff*,

v.                                                              Civil Action No. ELH-13-2597

JOHN P. MCDONOUGH, *et al.*,

*Defendants*.

**MEMORANDUM OPINION**

Plaintiff Jerry J. Mathis, who is self-represented, filed suit, individually and as a representative of the organization Citizens for Change, against various Maryland public officials and employees.[1]  In particular, plaintiff raises claims pursuant to 42 U.S.C. § 1983 *et seq.* against several defendants in their individual and official capacities: Secretary of State John P. McDonough; Assistant Attorney General Kathleen E. Wherthey; Attorney General Douglas F. Gansler; State Senator C. Anthony Muse; Deputy L. Berryman of the Prince George's County Sheriff's Department; Jared DeMarinis, a Director of the Maryland Board of Elections; and Prince George's County Circuit Court Judge Larnzell Martin, Jr.  *See* ECF 1 ("Complaint").[2] Plaintiff's suit arises from his candidacy for the County Council in Prince George's County, Maryland, in the 2010 Democratic primary election, held on September 14, 2010.  His central

---

[1] Defendants have not challenged plaintiff's right, as a self-represented litigant, to bring claims "as a representative of" an organization, Citizens for Change.  Given the disposition here, it is unnecessary to address whether plaintiff may bring claims "as a representative of" Citizens for Change.

[2] This case was originally assigned to Judge Alexander Williams.  It was subsequently reassigned to me upon Judge Williams's retirement.

allegation is that defendants violated his constitutional rights by interfering during the primary campaign with the distribution of a particular sample ballot (the "Sample Ballot").

The Complaint contains four counts:  (1) Count I, brought pursuant to 42 U.S.C. § 1983, alleging "Deprivation of Constitutional Rights under Color of State Law," including plaintiff's rights under the First, Fourth, Sixth, and Fourteenth Amendments of the U.S. Constitution, and which cites alleged acts of defendants McDonough, Wherthey, Gansler, Muse, Berryman, and Judge Martin; (2) Count II, brought pursuant to "42 U.S.C. § 1983-1996," alleging "Civil Conspiracy to Interfere with Constitutional Rights under color of state law in violation of Plaintiff's rights [under the] 1st, 6th and 14th Amendment," and which cites acts of defendant Gansler; (3) Count III, brought pursuant to 42 U.S.C. § 1983, alleging "Selective Treatment under Color of State Law and Equal Protection of the Law, 14th Amendment to the United States Constitution guaranteeing Equal Protection of the Law," and which cites acts of defendants DeMarinis and Gansler; and (4) Count IV, brought pursuant to 42 U.S.C. § 1983, alleging "Violation of 14th Amendment to the United States Constitution guaranteeing DUE PROCESS OF LAW," based upon a "Lack of Jurisdiction to Prosecute – Administrative and Investigative Misconduct," and which cites acts of defendant Gansler.[3]

In an Order dated September 11, 2013 (ECF 2), Judge Williams dismissed Judge Martin as a defendant, *sua sponte*, on the ground that Judge Martin was entitled to judicial immunity in connection with "actions taken in his capacity as a state court judge."  *See id.* at 1-2 & n.1 (citing *Stump v. Sparkman*, 435 U.S. 349, 356-57 (1978)).  In a Memorandum Opinion of October 11,

---

[3]  Defendants assert, without any citation, that plaintiff "seeks $25 million in compensatory and punitive damages against the Defendants acting in their individual and official capacities."  ECF 9-2 at 1-2; *see also* ECF 12 at 1.  However, it does not appear that plaintiff's Complaint contains such a request.

2013, Judge Williams denied plaintiff's motion seeking reconsideration of Judge Martin's dismissal. *See* ECF 7 at 4-10; *Mathis v. Martin*, 2013 WL 5609134, at *3-6 (D. Md. Oct. 11, 2013).

Now pending is defendants' Motion to Dismiss the Complaint (ECF 9), to which they have attached a supporting memorandum (ECF 9-2, "Memorandum" or "Mem.") (collectively, the "Motion"). Plaintiff opposes the Motion (ECF 11, "Opposition" or "Opp."), and defendants have replied (ECF 12, "Reply"). With leave of court, plaintiff also filed a surreply (ECF 15, "Surreply"). No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I will grant the Motion.

## I. Background[4]

In 2010, plaintiff sought the Democratic nomination for a seat on the Prince George's County Council for District 8. Complaint ¶¶ 11, 13; *id.* Exh. D (ECF 1-4). Plaintiff was defeated in the Democratic primary election by Obie Patterson. Complaint ¶ 13.

During the primary campaign, plaintiff, in his capacity "as a representative of the community group, Citizens for Change," "participated in the production and distribution" of the Sample Ballot, a copy of which is attached to the Complaint. *See id.* Exh. D; *see also* Complaint

---

[4] This Background is drawn largely from the Complaint. The court "'must accept as true all of the factual allegations contained in the complaint,'" and must "'draw all reasonable inferences in favor of the plaintiff.'" *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). Under the applicable Rule 12(b)(6) standard, discussed *infra*, a court "may properly consider documents attached to a complaint or motion to dismiss 'so long as they are integral to the complaint and authentic.'" *Anand v. Ocwen Loan Servicing, LLC*, --- F.3d ----, 2014 WL 2535405, at *2 (4th Cir. June 6, 2014) (quoting *Philips v. Pitt County Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)). Plaintiff attached sixteen exhibits to the Complaint, labeled Exhibits A through P (ECF 1-1 through 1-16). Additionally, he attached nine exhibits to the Opposition, labeled Exhibits A through I (ECF 11-1 through 11-9). And, plaintiff attached eight exhibits to the Surreply, labeled Exhibits A through H (ECF 15-1 through ECF 15-8).

¶ 31.  The Sample Ballot purported to be the "Official Democratic Ballot" for the 26th District, Prince George's County, and states, in small type, "By Authority, Citizens for Change, Charles Summers, Treasurer."  *See* Complaint Exh. D.  In the Complaint, plaintiff asserts that he "has been an outspoken critic of slate and sample ballot tactics used by the Democratic political machine as a tool to mislead voters and ensure their odds of winning elections.  Plaintiff's production of the sample ballot with alternative candidates for office was purposely designed to change the dynamics of how the Democratic machine intentionally misled voters for the machine's preferred candidates."  Complaint ¶ 11.

Some allegations pertain to an incident that occurred at the Oxon Hill library in Prince George's County, where early voting was taking place for the primary election.  One news article characterized the incident as a "heated confrontation," involving several candidates and their supporters.  *See* Complaint ¶¶ 54-66; *id.* Exh. E.  This portion of plaintiff's allegations focuses on the conduct of two defendants:  Senator Muse and Deputy Berryman.  Although the Complaint alleges that the incident occurred "[o]n or about . . . September 13, 2010," *see* Complaint ¶ 62, apparently the incident took place on September 6, 2010.[5]

With respect to the Oxon Hill library incident, Senator Muse is alleged to have "ordered Plaintiff and his supporters to cease distribution of Plaintiff's sample ballots under threat of law

_____

[5]  In the Opposition, plaintiff states: "After further review and investigation, Plaintiff calculates the date [of the Oxon Hill libarary incident] specifically as being Monday, September 6, 2010 at approximately 3:00 pm."  Opp. at 15.  A news item, attached to the Complaint as Exhibit E, and which apparently describes the incident at the Oxon Hill library, is dated September 9, 2010.  *See* Joshua Garner, "Muse investigates 'fake' campaign ballots," Gazette.Net, Sept. 9, 2010, available at http://ww2.gazette.net/stories/09092010/largnew 150123_32547.php (last accessed Aug. 7, 2014).  And, in the Reply, defendants do not dispute plaintiff's assertion that the incident at the Oxon Hill library preceded Judge Martin's issuance of a temporary restraining order on September 7, 2010.  In light of those considerations, I will treat that incident as having occurred on September 6, 2010.

enforcement intervention." Complaint ¶ 55. Senator Muse, purportedly acting "under color of law," also "summoned the Prince George's County Police Department and Sheriff's Department to harass Plaintiff and his supporters," and ordered Sheriff's deputies "to confiscate the Sample Ballot and intimidate Plaintiff's supporters under threat of arrest to cease and desist distribution of Plaintiff's sample ballot." *Id.* ¶¶ 56-57. Moreover, "[u]nder the direction of" Senator Muse, the Sheriff's deputies "intimidated Plaintiff and his supporters by confiscating their literature and their ID[s], while questioning their citizenship" and threatening them "with arrest if they refused to stop distributing Plaintiff's sample ballot." *Id.* ¶ 58 (identifying supporters as "primarily of Filipino de[s]cent"). According to plaintiff, Senator Muse's actions "violated Plaintiff's constitutional rights guaranteed by the 1st, 4th, 6th, and 14th Amendments to the United States Constitution." *Id.* ¶ 59.

As for Deputy Sheriff Berryman, plaintiff alleges that she violated those same constitutional rights in connection with the incident of September 6, 2010. *See* Complaint ¶¶ 61-66. According to plaintiff, Deputy Berryman "ordered Plaintiff and his supporters to cease the distribution of Plaintiff's sample ballot under threat of arrest or retribution"; "intimidated Plaintiff and his supporters by confiscating their ID[s] and questioning their citizenship"; and threatened them "with arrest if they violated the deputies' orders to cease and desist distribution of Plaintiff's sample ballot." *Id.* ¶¶ 61-64. However, plaintiff does not allege that either he or his supporters were placed under arrest.

With respect to several other alleged statements by Senator Muse on which plaintiff relies, the Complaint is ambiguous (at best) as to whether plaintiff is asserting that Muse made those statements during the course of the Oxon Hill library incident on September 6, 2010. In

this regard, plaintiff alleges that Senator Muse objected to the Sample Ballot, publicly accusing plaintiff "of fraud and other violations of the law" while insisting that "only he as the Senator was authorized to produce and distribute a sample ballot." Complaint ¶ 54. *See also id.* ¶ 12. According to a news article attached to the Complaint, Senator Muse asserted that the Sample Ballot "'deceives the voters'" and was "'illegal,'" violating "'election law and many other laws, including mail fraud.'" Complaint Exh. E (ECF 1-5) at 2 (quoting Muse). The article states that Muse believed that, as a State senator, only he was authorized to issue official ballots for his district. *Id.* at 1.

On September 7, 2010, Secretary of State McDonough, allegedly "at the request of" Attorney General Gansler, "filed an emergency motion for a temporary restraining order and injunctive relief in the Circuit Court for Prince George's County against Plaintiff and Citizens for Change . . . to cease and desist the production and distribution of Plaintiff's campaign sample ballot." Complaint ¶ 24. *See id.* Exh. C (ECF 1-3, "Emergency Motion for Temporary Restraining Order and Injunctive Relief," the "TRO Motion"). The TRO Motion asserted, "falsely and erroneously," that the Sample Ballot was "fraudulent," "false," and "misleading." Complaint ¶ 29. According to plaintiff, McDonough relied on "fabricated, misleading, unsubstantiated and undeniably false accusations" in bringing the TRO Motion. Complaint ¶ 25; *see generally id.* ¶¶ 23-36.

Plaintiff raises similar allegations against Assistant Attorney General Wherthey, who "by her signature authored the motion" seeking the restraining order. Complaint ¶ 39; *see generally id.* ¶¶ 37-47. Ms. Wherthey, by signing the motion, allegedly "became a complaining witness rather than a prosecutor" and thus "is not entitled to absolute immunity." *Id.* ¶ 40. *See also id.*

¶ 47.  Further, plaintiff alleges that Attorney General Gansler, "as the supervising authority" of Wherthey, is "jointly responsible for all constitutional violations" that she allegedly committed. *Id.* ¶ 50.

Judge Martin issued a temporary restraining order (the "TRO") on September 7, 2010, which prevented plaintiff and others acting under his supervision from distributing the Sample Ballot.  Complaint ¶ 15; *id.* Exh. B (ECF 1-2, copy of the TRO).  The TRO stated that the "order is being granted because a sufficient showing has been made that violations of [Md. Code (2010 Repl. Vol., 2013 Supp.) §§ 13-401 and 13-602 of the Election Law Article ('E.L.')] have occurred in the form of circulation of fraudulent and legally non-compliant campaign materials . . . and that immediate, substantial, and irreparable harm in the form of presentation of false and misleading advocacy information to the electorate will result if such violations were to continue . . . ."  Complaint Exh. B at 1; *see* Complaint ¶¶ 102-03.

Plaintiff alleges that on November 9, 2010, Attorney General Gansler filed criminal charges against Mr. Mathis in connection with the alleged election violations.  Complaint ¶ 13.[6]

---

[6]  In Count IV, plaintiff challenges Attorney General Gansler's jurisdiction to bring election law charges against him.  *See infra*.  A press release from the Office of the Attorney General announcing the filing of criminal charges against Mr. Mathis is attached to the Complaint in both Exhibit F (ECF 1-6) and Exhibit O (ECF 1-15).  Notably, the press release is dated October 8, 2010—approximately a month before plaintiff alleges that charges were filed. *See id.*  Neither party addresses that discrepancy.  However, this Court may take judicial notice of the unofficial electronic case dockets available on the Maryland Judiciary Case Search website, http://casesearch.courts.state.md.us/ (last accessed Aug. 7, 2014).  *See Bey v. Shapiro Brown & Alt, LLP*, --- F. Supp. 2d ----, 2014 WL 661586, at *5 n.4 (D. Md. Feb. 20, 2014); *see also* Fed. R. Evid. 201(b).

According to that docket information, two criminal actions were filed against Mr. Mathis in the Circuit Court for Prince George's County.  In one case ("Case CT101224X"), filed on October 1, 2010, Mathis was charged with three counts of violating E.L. § 13-401(a)(1)(i).  Based on the number of counts and the dates of the alleged conduct, the criminal information attached to the Complaint (as Exhibit G, ECF 1-7) would have been filed in Case CT101224X.

The case was tried to a jury in April 2011, and Mathis "was convicted of three counts of election violations pertaining to distribution of campaign material without the proper authority line." Complaint ¶ 13; *see also* Maryland Judiciary Case Search, available at http://casesearch.courts.state.md.us/ (last accessed Aug. 7, 2014), Case CT101380X (indicating that Mathis was convicted of three E.L. § 13-401(a)(1)(i) charges and acquitted of one E.L. § 13-601(a) charge). Plaintiff alleges that, "in order to prove his innocence on appeal," he declined an offer from the sentencing judge for probation before judgment, and instead was "sentenced to three months unsupervised probation and one hundred community [service] hours at a venue of his choice." Complaint ¶ 13.[7] As the Maryland Judiciary Case Search docket reflects, Mathis appealed his convictions, unsuccessfully, to the Maryland Court of Special Appeals. *See Mathis v. State*, No. 1165 (Md. Ct. Sp. App. Mar. 14, 2013) (unpublished), referenced at http://www.courts.state.md.us/appellate/unreportedopinions/201303unreported.html (last accessed Aug. 7, 2014). On July 5, 2013, the Maryland Court of Appeals denied Mathis's petition for certiorari. *See Mathis v. State*, Pet. Docket No. 167, referenced at http://www.courts.state.md.us/coappeals/petitions/201307petitions.html (last accessed Aug. 7, 2014).

    According to plaintiff, Attorney General Gansler "publicly accused Plaintiff in the press

---

However, Case CT101224X was resolved by an entry of *nolle prosequi*, on January 12, 2011. In a separately numbered case ("Case CT101380X"), filed November 5, 2010, Mathis was charged with three counts of violating E.L. § 13-401(a)(1)(i) and with one count under E.L. § 13-601(a), which pertains to false statements in campaign finance reports. Indeed, in the Complaint, plaintiff indicates that he was charged with four counts of election law violations. *Id.* ¶¶ 83, 85; *see also id.* Exh. O (ECF 1-15) at 6 (news article dated Nov. 17, 2010, addressing new charge filed against Mathis). As discussed, *infra*, Case CT101380X proceeded to trial.

    [7] The Maryland Judiciary Case Search docket for Case CT101380X indicates that, on July 15, 2011, Mathis received concurrent six-month sentences, all suspended, for the three E.L. § 13-401(a)(1)(i) counts, and that he was placed on unsupervised probation for a period of six months.

via press releases and press conferences of being guilty of fraud and fraudulent acts," even though "Plaintiff was never investigated, charged or prosecuted for fraud."  Complaint ¶ 69; *see also id.* ¶ 12.  This "pre-trial publicity" allegedly "destroyed the integrity of the trial resulting in Plaintiff's conviction."  *Id.* ¶ 75; *see also id.* ¶ 77.  Plaintiff also asserts that Attorney General Gansler's alleged misrepresentations to the press and the public caused "irreparable harm to Plaintiff's reputation and standing in the community"; "caused Plaintiff to suffer emotional distress"; and "irreparably destroyed Plaintiff's . . . ability to earn a livelihood," leaving a "taint" that "may never wash entirely clean."  Complaint ¶¶ 71, 78; *see generally id.* ¶¶ 67-80.  Notably, a press release issued by the Office of the Attorney General, dated October 8, 2010, and which is the only such press release of Gansler's that plaintiff has attached to his pleadings, stated:  "A criminal charge is merely an accusation of wrongdoing and the defendant is presumed innocent unless the State proves his guilt beyond a reasonable doubt."  Complaint Exh. F (ECF 1-6, press release) at 1; *id.* Exh. O (ECF 1-15, press release) at 3.

Beginning in the second half of September 2010 and continuing until at least March 2011, plaintiff filed complaints with the Maryland Board of Elections, the Office of the State Prosecutor, and the Office of the Attorney General against campaign committees associated with Obie Patterson, Muse, Jay Walker, Mark Spencer, Steven Morris, Ollie Anderson, and Archie O'Neal.  *See* Complaint ¶ 86; *id.* Exh. H (ECF 1-8, regarding Patterson) and Exh. I (ECF 1-9, regarding O'Neil, Spencer, Morris, Muse, Walker, and the "Team 26" campaign committee).  According to plaintiff, those campaign committees violated the same election laws under which plaintiff was convicted, yet those candidates were never criminally charged.  Complaint ¶¶ 84, 86.  For instance, Senator Muse allegedly violated § 13-401(a) of the Election Law Article,

which, plaintiff says, "is the exact same violation of the election law that Plaintiff was charged, prosecuted and convicted of." *Id.* ¶ 87.   Plaintiff asserts:   "The Maryland Board of Elections verified that Senator Muse's campaign literature violated *Maryland Election Law § 13-401* and issued a directive to the Muse campaign committee to bring their campaign literature in compliance with the law within thirty (30) days."   Complaint ¶ 87 (citing *id.* Exh. J, memorandum from DeMarinis to the Chairman and Treasurer of Friends of C. Anthony Muse, dated Oct. 23, 2010).  By contrast, plaintiff "was not afforded the same opportunity to bring any alleged violations of his campaign literature in compliance within thirty (30) days," as he was instead "prohibited from distributing his campaign literature, investigated, charged, prosecuted and convicted of the same violation that Senator Muse and his Team 26 were given thirty (30) days to correct."  Complaint ¶ 87.

Additional facts are included in the Discussion.

## II.  Legal Standards

Defendants' Motion is predicated in part on Fed. R. Civ. P. 12(b)(6).  A motion to dismiss pursuant to Rule 12(b)(6) constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."  Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  It provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendant with "fair notice" of the claim and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 n.3 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

A plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. But, the rule demands more than bald accusations or mere speculation. *Id.*; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). To satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556. In other words, the complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Id.* at 570; *see Iqbal*, 556 U.S. at 684; *Simmons v. United Mortg. and Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011).

In reviewing such a motion, a court "'must accept as true all of the factual allegations contained in the complaint,'" and must "'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir.), *cert. denied*, ___ U.S. ___, 132 S. Ct. 402 (2011); *Monroe v. City of Charlottesville*, 579 F.3d 380, 385-86 (4th Cir. 2009), *cert. denied*, 559 U.S. 991 (2010). However, a complaint that provides no more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action," is insufficient. *Twombly*, 550 U.S. at 555. Moreover, the court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Monroe*, 579 F.3d at 385-86.

A Rule 12(b)(6) motion will be granted if the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679 (citation omitted). "A court decides whether [the pleading] standard is met by separating the legal conclusions from

the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert. denied*, ___ U.S. ___, 132 S. Ct. 1960 (2012). "'Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.'" *Hartmann v. Calif. Dept. of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013) (citation omitted); *accord Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Reg. Sys., Inc.*, 680 F.3d 1194, 1201-02 (10th Cir. 2011) ("When reviewing a 12(b)(6) dismissal, 'we must determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed.' Dismissal is appropriate if the law simply affords no relief.") (citation omitted).

A motion asserting failure to state a claim typically "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses," *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (quotation marks omitted), unless such a defense can be resolved on the basis of the facts alleged in the complaint. *See Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). "This principle only applies, however, if all facts necessary to the affirmative defense '*clearly appear*[] *on the face of the complaint*,'" or in other documents that are proper subjects of consideration under Rule 12(b)(6). *Id.* (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)) (emphasis in *Goodman*).

In evaluating the sufficiency of a complaint in connection with a Rule 12(b)(6) motion, a court ordinarily "may not consider any documents that are outside of the complaint, or not

expressly incorporated therein . . . ." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013).  In considering a challenge to the adequacy of the Complaint, however, the court "may properly consider documents attached to a complaint or motion to dismiss 'so long as they are integral to the complaint and authentic.'" *Anand v. Ocwen Loan Servicing, LLC*, --- F.3d ----, 2014 WL 2535405, at *2 (4th Cir. June 6, 2014) (quoting *Philips v. Pitt County Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *see also E.I. du Pont de Nemours & Co.*, 637 F.3d at 448. To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original).

Finally, because plaintiff is a self-represented litigant, his pleadings are "'liberally construed'" and "'held to less stringent standards than formal pleadings drafted by lawyers.'" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citation omitted).  "However, liberal construction does not absolve Plaintiff from pleading a plausible claim." *Bey v. Shapiro Brown & Alt, LLP*, --- F. Supp. 2d ----, 2014 WL 661586, at *3 (D. Md. Feb. 20, 2014); *see also Coulibaly v. J.P. Morgan Chase Bank, N.A.*, 2011 WL 3476994, at *6 (D. Md. Aug. 8, 2011) ("[E]ven when pro se litigants are involved, the court cannot ignore a clear failure to allege facts that support a viable claim."), *aff'd*, 526 F. App'x 255 (4th Cir. 2013).  The Fourth Circuit has stated:

> It is neither unfair nor unreasonable to require a pleader to put his complaint in an intelligible, coherent, and manageable form, and his failure to do so may warrant dismissal. *Corcoran v. Yorty*, 347 F.2d 222, 223 (9th Cir.), *cert. denied*, 382 U.S. 966 (1965); *Holsey v. Collins*, 90 F.R.D. 122, 128 (D. Md. 1981).  District courts are not required to be mind readers, or to conjure questions not squarely presented to them. *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985), *cert. denied*, 475 U.S. 1088 (1986).

*Harris v. Angliker*, 955 F.2d 41 (Table), 1992 WL 21375, at *1 (4th Cir. Feb. 10, 1992) (unpublished).

### III.  Discussion

A.  Section 1983

Pursuant to 42 U.S.C. § 1983, a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  *See, e.g.*, *Filarsky v. Delia*, ___U.S. ___, 132 S. Ct. 1657 (2012).  Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

B.  Maryland election law

Central to this case are several Maryland election law provisions, including the one under which plaintiff was convicted: E.L. § 13-401.  That provision states, in part:

> (a)(1) Except as otherwise provided in this section, each item of campaign material shall contain, set apart from any other message, an authority line that states:
>
>> (i) as to campaign material published or distributed by a campaign finance entity:
>>
>>> 1. the name and address of the treasurer of each campaign finance entity responsible for the campaign material; and
>>>
>>> 2. as to each treasurer named under item 1 of this item, the name of each campaign finance entity for which the treasurer is acting; and

- 14 -

(ii) as to campaign material published or distributed by any other person, the name and address of the person responsible for the campaign material.

(2) The authority line may omit an address that is on file with the State Board or a local board.

(3) If the campaign material is too small to include all the information specified in paragraph (1) of this subsection in a legible manner, the authority line need only contain the name and title of the treasurer or other person responsible for it.

(4) The authority line for campaign material that is a commercial advertisement need only contain the information specified in paragraphs (1) and (2) of this subsection for one campaign finance entity or other person responsible for the advertisement.

Notably, "[t]he Secretary of State may seek an immediate injunction against any violation of " Title 13.  E.L. § 13-605(a).  And, except as otherwise provided in the statute, "a person who knowingly and willfully violates a provision of [Title 13] is guilty of a misdemeanor and on conviction is subject to a fine not exceeding $25,000 or imprisonment not exceeding 1 year or both."  *Id.* § 13-603.

C.  "Official capacity" claims

As noted, plaintiff has brought suit against defendants in both their individual and their official capacities.  Complaint at 1.  In the Motion, defendants argue that "[b]ecause a State official acting in his or her official capacity is an arm of the State, the Defendants are entitled to Eleventh Amendment immunity for acts allegedly committed within their official capacity and for which Mr. Mathis seeks monetary damages."  Mem. at 2 n.1 (citing *Bland v. Roberts*, 730 F.3d 368, 389-90 (4th Cir. 2013)).  *See, e.g.*, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (Eleventh Amendment bars claims for damages brought against state officials in their official capacities); *Nivens v. Gilchrist*, 444 F.3d 237, 249 (4th Cir.) (same), *cert. dismissed sub nom. Stork v. Gilchrist*, 548 U.S. 939 (2006); *Cromer v. Brown*, 88 F.3d 1315, 1332 (4th Cir.

1996) (same).   Plaintiff does not challenge that argument.   *See Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010) ("By her failure to respond to [the defendant's] argument" in dispositive motion, "the plaintiff abandons [her] claim."); *Mentch v. E. Sav. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997) (plaintiff's failure to address in opposition brief an argument raised in defendant's opening brief constitutes abandonment of claim).   Nor does the Complaint specifically request injunctive relief or other remedies as to the remaining defendants that might survive the bar of Eleventh Amendment immunity. Accordingly, I will dismiss plaintiff's claims against defendants in their official capacities.

D.  Absolute and qualified immunity

1.  Absolute Immunity

The defense of absolute immunity protects "officials whose special functions or constitutional status requires complete protection from suit[.]"   *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982).   A defendant bears the burden of showing entitlement to absolute immunity. *Burns v. Reed*, 500 U.S. 478, 486 (1991); *see, e.g.*, *Stapley v. Pestalozzi*, 733 F.3d 804, 811 (9th Cir. 2013).

It is well settled that judges and prosecutors are safeguarded by absolute immunity from individual-capacity suits when exercising their discretionary judgment.   *See Imbler v. Pachtman*, 424 U.S. 409, 423 (1976).   "[T]he purpose of absolute immunity 'is not to protect an erring official, but to insulate the decisionmaking process from the harassment of prospective litigation.'"   *Goldstein v. Moatz*, 364 F.3d 205, 212 (4th Cir. 2004) (quoting *Westfall v. Erwin*, 484 U.S. 292, 295 (1988)).   Nevertheless, "courts are obliged to apply absolute immunity sparingly, because '[t]he presumption is that qualified rather than absolute immunity is sufficient

to protect government officials in the exercise of their duties.'"  *Goldstein*, 364 F.3d at 212

(quoting *Burns*, 500 U.S. at 486-87) (modification in *Goldstein*).

    2.  Qualified Immunity

Under federal law, "[t]he doctrine of qualified immunity protects police officers and

public officials from claims of constitutional violations 'for reasonable mistakes as to the legality

of their actions.'"  *Merchant v. Bauer*, 677 F.3d 656, 661 (4th Cir. 2012) (quoting *Saucier v.*

*Katz*, 533 U.S. 194, 206 (2001)), *cert. denied*, ___ U.S. ___, 133 S. Ct. 789 (2012).  *See Harlow*

*v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Occupy Columbia v. Haley*, 738 F.3d 107, 118 (4th Cir.

2013); *Bland*, 730 F.3d at 391.  "Qualified immunity extends to protect officials 'who commit

constitutional violations but who, in light of clearly established law, could reasonably believe

that their actions were lawful.'"  *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013)

(quoting *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir.) (en banc), *cert. denied*, ___ U.S. ___,

132 S. Ct. 781 (2011)); *accord Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012).  In other

words, qualified immunity "'gives government officials breathing room to make reasonable but

mistaken judgments about open legal questions.'"  *Lane v. Franks*, ___ U.S. ___, 134 S. Ct.

2369, 2381 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. ___, 131 S. Ct. 2074, 2085 (2011)).

A qualified immunity analysis involves two inquiries: (1) whether the facts alleged,

"[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's

conduct violated a constitutional right," *Saucier*, 533 U.S. at 201; and (2) whether the right at

issue "'was clearly established in the specific context of the case—that is, [whether] it was clear

to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the

situation he confronted.'"  *Merchant*, 677 F.3d at 662 (citation omitted).  The "two inquiries . . .

may be assessed in either sequence." *Id.* at 661-62; *accord Pearson*, 555 U.S. at 236 (2009) (judges are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand").

The second inquiry "turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Messerschmidt v. Millender*, ___ U.S. ___, 132 S. Ct. 1235, 1245 (2012) (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)).  "To be clearly established, a right must be sufficiently clear that 'every reasonable official would [have understood] that what he is doing violates that right.'  In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Reichle v. Howards*, ___ U.S. ___, 132 S. Ct. 2088, 2093 (2012) (quoting *Ashcroft*, 131 S. Ct. at 2078) (some quotation marks and citations omitted).  *Accord Plumhoff v. Rickard*, ___ U.S. ___, 134 S. Ct. 2012, 2023 (2014).

If the law at the time of the alleged violation was not "clearly established," the official will be entitled to qualified immunity, because "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, 457 U.S. at 818.  On the other hand, "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Id.* at 818-19. In determining whether a right was clearly established, courts in this Circuit "'ordinarily need not look beyond the decisions of the Supreme Court, [the Fourth Circuit], and the highest court of the state in which the case arose,'" as of the date of the conduct at issue. *Doe ex rel. Johnson*

*v. S.C. Dept. of Soc. Servs.*, 597 F.3d 163, 176 (4th Cir.) (citations omitted), *cert. denied*, ___

U.S. ___, 131 S. Ct. 392 (2010).

Notably, "[b]ecause an official 'who performs an act clearly established to be beyond the

scope of his discretionary authority is not entitled to claim qualified immunity,' the defendant

bears the initial burden 'of demonstrating that the conduct of which the plaintiff complains falls

within the scope of the defendant's duties.'" *Henry v. Purnell*, 501 F.3d 374, 377 n.2 (4th Cir.

2007) (quoting *In re Allen*, 106 F.3d 582, 593, 594 (4th Cir. 1997), *cert. denied sub nom.*

*McGraw v. Better Government Bureau, Inc.*, 522 U.S. 1047 (1998)).  *See also, e.g.*, *Holloman ex*

*rel. Holloman v. Harland*, 370 F.3d 1252, 1265-66 (11th Cir. 2004).

E.  Count I: TRO Motion and Oxon Hill library incident

Count I, brought pursuant to 42 U.S.C. § 1983, alleges a "Deprivation of Constitutional

Rights under Color of State Law."  Plaintiff, invoking his rights as a member of a "Class of

One," alleges violations of his rights under the First, Fourth, Sixth, and Fourteenth Amendments,

including, *inter alia*, his rights to free speech, equal protection, and due process.  *See* Complaint

¶¶ 14, 61.

1.  TRO Motion

Defendants argue that Attorney General Gansler and Assistant Attorney General

Wherthey are entitled to absolute immunity in connection with their efforts to obtain a temporary

restraining order against plaintiff.  Mem. at 7.  As defendants note, *see id.*, absolute immunity

protects a "prosecutor when serving as an advocate in judicial proceedings," including for "'acts

undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and

which occur in the course of his role as an advocate for the State[.]'"  *Kalina v. Fletcher*, 522

U.S. 118, 126 (1997) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993)).  Likewise, defendants assert that Secretary of State McDonough is entitled to absolute immunity, as "Maryland law expressly authorizes the Secretary of State to 'seek an immediate injunction against any violation' of the State's election law."  Mem. at 7 (quoting E.L. § 13-605(a)).  Thus, defendants maintain that McDonough "is absolutely immune from suit either as a prosecutor or as a party advocating on the State's behalf."  Mem. at 8 (citing *Briscoe v. Lahue*, 460 U.S. 325, 334-36 (1983)).

In his Opposition, plaintiff argues, *inter alia*, that principles applicable to prosecutors in the context of criminal cases do not extend to the TRO Motion brought by the three defendants. Opp. at 4.  In connection with that claim, plaintiff acknowledges that "Gansler and Wherthey were acting in the role of attorneys representing the State on behalf of Secretary of State McDonough," but he asserts that they were "not [acting] in the capacity of prosecutors," insofar as no criminal indictment had been filed at the time the TRO was sought.  *See id.*; *see also, e.g.*, Surreply at 5.

Although plaintiff is correct that the TRO Motion was not filed in a traditional criminal proceeding, that fact does not end the absolute immunity analysis.  That is because courts have found absolute immunity to apply to advocates in a number of other contexts beyond traditional criminal prosecutions, including where government attorneys pursue civil enforcement actions analogous to the proceeding at issue here.

For instance, in *Butz v. Economou*, 438 U.S. 478, 512 (1978), the Supreme Court considered the applicability of absolute immunity in the context of adjudication within a federal administrative agency, and concluded that such a proceeding "shares enough of the

characteristics of the judicial process that those who participate in such adjudication should also be immune from suits for damages." *Id.* at 513. Of relevance here, absolute immunity extends not only to hearing officers presiding over administrative adjudications, but also to agency officials who initiate the proceedings and serve as advocates. The Supreme Court said in *Butz*, *id.* at 515:

> We also believe that agency officials performing certain functions analogous to those of a prosecutor should be able to claim absolute immunity with respect to such acts. The decision to initiate administrative proceedings against an individual or corporation is very much like the prosecutor's decision to initiate or move forward with a criminal prosecution. An agency official, like a prosecutor, may have broad discretion in deciding whether a proceeding should be brought and what sanctions should be sought.

Further, the *Butz* Court observed, *id.*: "The discretion which executive officials exercise with respect to the initiation of administrative proceedings might be distorted if their immunity from damages arising from that decision was less than complete." Similarly, the *Butz* Court concluded that it "can see no substantial difference between the function of the agency attorney in presenting evidence in an agency hearing and the function of the prosecutor who brings evidence before a court." *Id.* at 516. Accordingly, the Court held "that an agency attorney who arranges for the presentation of evidence on the record in the course of an adjudication is absolutely immune from suits based on the introduction of such evidence." *Id.* at 517.

*Vosburg v. Department of Social Services*, 884 F.2d 133 (4th Cir. 1989), also provides guidance. There, the Fourth Circuit concluded that "state social workers are absolutely immune from liability arising from their role in filing a removal petition," which in that case had deprived the plaintiff of the custody of her daughter. *Id.* at 134. In so holding, the *Vosburg* Court rejected the claim that "the function of a social worker in this situation is more analogous to that of a

police officer than that of a prosecutor," thus entitling a social worker only to qualified immunity. *Id.* at 135. Rather, the Fourth Circuit said that "in filing the Removal Petition the social workers were acting in a prosecutorial, rather than an investigative or 'policing' capacity," and therefore "must be afforded absolute immunity from any liability arising from this conduct." *Id.* (citing *Butz*, 438 U.S. 478, and *Imbler*, 424 U.S. 409). The Court observed that in *Butz* "the Supreme Court extended absolute immunity to all federal officials whose 'special functions required a full exemption from liability,'" which included "'activities intimately associated with the judicial process'—i.e. activities that constitute the functional equivalent of those engaged in by judges, advocates, and witnesses." *Vosburg*, 884 F.2d at 136 (quoting *Butz*, 438 U.S. at 508, 512).

Further, the *Vosburg* Court reasoned, 884 F.2d at 137:

> Under Virginia law, the filing of a removal petition is, in essence, the start of judicial proceedings against the parent or guardian of a minor child, and the duties of the social worker at that point are those of an advocate in that process . . . . Like a prosecutor, a social worker must exercise her best judgment and discretion in deciding when to file a Removal Petition. The welfare of the state's children would be jeopardized if social workers had to weigh their decision in terms of their potential personal liability. In short, the denial of absolute immunity here has the potential to adversely affect the efficient functioning of the state's child welfare system. Additionally, the chances are high that suits against the social workers would occur with some degree of regularity. Parents, resentful of and humiliated by an attempt to usurp their rights, would likely channel their frustration "into the ascription of improper and malicious actions to the State's advocate."

*See also, e.g.*, *Evans v. Perry*, --- F. App'x ----, 2014 WL 3378025, at *2 (July 11, 2014) (per curiam) ("Social workers are entitled to absolute immunity for actions taken in a prosecutorial rather than investigative or policing capacity," including for "preparing and filing a removal petition and prosecuting that action.").

In other instances, the Fourth Circuit and district courts within this Circuit have extended absolute immunity outside the context of traditional criminal prosecutions. *See, e.g.*, *Pak v. Ridgell*, 2011 WL 3320197, at *7 (D. Md. Aug. 1, 2011) (concluding that "bar counsel prosecutors are afforded absolute immunity for conduct performed in a judicial capacity"), *aff'd*, 476 F. App'x 750 (4th Cir. 2012), *cert. denied*, ___ U.S. ___, 133 S. Ct. 1279 (2013); *Hunter v. Virginia State Bar*, 786 F. Supp. 2d 1107, 1112 (E.D. Va. 2011) (extending prosecutorial immunity to an assistant bar counsel); *see also Ostrzenski v. Seigel*, 177 F.3d 245, 250 (4th Cir. 1999).

Courts outside the Fourth Circuit have reached similar conclusions, including in cases involving either assistant state attorneys general, civil enforcement actions, or both. *See, e.g.*, *Skinner v. Govorchin*, 463 F.3d 518, 525 (6th Cir. 2006) (extending absolute immunity to state assistant attorney general); *Fry v. Melaragna*, 939 F.2d 832, 837-38 (9th Cir. 1991) (stating that "the principles outlined in *Butz* should a fortiori apply to the government attorney's initiation and handling of civil litigation in a state or federal court" and extending absolute immunity to IRS attorneys who initiated civil tax litigation); *Murphy v. Morris*, 849 F.2d 1101, 1005 (8th Cir. 1988) (extending absolute immunity to "the advocacy functions of a state assistant attorney general defending state officials" in civil litigation); *Barrett v. United States*, 798 F.2d 565, 571-73 (2d Cir. 1986) (extending absolute immunity to state assistant attorney general in connection with defense of a civil suit); *Dukes v. Pappas*, 2010 WL 571779, at *8-9 (E.D. Pa. Feb. 17, 2010) (extending absolute immunity to Maryland assistant attorney general regarding conduct pertaining to civil enforcement action brought against plaintiff).

Plaintiff raises a host of arguments in response to defendants' assertion of absolute immunity. However, none of those contentions is compelling.

To begin, in his Surreply, plaintiff argues that the motion and proceedings that resulted in the issuance of the TRO "cannot be deemed a judicial proceeding that would entitle Defendants to absolute immunity because the proceedings lacked sufficient procedural safeguards adequate to minimize the occurrence of injury to the Plaintiff." Surreply at 4. However, as defendants note, "the TRO hearing involved an impartial arbiter, Judge Martin, the presentation of evidence in the form of Mr. Mathis's campaign materials on the record and—although that particular hearing was conducted ex parte—an opportunity for Mr. Mathis to challenge any falsehoods through a later proceeding." Reply at 5-6 (citing Md. Rule 15-504 (addressing, *inter alia*, procedures for the modification or dissolution of temporary restraining orders); *Smith v. Danielczyk*, 400 Md. 98, 126, 928 A.2d 795, 812 (2007) ("Even in sub-proceedings that may themselves be *ex parte* in nature, such as requests for temporary restraining orders, the opportunity exists later in the case to expose and sanction false statements.")). Indeed, the TRO issued by Judge Martin stated that "any party or person affected by this Order may apply for a modification or dissolution of it on two days' notice (or such shorter notice as the court may prescribe) to the party who obtained the order." Complaint Exh. B (ECF 1-2, copy of the TRO).[8]

Plaintiff's repeated assertions that defendants "fabricated" evidence, *see, e.g.*, Complaint ¶¶ 32, 39, 46, 47, 53, are also unavailing. "Prosecutorial immunity applies even when a

---

[8] Plaintiff complains that he was not served with the TRO until September 30, 2010. Opp. at 16. Notably, an email message attached as Exhibit A to the Opposition indicates that an Assistant Sheriff with Prince George's County emailed plaintiff on September 8, 2010, stating that he "would like to meet with [plaintiff regarding] the Temporary Restraining Order issued yesterday and provide you with a copy." Exh. A at 1. However, for reasons that are not clear from that correspondence, plaintiff did not reply to that message until September 30, 2010.

prosecutor fabricates evidence *so long as* the prosecutor is acting in a semi-judicial capacity." *Pak*, 2011 WL 3320197, at *6. In any event, plaintiff's allegations that defendants "fabricated" evidence are wholly conclusory, as they fail to identify what evidence presented in connection with the TRO Motion was purportedly fabricated.

Also unconvincing is plaintiff's claim that Assistant Attorney General Wherthey, "by signing [the TRO Motion,] did swear under oath to all the false statements of fact in the motion," and thus "became a complaining witness rather than a prosecutor[.]" Complaint ¶ 40; *see also id.* ¶¶ 47, 53. Defendants argue, and I agree, that plaintiff has not plausibly alleged how Wherthey's conduct was akin to that of a witness, rather than counsel. *See* Mem. at 8-9. Nor has plaintiff plausibly alleged that Wherthey functioned as an "administrator and/or investigative officer," rather than as an advocate. *See* Complaint ¶ 47.

Further, in the Opposition, plaintiff insists that as of 2010 the Attorney General lacked authority "to institute an action in Circuit Court for a temporary restraining order." Opp. at 5. Yet, he also concedes that, at that time, the Secretary of State *did* have authority to seek an injunction. *Id.* As the TRO Motion reflects, the "Plaintiff/Petitioner" bringing the action was Secretary of State McDonough, and not the Attorney General. And, as defendants note, *see* Reply at 5, Maryland law provides that, unless a statute expressly provides otherwise, "the Attorney General is the legal adviser and shall represent and otherwise perform all of the legal work for each officer and unit of the State government." *See* Md. Code (2009 Repl. Vol., 2011 Supp.) § 6-106(b) of State Government Article.

In my view, none of the arguments that plaintiff offers undermines the entitlement of Attorney General Gansler, Assistant Attorney General Wherthey, and Secretary of State

McDonough to absolute immunity in connection with allegations raised in Count I concerning

the TRO Motion.  As a result, that aspect of Count I will be dismissed as to defendants Gansler,

Wherthey, and McDonough.

### 2.  Senator Muse and Deputy Berryman

As noted, plaintiff's allegations regarding Senator Muse and Deputy Berryman largely

arise from the incident at the Oxon Hill library on September 6, 2010.  With respect to Senator

Muse, defendants argue that plaintiff fails to allege that Senator Muse acted under color of state

law, and that the § 1983 claim against Senator Muse fails on that basis alone.  Alternatively, even

if Senator Muse did act under color of law, defendants maintain that he would be entitled to

qualified immunity.  *See* Mem. at 9-11.[9]  As for Deputy Berryman, defendants argue that she is

entitled to qualified immunity.  *See id.* at 11-15.

As an initial matter, defendants assert that, to the extent plaintiff seeks to pursue a claim

based on alleged violations of the constitutional rights of his supporters who were present during

the incident at the Oxon Hill library, plaintiff lacks standing to raise such a claim.  Therefore, in

defendants' view, purported violations of the rights of Mathis's supporters are irrelevant to the

Court's analysis.  Mem. at 12 n.3.  Plaintiff does not challenge that argument, and thus has

abandoned any claim premised on alleged violations of his supporters' rights.  *See Ferdinand-*

*Davenport*, *supra*, 742 F. Supp. 2d at 777; *Mentch*, *supra*, 949 F. Supp. at 1247.

---

[9] Defendants do not argue that Senator Muse is entitled to absolute immunity pursuant to
the doctrine of legislative immunity, which applies only to legislative activities.  *See McCray v.
Maryland Dept. of Transp., Maryland Transit Admin.*, 741 F.3d 480, 484-85 (4th Cir. 2014);
*Kensington Volunteer Fire Dept., Inc. v. Montgomery County, Md.*, 684 F.3d 462, 470 (4th Cir.
2012); *see also, e.g.*, *Carlos v. Santos*, 123 F.3d 61, 67 (2d Cir. 1997) ("A viable § 1983 claim
against a town legislator in his individual capacity must allege acts taken under color of state
law, but not acts that were legislative in nature.").

Of relevance to plaintiff's claim concerning a violation of his own First Amendment rights, the Supreme Court has made clear that the First Amendment "has its fullest and most urgent application to speech uttered during a campaign for political office." *Citizens United v. FEC*, 558 U.S. 310, 339 (2010) (citations and quotation marks omitted). And, "the Supreme Court has emphasized the importance of providing the electorate with information about the source of campaign spending—even when these disclosure requirements burden election-related speech." *Center for Individual Freedom, Inc. v. Tennant*, 706 F.3d 270, 275 (4th Cir. 2013).

Plaintiff also seeks to vindicate his right against unreasonable searches and seizures, guaranteed by the Fourth Amendment to the Constitution. The Fourth Amendment protects, *inter alia*, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Section 1983 provides a damages remedy for violations of the Fourth Amendment. *See, e.g.*, *Wilson v. Layne*, 526 U.S. 603, 609 (1999) ("§ 1983 allow[s] a plaintiff to seek money damages from government officials who have violated his Fourth Amendment rights.").

In *Santos v. Frederick County Bd. of Com'rs*, 725 F.3d 451, 460-61 (4th Cir. 2013), the Fourth Circuit summarized "three categories of police-citizen encounters" recognized by the Supreme Court:

> First, "consensual" encounters, the least intrusive type of police-citizen interaction, do not constitute seizures and, therefore, do not implicate Fourth Amendment protections. *Florida v. Bostick*, 501 U.S. 429, 434[] (1991). Second, brief investigative detentions—commonly referred to as "*Terry* stops"—require reasonable, articulable suspicion of criminal activity. *Terry* [*v. Ohio*, 392 U.S. 1, 21 (1968)]. Finally, arrests, the most intrusive type of police-citizen encounter, must be supported by probable cause. *Devenpeck v. Alford*, 543 U.S. 146, 152[] (2006).

A police-citizen encounter rises to the level of a Fourth Amendment seizure when "the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen . . . ." *United States v. Jones*, 678 F.3d 293, 299 (4th Cir. 2012) (quoting *Terry*, 392 U.S. at 19 n.16[]). This inquiry is objective, [*United States v. Weaver*, 282 F.3d 302, 309 (4th Cir. 2002)], asking whether "'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Jones*, 678 F.3d at 299 (quoting [*United States v. Mendenhall*, 446 U.S. 544, 554 (1980)]. An encounter generally remains consensual when, for example, police officers engage an individual in routine questioning in a public place. *United States v. Gray*, 883 F.2d 320, 323 (1989); *see also Bostick*, 501 U.S. at 434[] ("[M]ere police questioning does not constitute a seizure.").

As indicated, defendants first challenge plaintiff's § 1983 claim against Senator Muse on the ground that none of the alleged actions were performed "under color of state law." To state a claim under § 1983, "a plaintiff must aver that a person *acting under color of state law* deprived him of a constitutional right or a right conferred by a law of the United States." *Wahi v. Charleston Area Medical Center, Inc.*, 562 F.3d 599, 615 (4th Cir. 2009) (emphasis added). The "under color of state law" element "is synonymous with the more familiar state-action requirement—and the analysis for each is identical." *Philips*, *supra*, 572 F.3d at 180.

Acting "under color of state law" is a jurisdictional prerequisite for a § 1983 action. *Polk County v. Dodson*, 454 U.S. 312, 315 (1981). In *Polk County*, the Supreme Court said: "[A] person acts under color of state law only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Id.* at 317-18 (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). As a result, "a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *West v. Atkins*, 487 U.S. 42, 50 (1988). However, "[n]ot every action by a state official or employee is to be deemed as occurring 'under color' of state law. Action is taken under color of state law when it is 'made possible only because the

wrongdoer is clothed with the authority of state law.'" *Hughes v. Myer*, 880 F.2d 967, 971-72 (7th Cir. 1989) (quoting *West*, 487 U.S. at 49) (further citation omitted).  Further, the Fourth Circuit has indicated that actions may be said to have occurred "under color of state law" where they "were committed while the defendants were purporting to act under the authority vested in them by the state, or were otherwise made possible because of the privileges of their employment." *Hughes v. Halifax County School Bd.*, 855 F.2d 183, 186-87 (4th Cir. 1988).  *See also Monroe v. Pape*, 365 U.S. 167, 184 (1961); *Williams v. United States*, 341 U.S. 97, 100 (1951) ("the manner of his conduct . . . makes clear that he was asserting the authority granted him and not acting in the role of a private person").

"Like the state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of § 1983 excludes from its reach 'merely private conduct, no matter how discriminatory or wrongful.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (citations omitted).  *See also, e.g.*, *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1523 (11th Cir. 1995) ("The dispositive issue is whether the official was acting pursuant to the power he/she possessed by state authority or acting only as a private individual.").  Nevertheless, a private party may be "considered a state actor for purposes of § 1983 if 'the deprivation [is] caused by the exercise of some right or privilege created by the State . . . [and] the party charged with the deprivation [is] a person who may fairly be said to be a state actor.'"  *Gregg v. Ham*, 678 F.3d 333, 339 n.3 (4th Cir. 2012) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982); modifications in *Gregg*).

Regarding the distinction between private and state action, the Fourth Circuit explained in *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir.), *cert. denied*, 540 U.S. 822 (2003) (footnote omitted):

> If the substance of § 1983 is not to be substantially eviscerated, . . . "its ambit cannot be a simple line between States and people operating outside formally governmental organizations." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295[] (2001).   Section 1983 therefore includes within its scope apparently private actions which have a "sufficiently close nexus" with the State to be "fairly treated as that of the State itself." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351[] (1974).   "[T]here is no specific formula for defining state action" under this standard.  *Hicks v. Southern Maryland Health Sys. Agency*, 737 F.2d 399, 402 n.3 (4th Cir. 1984) (quoting *Howerton v. Gabica*, 708 F.2d 380, 383 (9th Cir. 1983)).   Rather, the question of what is fairly attributable to the State "is a matter of normative judgment, and the criteria lack rigid simplicity." *Brentwood Academy*, 531 U.S. at 295[.]

Although the facts of *Rossignol* are markedly different from those alleged here, the Fourth Circuit's analysis is instructive as to the "under color of state law" issue.  In *Rossignol*, 316 F.3d at 519, the plaintiff brought § 1983 claims against, among others, sheriff's deputies. The deputies, while off duty and wearing plainclothes, completed a "mass purchase" of plaintiff's *St. Mary's Today* newspaper, in order to suppress unfavorable coverage of their official conduct.  *Id.* at 520-21.  The district court granted summary judgment to the deputies, on the ground that "'the mass purchase constituted private conduct not executed under color of state law[.]'"  *Id.* (quoting district court opinion).   The Fourth Circuit reversed, concluding that the deputies' conduct was attributable to the state, due in part to their motivation to stifle criticism of the Sheriff's Department's official conduct.  *Id.* at 524-25 (noting that "if a defendant's purportedly private actions are linked to events which arose out of his official status, the nexus between the two can play a role in establishing that he acted under color of state law").   The *Rossignol* Court also emphasized the deputies' "ability to use their positions in the Sheriff's

- 30 -

Department" to advance their effort and to shield themselves from consequences for their acts. *See id.* at 525-26 (noting that "the deputies' identities as state officers played a role at several points during the seizure" and citing the undoubted "effect of a police presence on a store owner or clerk").

As indicated, plaintiff's allegations concerning Senator Muse relate primarily to the incident of September 6, 2010, when Senator Muse allegedly "ordered Plaintiff and his supporters to cease distribution of Plaintiff's sample ballots under threat of law enforcement intervention." Complaint ¶ 55. Senator Muse is also alleged to have "summoned the Prince George's County Police Department and Sheriff's Department to harasss Plaintiff and his supporters," and to have ordered Sheriff's deputies "to confiscate the Sample Ballot and intimidate Plaintiff's supporters under threat of arrest to cease and desist distribution of Plaintiff's sample ballot." *Id.* ¶¶ 56-57. Moreover, "[u]nder the direction of" Senator Muse, the Sheriff's deputies "intimidated Plaintiff and his supporters by confiscating their literature and their ID[s], while questioning their citizenship" and threatening them "with arrest if they refused to stop distributing Plaintiff's sample ballot." *Id.* ¶ 58.

With respect to other statements allegedly made by Senator Muse, the Complaint does not make clear whether those statements were made during the Oxon Hill library incident of September 6, 2010. Among those allegations is the claim that Senator Muse publicly accused plaintiff "of fraud and other violations of the law" while insisting that "only he as the Senator was authorized to produce and distribute a sample ballot." Complaint ¶ 54. In a news article attached to the Complaint, Muse is quoted as asserting that the Sample Ballot "'deceives the voters'" and was "'illegal,'" violating "'election law and many other laws, including mail

fraud.'"   Complaint Exh. E at 2 (quoting Muse).   Also in the article, Muse is said to have asserted that, as a State senator, only he was authorized to issue official ballots for his district. *Id.* at 1.

In the Motion, defendants assert: "None of [plaintiff's] allegations raise an inference that Senator Muse's alleged conduct was 'in [any] way dependent on state authority.'"   Mem. at 10 (quoting *Polk County*, 454 U.S. at 318).   In their view, even though Senator Muse was a State official, he "was not acting within his authority as a State Senator when he commented to the press about Mr. Mathis's illegal campaign materials.   Nor was he exercising any power granted to him under State law when he 'ordered' Mr. Mathis to cease distributing his campaign materials or when he summoned law enforcement."   Mem. at 10.   In this regard, defendants note that, as "a member of the State's legislative branch of government, [Senator Muse] has no authority to enforce the law or to direct the actions of local law enforcement and the Complaint makes no allegation that he is a law enforcement official."   *Id.*   Similarly, in the Reply, defendants insist that Muse "took no official enforcement action that could be fairly attributable to the State."   *Id.* at 7 (citing *Filarsky*, *supra*, 132 S. Ct. at 1661 (2012)) (quotation marks omitted).

Plaintiff challenges defendants' position that Senator Muse did not act "under color of law."   *See* Opp. at 13-15, 17-18.   He asserts that Senator Muse "falsely informed the Sheriff's deputies, under the []pretense or appearance of legal right . . . that he as Senator was the only legal entity authorized to issue official ballots for the District."   *Id.* at 15.[10]   Further, plaintiff

---

[10] Neither the Complaint nor a news article attached to it, which indicates that Senator Muse made this assertion, specifically states that Muse made that remark to Sheriff's deputies during the course of the incident at the Oxon Hill library.   *See* Complaint ¶ 54; *id.* Exh. E at 1.

insists:  "As a legislator and lawmaker, Defendant Muse deceptively and intentionally used the power inherent in the office he holds to persuade both the Police Department and Deputy Berryman to unconstitutionally harass, intimidate and seize Plaintiff's campaign literature." Opp. at 17.

Plaintiff does not allege that Senator Muse, as a State legislator, possessed any actual law enforcement authority.  Some courts have taken the position, including in cases involving legislators, that government officials do not act "under color of state law" in connection with actions that they have no legal authority to perform.  *See, e.g.*, *Wilson v. Price*, 624 F.3d 389, 393 (7th Cir. 2010) ("Because [defendant, an alderman] had no enforcement authority, none of the actions taken to compel [plaintiff] to move the illegally parked cars were effectuated under color of state law, as one cannot misuse power one does not possess."); *Gibson v. City of Chicago*, 910 F.2d 1510, 1518 (7th Cir. 1990) ("[W]e have found no authority for expanding this concept of [acting under color or pretense of law] to encompass the actions of an official who possessed *absolutely no authority* to act but nonetheless assumed the position of an imposter in pretending that he did.") (emphasis in original); *see also Myers v. Bowman*, 713 F.3d 1319, 1329-31 (11th Cir. 2013) (conduct by magistrate judge); *Marion v. Groh*, 954 F. Supp. 39 (D. Conn. 1997) (conduct by selectwoman).  *But cf. Carlos v. Santos*, 123 F.3d 61, 65 (2d Cir. 1997) (suggesting that if members of a town board had "provided scurrilous information to the FBI . . . in their official capacities, they might have been acting under color of law," but affirming dismissal of allegation for lack of proof).

When viewed in isolation, certain aspects of Senator Muse's alleged conduct, including the mere fact that he reported unlawful activity to the police, would fall short of occurring "under

color of state law."  However, plaintiff alleges that Senator Muse did far more than merely report wrongdoing.  According to plaintiff, Senator Muse "ordered deputies . . . to confiscate Plaintiff's sample ballot and intimidate Plaintiff's supporters under threat of arrest to cease and desist distribution of Plaintiff's sample ballot," and "[u]nder the direction of [Senator Muse], the Sheriff's deputies intimidated Plaintiff and his supporters . . . ."  Particularly in light of those allegations, it would be premature to decide at this stage that Senator Muse did not act "under color of state law" in connection with the Oxon Hill library incident.[11]

In the alternative, defendants argue that, even if plaintiff sufficiently alleged that Senator Muse acted "under color of state law," Muse is protected by qualified immunity.  Mem. at 10.  To that end, defendants note that plaintiff acknowledges he was convicted of violating Maryland election law in connection with his distribution of the Sample Ballot—which is the very conduct about which Senator Muse complained.  *See* Mem. at 10-11.  Defendants add that, "given that no court has questioned the constitutionality of Maryland's election laws pertaining to campaign finance disclosures, a reasonable official would not understand that efforts to stop an individual from violating those State laws violated that individual's constitutional rights."  Mem. at 11 (citing *Bland*, *supra*, 730 F.3d at 391).  *See also* Reply at 8-9.

---

[11] Plaintiff also invokes the principle that a private actor may be held liable under § 1983 for conspiring with a state official to violate a private citizen's constitutional rights.  Opp. at 14 (citing *Dossett v. First State Bank*, 399 F.3d 940, 950 (8th Cir. 2005)).  In *Dossett*, the Eighth Circuit made clear that, "[u]nder § 1983, a plaintiff must establish not only that a private actor caused a deprivation of constitutional rights, but that the private actor willfully participated with state officials and reached a mutual understanding concerning the unlawful objective of a conspiracy."  *Id.* at 951 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970)).  Under that standard, plaintiff's allegations fall well short of plausibly alleging any such understanding between Muse and either Deputy Berryman or any other law enforcement official.

With respect to the qualified immunity argument, plaintiff insists that Senator Muse's "accusations of illegal activity" were based on Muse's "personal beliefs and not on any legal theory or statute."  Opp. at 20.  Mathis argues that the Sample Ballot's authority line did not appear, on its face, to be deficient; that the "authority line on his campaign literature was not adjudicated to be defective until April 12, 2011"; and that, at the time of Senator Muse's purportedly unlawful conduct, "no restraining order had been issued [and] there was no indication in the press or otherwise that Plaintiff had violated any election laws."  Opp. at 20. Moreover, in the Surreply, plaintiff argues, *inter alia*, that the notion advanced by defendants— that Muse's actions are not fairly attributable to the State—"militate[s] against their claim that Senator Muse is entitled to qualified immunity."  *Id.* at 14.

Regarding this final point, I agree with plaintiff that defendants have not shown how Senator Muse's alleged actions are of the type that, when committed by a legislator, are entitled to the protection of qualified immunity.  That is because qualified immunity protects an official for conduct that falls within "'the scope of [the official's] discretionary authority,'" and requires a showing "'that the conduct of which the plaintiff complains falls within the scope of the defendant's duties.'"  *Henry*, *supra*, 501 F.3d at 377 n.2 (citation omitted).  Because defendants plainly have not established that Senator Muse's actions fell within the scope of his discretionary authority as a State senator, he does not enjoy here the protection afforded by qualified immunity.  Nevertheless, to state a claim under § 1983, plaintiff must still plausibly allege (and ultimately prove) a violation of his federal rights.  As discussed, *infra*, he fails to do so.

With respect to Deputy Berryman, defendants argue that she is entitled to qualified immunity for her alleged conduct.  Mem. at 11.  They reiterate that plaintiff was convicted in

State court of election law violations, does not challenge his conviction in this § 1983 action, and "does not claim that the State's election laws violate the Constitution." *Id.*  As a result, defendants say, plaintiff's "allegations that Deputy Berryman attempted to enforce valid State election law by ordering him to cease and desist distributing the unlawful campaign materials do not raise any inference that Deputy Berryman violated his clearly established constitutional rights." *Id.*

Defendants observe that "an investigative detention" runs afoul of the Fourth Amendment only when it is not supported by reasonable suspicion.  *See* Mem. at 12 (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989) ("[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause.") (quoting *Terry*, 392 U.S. at 30)).  According to defendants, plaintiff's allegations indicate that, "when Deputy Berryman encountered Mr. Mathis distributing his sample ballot, the deputy had more than a reasonable suspicion that Mr. Mathis was violating State law; the deputy had probable cause to believe Mr. Mathis was violating [E.L. § 13-401] and, thus, was guilty of a misdemeanor" under Maryland law.  Mem. at 12 (quotation marks omitted).  As defendants note, "[f]or probable cause to exist, there need only be enough evidence to warrant the belief of a reasonable officer that an offense has been or is being committed; evidence sufficient to convict is not required."  *Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002).

Moreover, defendants maintain that plaintiff has identified no violation of his clearly established constitutional rights based on Deputy Berryman's conduct in "detaining him in order to investigate his conduct, ordering him to cease his unlawful conduct, or threatening to arrest

him if he did not abide by her lawful order."  Mem. at 13.  To that end, defendants argue that plaintiff committed a further violation of Maryland law by initially refusing to abide by Deputy Berryman's cease-and-desist order.  *See id.* at 13-14 (citing *Carter v. Jess*, 179 F. Supp. 2d 534, 546 (D. Md. 2001); Md. Code (2012 Rep. Vol., 2013 Supp.) § 10-201(c)(3) of the Criminal Law Article (making it a criminal offense for a person to "willfully fail to obey a reasonable and lawful order that a law enforcement officer makes to prevent a disturbance to the public peace")).  Notably, plaintiff does not challenge the assertion that he failed to obey a lawful order; rather, he insists, albeit without citation to authority, that "a citizen has a legal right to verbally oppose or challenge police activities without resisting arrest as long as Plaintiff was engaged in constitutionally protected activities."  Opp. at 21.

In my view, plaintiff's § 1983 claims against Senator Muse and Deputy Berryman suffer from a crucial defect: the lack of any plausible allegation that the conduct of either defendant violated the constitutional rights that plaintiff invokes.  *See* 42 U.S.C. § 1983 (creating liability for "the deprivation of . . . rights, privileges, or immunities secured by the Constitution and laws" of the United States); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997) (to state a § 1983 claim, "a plaintiff must establish three elements," including "the deprivation of a right secured by the Constitution or a federal statute").  As plaintiff's allegations reflect, his claims against Senator Muse and Deputy Berryman are largely grounded in the notion that the Sample Ballots were legal as of September 6, 2010.  However, I am not persuaded that plaintiff has plausibly shown, particularly in light of Mr. Mathis's criminal conviction for distributing the Sample Ballot, how the conduct of either defendant, in response to Mathis's distribution of that very ballot, violated his constitutional rights.

Plaintiff's claims against Senator Muse and Deputy Berryman rest on several flawed premises. For one, in connection with his claim against Senator Muse, plaintiff insists that Muse's report of wrongdoing was baseless, because at that time no TRO had issued and the Sample Ballot had not yet been "adjudicated to be defective." Opp. at 20. Similarly, as to Deputy Berryman, plaintiff argues that because the encounter at the Oxon Hill library occurred "prior to the issuance of the temporary restraining order by Judge Martin to cease and desist," Deputy Berryman "was not enforcing any legal order . . . ." *Id.* at 18; *see also id.* at 20 (noting that at the time of Deputy Berryman's actions, "it had not been adjudicated or determined that Plaintiff had violated any election laws; therefore it would be impossible for Defendant to be enforcing a law that legally had not been determined to have [been] violated").[12] These arguments are unpersuasive. A TRO or other court order is not a prerequisite for an investigative detention or arrest, where reasonable suspicion or probable cause otherwise can be established. Under plaintiff's logic, a wide range of investigative activity, which necessarily precedes the criminal prosecution of a defendant, could be rendered unlawful.

Second, plaintiff insists that he was convicted only "because the treasurer listed on the literature, Charles Summers, falsely testified that Plaintiff did not have permission to use his name." Opp. at 21. *See also* Surreply at 15 (asserting that, in the absence of Summers' "perjured testimony," the Sample Ballot "would have been in total conformance with the law"). Arguably, that assertion amounts to a legal conclusion couched as a factual allegation, of the sort

---

[12] This argument raised by plaintiff may derive from First Amendment cases concerning purportedly obscene materials, for which there exist certain "procedural safeguards [that] must be employed before expressive materials can be seized as 'obscene.'" *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 62 (1989) (concluding that the seizure of "literally thousands of books and films" was improper, as it occurred before any determination that the materials were "obscene").

that this Court is not required to accept as true. *See Papasan*, *supra*, 478 U.S. at 286.[13] And, any claim based upon Summers's purported perjury, if raised, did not prevail in the Maryland state appellate courts; plaintiff's criminal conviction was affirmed on appeal.

As to the First Amendment claims, plaintiff argues that Senator Muse, through his direct actions and in collaboration with the Sheriff's Department, violated plaintiff's rights by interfering with the distribution of the Sample Ballot.  Likewise, plaintiff insists that Deputy Berryman's "seizure of Plaintiff's sample ballot violated Plaintiff's right to disseminate core political speech."  Opp. at 19.[14]  However, what plaintiff's allegations do not establish is how a First Amendment violation occurs where defendants' actions targeted a Sample Ballot shown to violate Maryland election law.  That is particularly so where plaintiff has offered only a wholly conclusory theory as to why the Sample Ballot was lawful as of September 6, 2010, and where plaintiff has not questioned the constitutionality of E.L. § 13-401(a).

---

[13] Plaintiff's argument also rings hollow in light of his allegations in Count IV that enforcement action should have been taken against other candidates and campaign committees for what plaintiff portrays as the exact same conduct for which he was charged.  *See* Complaint ¶¶ 84-91.

[14] The Complaint contains no direct allegation that Deputy Berryman herself seized any copies of the Sample Ballot.  Rather, plaintiff alleges, in the context of his claims against Senator Muse, that, "[u]nder the direction of" Muse, "the Sheriff's deputies intimidated Plaintiff and his supporters by," among other things, "confiscating their literature[.]"  Complaint ¶ 58.  Although plaintiff raises a number of specific allegations against Deputy Berryman, *see id.* ¶¶ 61-66, absent from those allegations are any indication that she seized any copies of the Sample Ballot.  Defendants do not address the seizure or confiscation in their Motion or Reply.  Notably, in the Opposition, plaintiff asserts that Deputy Berryman did, in fact, seize copies of the Sample Ballot. *See* Opp. at 19; *see also id.* at 17.  However, plaintiff cannot supplement the allegations found in his Complaint by adding allegations through the Opposition.  *See Mylan Laboratories, Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1068 (D. Md. 1991) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101 (7th Cir. 1984)), *aff'd*, 2 F.3d 56 (4th Cir. 1993); *see also Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997), *aff'd*, 141 F.3d 1162 (4th Cir. 1998).

One question relevant to the Fourth Amendment aspect of plaintiff's claims is whether the Sample Ballot's illegality was established at the time of defendants' actions on September 6, 2010.  In this regard, the parties sharply disagree as to whether the Sample Ballot was facially unlawful.  Defendants argue that, "[o]n their face," plaintiff's Sample Ballots violated E.L. § 13-401(a)(1).  *See* Mem. at 11-12.  Under that provision, the "authority line" of such materials is generally required to include "the name and address of the treasurer of each campaign finance entity responsible for the campaign material[.]"  The Sample Ballot attached to the Complaint plainly contains no address information.  *See* Complaint Exh. D.  Plaintiff disputes defendants' characterization, arguing that it was "literally impossible" for an officer to believe that the Sample Ballot was defective and that, to the contrary, the Sample Ballot "on its[] face was clearly compl[ia]nt with § 13-401(a)(1)."  *See* Opp. at 21.  Significantly, E.L. § 13-401(a)(2) provides: "The authority line may omit an address that is on file with the State Board or a local board."  To be sure, plaintiff does not allege that such an address was on file.  Nevertheless, it does appear, in light of that exception, that the Sample Ballot's illegality was not necessarily apparent on its face.

In any event, the issue of the Sample Ballot's facial legality is not dispositive.  This is because plaintiff's own allegations indicate that the deputies' actions followed one or more reports, including by Senator Muse, that the Sample Ballot being distributed was illegal.  Because Senator Muse was present on the scene, defendants say, Deputy Berryman would have been able to assess his credibility, a factor that, in defendants' view, supports the reasonableness of the deputy's actions.  *See* Reply at 10 (citing *United States v. Griffin*, 589 F.3d 148, 152 (4th Cir. 2009) (factors relevant to whether an informant's tip supports reasonable suspicion include

whether "the officer had the opportunity to observe the informant's credibility and demeanor";

"whether the officer could later hold the informant accountable for making false accusations";

and "whether the informant reported to the police in public, exposing himself to retaliation from

the suspect and increasing the informant's reliability"), *cert. denied*, ___ U.S. ___, 131 S. Ct.

1599 (2011)).  *See also, e.g.*, *United States v. Lawing*, 703 F.3d 229, 236 (4th Cir. 2012)

(reasonable suspicion existed where confidential informant "had relayed information to the

police in a face-to-face setting thereby affording them the clear ability to judge his credibility

and corroborate the information he provided"), *cert. denied*, ___ U.S. ___, 133 S. Ct. 1851

(2013); *United States v. Perkins*, 363 F.3d 317, 323 (4th Cir. 2004) (in a face-to-face encounter

with an informant, police can "judge the credibility of the tipster firsthand and thus confirm

whether the tip is sufficiently reliable to support reasonable suspicion"), *cert. denied*, 543 U.S.

1056 (2005); *United States v. Miller*, 925 F.2d 695, 699 (4th Cir. 1991) (probable cause existed

where police sufficiently corroborated a tip from an unknown informant), *cert. denied*, 502 U.S.

833 (1991).

Plaintiff's allegations also indicate that Deputy Berryman observed plaintiff and his

supporters engaging in the distribution of the Sample Ballots.  Under Maryland law, "[a] police

officer may arrest without a warrant a person who commits or attempts to commit a felony or

misdemeanor in the presence or within the view of the police officer."  Md. Code (2008 Repl.

Vol., 2013 Supp.), § 2-202 of the Criminal Procedure Article ("C.P.").  Although a violation of

E.L. § 13-401(a) is only a misdemeanor, *see id.* § 13-603, it is an offense that occurred in view of

the deputy, and for which arrest is authorized under C.P. § 2-202.  Notably, plaintiff alleges that

the deputies threatened him and his supporters with arrest, but he does not allege that either he or any supporter was actually placed under arrest.

Also relevant to the Fourth Amendment aspect of Count I is plaintiff's allegation that Deputy Berryman "acted solely based on Senator Muse's false allegations." Opp. at 18-19. However, in my view, plaintiff has failed to allege facts plausibly showing how Senator Muse's allegations were false. After all, plaintiff was convicted of three election law counts in connection with his distribution of the Sample Ballot. And, in support of plaintiff's claim that the Sample Ballot was legal as of September 6, 2010, plaintiff has offered nothing more than a bald claim that he was convicted only because of perjured testimony from Charles Summers.

Regarding the other assertions that plaintiff levies against Deputy Berryman, I am not persuaded that he has identified any constitutional violation based on vague allegations of her purported "harassment" of plaintiff. *See* Complaint ¶ 65. *Cf. Carter*, *supra*, 179 F. Supp. 2d at 546 (officer's "rude, unprofessional, and overly aggressive" conduct did not undermine probable cause or pose a barrier to qualified immunity). To the extent that plaintiff alleges that Deputy Berryman questioned *plaintiff* (as opposed to only his supporters) regarding his citizenship status, and it is far from clear that he does, *see* Complaint ¶ 64, plaintiff's allegations fail plausibly to allege any constitutional violation based on that conduct. *See Muehler v. Mena*, 544 U.S. 93, 100-101 (2005). Moreover, in the Opposition, plaintiff fails to raise any argument in response to defendants' claim that such questioning did not violate a constitutional right of Mathis. Rather, plaintiff merely reiterates his factual allegation found in the Complaint. *See* Opp. at 17, 19. As such, plaintiff has abandoned that aspect of his claim.

Finally, even assuming that plaintiff has plausibly identified a constitutional violation by Deputy Berryman, she would be entitled to qualified immunity in connection with her conduct at the Oxon Hill library.  Qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law," and it safeguards "law enforcement officers from bad guesses in gray areas," by "ensur[ing] that they are liable only for transgressing bright lines."  *Waterman v. Batton*, 393 F.3d 471, 476 (4th Cir. 2005) (citations and quotation marks omitted).  *See Malley v. Briggs*, 475 U.S. 335, 341 (1986); *Occupy Columbia v. Haley*, 738 F.3d 107, 118 (4th Cir. 2013).  Here, plaintiff fails to allege facts to show that a reasonable official in Deputy Berryman's shoes would have understood that the challenged conduct was unlawful.  *See Reichle*, 132 S. Ct. at 2093 (citation omitted).  Deputy Berryman did not transgress a bright line when, in response to a complaint about the legality of the Sample Ballot, she acted in the manner that plaintiff alleges.

F.  Count II

In connection with Count II, titled "False and Defamatory Statements against Plaintiff in the Press," plaintiff alleges that Attorney General Gansler "publicly accused [him] via press releases and press conferences of being guilty of fraud and fraudulent acts," even though "Plaintiff was never investigated, charged or prosecuted for fraud."  Complaint ¶ 69.  According to plaintiff, the "pre-trial publicity" created by Attorney General Gansler "destroyed the integrity of the trial resulting in Plaintiff's conviction."  *Id.* ¶ 75.  *See also id.* ¶ 77.  Plaintiff also alleges that Gansler's alleged misrepresentations to the press and the public caused "irreparable harm to Plaintiff's reputation and standing in the community"; "caused Plaintiff to suffer emotional distress"; and "irreparably destroyed Plaintiff's . . . ability to earn a livelihood."  Complaint ¶¶ 71, 78; *see generally id.* ¶¶ 67-80.

Defendants seek dismissal of Count II on the grounds that Attorney General Gansler is entitled to qualified immunity and for failure to state a claim.  Mem. at 15.  As both parties acknowledge, *see* Complaint ¶ 68, Mem. at 15, a prosecutor's statements to the press are subject to qualified immunity.  *See Buckley*, *supra*, 509 U.S. at 277-78; *Carter v. Burch*, 34 F.3d 257, 262 (4th Cir. 1994).

Significantly, in the section of the Opposition that purportedly pertains to Count II, *see* Opp. at 22-31, plaintiff does not refute defendants' legal arguments challenging the viability of Count II.   Instead, plaintiff raises arguments concerning an alleged conspiracy involving McDonough, Wherthey, Gansler, Muse, DeMarinis, and others associated with Maryland's "Democratic political machine," to thwart Mathis's "successful political campaign and his future pursuit of elected office."  Opp. at 24; *see generally id.* at 22-31.  Because the Opposition lacks any response to defendants' arguments that Count II fails to state a claim upon which relief may be granted, and that Attorney General Gansler is entitled to qualified immunity, dismissal of Count II is warranted.

In any event, Court II's allegations against Attorney General Gansler fail to state a claim. In connection with Count II, plaintiff relies on Exhibit F of the Complaint, which consists of two separate documents.  *See* Complaint ¶ 69.   The first is a press release, dated October 10, 2010, which announces the filing of criminal charges against Mr. Mathis, summarizes the allegations against him, and provides the maximum penalties associated with the charges.  *See id.* Exh. F. at 1.  Significantly, the press release makes no mention of "fraud."  Nor does it otherwise suggest that plaintiff's conduct amounted to fraud.  Moreover, the press release makes clear, in its

concluding sentence:   "A criminal charge is merely an accusation of wrongdoing and the defendant is presumed innocent unless the State proves his guilt beyond a reasonable doubt."  *Id.*

The second document found in Exhibit F is a news item that, like the press release, contains no statement attributable to the Attorney General stating that Mathis committed "fraud." *See id*. at 2-3 (Daniel Valentine, "Former Prince George's council candidate denies wrongdoing related to campaign fliers," Gazette.Net, Oct. 14, 2010, available at http://ww2.gazette.net/ stories/10142010/prinnew150108_32533.php (last accessed Aug. 7, 2014)).  Rather, the article indicates that a Gansler spokeswoman stated, with apparent reference to plaintiff's case: "'[Y]ou have to have a ballot authority . . . . In this case, it was all bogus.'"  Complaint Exh. at 3 (ellipsis in original).

Notably, "'pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial.'"  *Skilling v. United States*, 561 U.S. 358, 384 (2010) (quoting *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 554 (1976)).  Regarding Mathis's right to a fair trial, defendants argue that plaintiff fails to allege how he was deprived of that right.  Mem. at 15-16. To that end, defendants point out that the alleged statements attributed to Attorney General Gansler "do not contain any accusations of 'fraud.'"  *Id.* at 15.  Particularly given the mild nature of the statements at issue, defendants argue, and I agree, that plaintiff "failed to allege any facts that would raise an inference that he did not receive a fair trial," and therefore "failed to allege a deprivation of his federal rights."  Mem. at 15.

Defendants also argue that plaintiff has failed to state a claim based on his allegation that Gansler's statements resulted in "irreparable harm to Plaintiff's reputation and standing in the community" as well as his "ability to earn a livelihood."  Complaint ¶¶ 71, 78.  Of relevance to

that claim, in *Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 314-15 (4th Cir. 2012), the Fourth Circuit said:   "[T]he Supreme Court has required plaintiffs in cases involving allegedly defamatory statements by the government to show more than reputational injury in order to prevail on a constitutional claim."  This is because, under *Paul v. Davis*, 424 U.S. 693 (1976), "injury to reputation by itself [is] not a 'liberty' interest protected under the Fourteenth Amendment."  *Siegert v. Gilley*, 500 U.S. 226, 233 (1991).  Accordingly, because plaintiff has failed to allege how "his reputational injury was accompanied by a state action that 'distinctly altered or extinguished' his legal status," this aspect of Count II also fails to state a claim.  *See Shirvinski*, 673 F.3d at 315 (citing *Paul*, 424 U.S. at 711).

Further, to the extent plaintiff seeks in his Opposition to transform Count II into a vehicle to raise additional conspiracy allegations, that effort fails as both procedurally improper and inadequately pleaded.  Although the heading of Count II makes reference to "Civil Conspiracy," the remainder of Count II focuses on Attorney General Gansler's conduct in making allegedly false and defamatory statements to the press about Mr. Mathis.  By contrast, the portion of the Opposition that ostensibly pertains to Count II portrays an alleged conspiracy involving McDonough, Wherthey, Gansler, Muse, DeMarinis, and others associated with Maryland's "Democratic political machine," to block plaintiff's "successful political campaign and his future pursuit of elected office."  Opp. at 24; *see id.* at 22-31.  To the extent plaintiff seeks to amend his Complaint by adding new allegations by way of his Opposition, that effort must fail, as "'it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.'"  *Mylan Laboratories, Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1068 (D. Md. 1991) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984)), *aff'd*, 2

F.3d 56 (4th Cir. 1993); *see also Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998).

As for the substance of plaintiff's allegations, he has plainly failed to state an actionable conspiracy claim. With respect to claims for civil conspiracy brought under 42 U.S.C. § 1985(3), the Fourth Circuit has explained that, to state a claim, a plaintiff must show:

> "(1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy."

*A Society Without A Name*, *supra*, 655 F.3d at 346 (quoting *Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995)). Further, a plaintiff "'must show an agreement or a meeting of the minds by [the] defendants to violate the [plaintiff's] constitutional rights.'" *Id.* at 346 (quoting *Simmons*, 47 F.3d at 1377; modifications and quotation marks omitted in *A Society Without A Name*).

Similarly, "'[t]o establish a conspiracy claim under § 1983, a plaintiff 'must present evidence that [the defendants] acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [a] deprivation of a constitutional right." *Massey v. Ojaniit*, --- F.3d ----, 2014 WL 3563221, at *11 (4th Cir. July 21, 2014) (quoting *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996)). *Accord Glassman v. Arlington County, VA*, 628 F.3d 140, 150 (4th Cir. 2010). "An essential element for a claim of conspiracy to deprive Plaintiff of a constitutional right is an agreement to do so among the alleged co-conspirators." *Brightwell v. Moultrie*, 2013 WL 4495793, at *7 (D. Md. Aug. 19, 2013) (Chasanow, J.) (citing *Ballinger v. N.C. Agric. Extension Serv.*, 815 F.2d 1001, 1006-07 (4th Cir.), *cert. denied*, 484

U.S. 897 (1987)); *see also Simmons*, 47 F.3d at 1377 (noting that a conspiracy claimant "must show an agreement or a 'meeting of the minds' by defendants to violate the claimant's constitutional rights").  And, "'courts have [] required that plaintiffs alleging unlawful intent in conspiracy claims under § 1985(3) or § 1983 plead specific facts in a nonconclusory fashion to survive a motion to dismiss.'"  *Simmons*, 47 F.3d at 1377 (citation omitted; modification in *Simmons*).

In my view, plaintiff falls far short of pleading any "agreement or meeting of the minds" among defendants.  Notwithstanding the voluminous allegations and arguments found in the Complaint and in plaintiff's Opposition and Surreply, those assertions amount to little more than "'parallel conduct and a bare assertion of a conspiracy.'"  *A Society Without A Name*, 655 F.3d at 347 (quoting *Twombly*, *supra*, 550 U.S. at 556).  *See also, e.g.*, *Brightwell*, 2013 WL 4495793, at *7.  In addition, a § 1985(3) conspiracy claim requires the defendants to be "motivated by a specific *class-based*, invidiously discriminatory animus."  *See Simmons*, 47 F.3d at 1376 (emphasis added).  Plaintiff's "class of one" theory is not based on his membership in any protected class, however.  Therefore, the § 1985(3) aspect of his conspiracy claim must fail for that reason as well.  *See C & H Co. v. Richardson*, 78 F. App'x 894, 901-02 (4th Cir. 2003) (per curiam).  As such, the conspiracy portion of Count II must be dismissed.

G.  "Class of One"/"Selective Enforcement" claims (Counts I and III)

Plaintiff also alleges a violation of his rights under the Equal Protection Clause of the Fourteenth Amendment, as the member of a "class of one."  Although Count I focuses on the TRO Motion and the Oxon Hill library incident, plaintiff also raises equal protection and "Selective Enforcement" claims in that count.  *See* Complaint ¶ 14.  The heart of plaintiff's

- 48 -

"class of one" theory is found in Count III, which alleges unconstitutional "Selective Treatment" of plaintiff, as a "Class of One," in violation of his equal protection rights.  Specifically, plaintiff maintains that "while others similarly situated have not been proceeded against because of conduct of the type forming the basis of the charges against him, he has been singled out for prosecution and unlawful oppression."  Complaint ¶ 81.  To that end, plaintiff cites various complaints he filed with the Maryland Board of Elections, State Prosecutor, and Office of the Attorney General regarding the conduct of other political candidates, including Senator Muse and Attorney General Gansler, in their capacity as political candidates.  In plaintiff's view, those candidates committed the same acts that he did, yet faced lesser or no consequences for their conduct.  *See* Complaint ¶¶ 84-91.

Also in the context of Count III, plaintiff accuses Attorney General Gansler of "Investigative Misconduct" by prosecuting plaintiff while declining to investigate or prosecute other "similarly situated individuals or entities that violated the same election laws as the Plaintiff was charged with violating."  *See* Complaint ¶ 96; *see generally* ¶¶ 95-104.  Notably, although the paragraphs encompassing Count III cite only acts of DeMarinis and Gansler, plaintiff alleges that they "conspired with the other named defendants in this complaint to pursue the vindictive and malicious prosecution of Plaintiff . . . ."  *Id.* ¶ 93.

The Fourteenth Amendment's Equal Protection Clause "commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).  However, the Equal Protection Clause does not itself provide a private cause of action.

Rather, 42 U.S.C. § 1983 is the mechanism that "provides a cause of action for all citizens injured by an abridgment" of the Equal Protection Clause. *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 119-20 (1992).   As noted, 42 U.S.C. § 1983 establishes a cause of action against any "person" who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.

In *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000), the Supreme Court recognized that a plaintiff, although not invoking membership in a protected class, may prevail on an equal protection claim by showing "that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *See Sunrise Corp. of Myrtle Beach v. City of Myrtle Beach*, 420 F.3d 322, 328 (4th Cir. 2005)); *Maages Auditorium v. Prince George's County, Md.*, --- F. Supp. 2d ----, 2014 WL 884009, at *17 (D. Md. Mar. 5, 2014); *see also, e.g.*, *Lauth v. McCollum*, 424 F.3d 631, 633 (7th Cir. 2005) ("The paradigmatic 'class of one' case, [] sensibly conceived, is one in which a public official, with no conceivable basis for his action other than spite or some other improper motive (improper because unrelated to his public duties), comes down hard on a hapless private citizen.").

However, in *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591 (2008), the Supreme Court limited the availability of the "class of one" theory, concluding it does not apply in the context of public employment.  The Court reasoned, *id.* at 603:

> There are some forms of state action . . . which by their nature involve
> discretionary decisionmaking based on a vast array of subjective, individualized

assessments.  In such cases . . . treating like individuals differently is an accepted consequence of the discretion granted.  In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.

Taking a cue from the Supreme Court's reasoning, a number of courts have questioned whether "class of one" claims in the context of discretionary decision-making remain viable after *Engquist*.  *See, e.g.*, *Rapp v. Dutcher*, 557 F. App'x 444, 449 (6th Cir. 2014); *Flowers v. City of Minneapolis, Minn.*, 558 F.3d 794, 799-800 (8th Cir. 2009) ("[W]e conclude that while a police officer's investigative decisions remain subject to traditional class-based equal protection analysis, they may not be attacked in a class-of-one equal protection claim."); *United States v. Moore*, 543 F.3d 891, 898-99 (7th Cir. 2008) ("[A] class-of-one equal protection challenge . . . is just as much a 'poor fit' in the prosecutorial discretion context as in the public employment context" because "there is no readily apparent standard against which departures can be assessed for arbitrariness."); *see also Uzoukwu v. Prince George's Community College Bd. of Trustees*, 2013 WL 4442289, at *9-10 (D. Md. Aug. 15, 2013) (Chasanow, J.) (dismissing class-of-one equal protection claim as not viable after *Engquist* in the public education context).

To date, the Fourth Circuit has not addressed the impact of *Engquist* on the viability of class-of-one equal protection claims.  *See Sansotta v. Town of Nags Head*, 724 F.3d 533, 542 n.13 (4th Cir. 2013) (observing that other circuits have discussed the impact of *Engquist* on class-of-one claims, but concluding that "such discussion is not necessary to resolving the claim before us").  Nevertheless, subsequent to *Engquist*, the approaches of other courts cast significant doubt on the viability of a class-of-one theory in this context.

Even assuming, *arguendo*, that a "class of one" equal protection claim remains viable, defendants argue that this claim must be dismissed, *see* Mem. at 17, because plaintiff has failed

adequately to allege that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Olech*, 528 U.S. at 564 (quotation marks omitted). *See also Rapp*, 557 F. App'x at 449-50 (assuming that a "class of one" claim survives *Engquist*, a plaintiff "must plead and prove" both intentional mistreatment and a lack of a rational basis for a difference in treatment, by alleging "enough factual matter to plausibly show there was not '*any* conceivable basis' that rationally supported the enforcement of the" provisions at issue) (emphasis in original; citation omitted).

Before turning to the substance of plaintiff's allegations, I pause to comment on plaintiff's conspiracy claims relating to defendants' alleged selective enforcement. As indicated with regard to the conspiracy allegations in Count II, the Fourth Circuit has explained that, in order to state a claim for a civil conspiracy under § 1985(3), a plaintiff must show, *inter alia*, "'an agreement or a meeting of the minds by [the] defendants to violate the [plaintiff's] constitutional rights.'" *A Society Without A Name*, *supra*, 655 F.3d at 346 (quoting *Simmons*, *supra*, 47 F.3d at 1377; modifications and quotation marks omitted in *A Society Without A Name*). In my view, plaintiff has plainly failed to plead any "agreement or meeting of the minds" pertaining to selective enforcement against Mathis. Notwithstanding the voluminous allegations and arguments found in the Complaint and in plaintiff's Opposition and Surreply, those assertions amount to little more than "'parallel conduct and a bare assertion of a conspiracy.'" *A Society Without A Name*, 655 F.3d at 347 (quoting *Twombly*, *supra*, 550 U.S. at 556). *See also, e.g.*, *Brightwell*, 2013 WL 4495793, at *7. Accordingly, that aspect of Count III must be dismissed.

Regarding Mr. DeMarinis, identified as the Director of Candidacy and Campaign Finance for the Maryland State Board of Elections, defendants argue that plaintiff fails to allege any enforcement action by DeMarinis taken against Mathis, and that plaintiff cannot state a viable claim wholly premised on DeMarinis's failure to take action against others.  Mem. at 18.  Of relevance to that final point, the Supreme Court concluded in *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973): "[I]n American jurisprudence at least, a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."

In the Opposition, plaintiff disputes defendant's claim that DeMarinis took no enforcement action against him.  Opp. at 33.  In particular, plaintiff insists that DeMarinis, "in his capacity as Director of Candidacy and Finance for the board of elections is the individual responsible for initiating any investigative or enforcement action," and thus was the "'moving force' behind the investigative and enforcement actions perpetrated against the Plaintiff."  *Id.* Plaintiff also asserts: "DeMarinis admitted in Court testimony that he received and reviewed complaints against Plaintiff and his organization, Citizens for Change, for alleged distribution of fraudulent campaign material."  Opp. at 34.  However, these allegations are absent from the Complaint.  As stated earlier, "'it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.'"  *Mylan Laboratories, Inc.*, 770 F. Supp. at 1068 (quoting *Car Carriers, Inc.*, 745 F.2d at 1107); *see also Zachair Ltd.*, 965 F. Supp. at 748 n.4.

Plaintiff also insists in the Opposition that DeMarinis "did not refer Plaintiff's complaints against similarly situated individuals to either" the State Prosecutor or the Office of the Attorney General.  Opp. at 34.  That assertion, however, is contradicted by plaintiff's own allegations in the Complaint.  Specifically, plaintiff alleges that he "filed a specific complaint against Senator

C. Ant[h]ony Muse with the Maryland Board of Elections" and others, alleging that Muse committed "the exact same violation of the election law that Plaintiff was charged, prosecuted and convicted of"; that the "Maryland Board of Elections as required by law also forwarded this election violation by Senator Muse to the State Prosecutor's office"; and that it was the Office of the State Prosecutor—which is not a defendant in this suit—that "declined to prosecute Senator Muse." Complaint ¶¶ 87-88. *See also id.* Exh. J (memorandum from DeMarinis, dated Oct. 23, 2010, indicating that alleged authority line violation by campaign committee associated with Senator Muse had been referred by DeMarinis to the Office of the State Prosecutor).

As indicated, defendants also argue that dismissal of plaintiff's selective enforcement and class-of-one allegations is required because plaintiff has failed adequately to allege that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Olech*, 528 U.S. at 564. In his Complaint and briefing, plaintiff cites multiple examples of acts by other candidates and campaign committees that, in his view, were no different than the conduct for which he was charged. However, in several instances, plaintiff has merely alleged in conclusory terms that another candidate committed, yet was not prosecuted for, the same election law violation as Mathis. *See* Complaint ¶ 84 & Exh. H (regarding alleged violation by Obie Patterson); Complaint ¶ 86 & Exh. I at 3-5, 9 (regarding alleged violations by Archie O'Neil, Mark Spencer, Steven Morris, C. Anthony Muse, Obie Patterson, and Jay Walker); Complaint Exh. L. at 1-2 (regarding alleged violations by Melvin High and Michael Jackson). Moreover, among several of the other candidates and entities, plaintiff alleges that some violated only *other* provisions of Maryland election law. *See* Complaint ¶ 90 (alleging that Gansler violated E.L. § 13-235); *id.* ¶ 91 & Exh. I at 6 (alleging

that Muse violated E.L. §§ 13-202 and 13-207); *see also* Exh. I at 11-12 (alleging violations of E.L. §§ 229 and 601).

Plaintiff's assertions regarding Senator Muse are also illustrative.  Specifically, plaintiff maintains that, although Muse committed "the exact same violation of the election law that Plaintiff was charged, prosecuted and convicted of," Muse's campaign committee was given an opportunity "to bring their campaign literature in compliance with the law within thirty (30) days."  Complaint ¶ 87 (citing *id.* Exh. J at 1).

However, as plaintiff's own allegations and exhibits reflect, it is apparent that Senator Muse and other associated candidates purportedly engaged in conduct distinct from the allegations that Mathis faced.  As reflected in a letter sent by Mathis to the Office of the Attorney General, dated November 10, 2010, Senator Muse's campaign materials bore the name of a campaign committee similar to one that, by the time of Mathis's complaints, had already registered with the State.  *See* Complaint Exh. N (ECF 1-14) at 3 (acknowledging that the "26th District Slate" registered with the State on September 1, 2010); *id.* Exh. I at 2 (same); *see also* Complaint ¶ 22.   Also relevant is a letter from the Office of the State Prosecutor, dated November 2, 2010, *see* Complaint Exh. K (ECF 1-11), which provided three reasons as to why the State Prosecutor was declining to bring charges against Senator Muse's campaign committee:

> This Office has reviewed the campaign committee's materials and found them to be substantially in compliance with the Election Law Article's authority line strictures.  As the committee has not been previously referred to this office for any such violations and appears to be making every effort to comply with the spirit, if not the letter of the law, this office is declining to prosecute in this matter.

In contrast, as plaintiff acknowledges, a press release from the Office of the Attorney General "stated that one of the reasons Plaintiff was being prosecuted was because 'Citizens for

Change . . . is not registered with the State Board of Elections, and does not exist as a campaign finance entity in Maryland [as] defined under Maryland [l]aw.'"  Complaint ¶ 92 (quoting *id.* Exh. O at 3, ECF 1-15, press release dated Oct. 8, 2010).  Indeed, plaintiff never alleges that Citizens for Change ever registered with the State.  To the contrary, a news article that plaintiff attached to the Complaint states:  "Mathis said a resident group," which he apparently believed Citizens for Change qualified as, "does not have to be registered with the board of elections to circulate campaign literature because it's freedom of speech."  Complaint Exh. E at 3.  Another aspect of plaintiff's Sample Ballot, referenced in a number of exhibits, is that the ballot suggests that candidates have endorsed other candidates who they did not, in fact, support.  *See, e.g.*, TRO Motion at 2; Complaint Exh. E. at 1-3 (news articles).

In other words, plaintiff's own allegations reflect several factors, which he has not disputed, that differentiate his conduct from the acts of the other candidates whose conduct he cites in connection with the "class of one" claim.  Given these circumstances, plaintiff falls well short of alleging "enough factual matter to plausibly show there was not '*any* conceivable basis' that rationally supported the enforcement of" Maryland election law.  *See Rapp*, 557 F. App'x at 449-50; *see also, e.g.*, *Herman v. Lackey*, 309 F. App'x 778, 785 (4th Cir. 2009) (per curiam) (affirming dismissal of "class of one" equal protection claim, where "'one can easily hypothesize 'rational' scenarios for [defendant's] alleged conduct'") (quoting district court opinion).[15]

---

[15] Defendants maintain that plaintiff's State conviction bars any malicious prosecution claim. Mem. at 21 n.5. In his Surreply, plaintiff disputes that he is pursuing a claim of malicious prosecution. *Id.* at 19-20. In any event, the Fourth Circuit addressed malicious prosecution claims in *Snider v. Seung Lee*, 584 F.3d 193, 199 (4th Cir. 2009) (citations omitted), explaining that although "it is not entirely clear whether [there is] a separate constitutional right to be free from malicious prosecution, if there is such a right, the plaintiff must demonstrate . . . favorable

Defendants also argue, *see* Mem. at 17, and I agree, that to the extent plaintiff has stated a "class of one" equal protection claim, they are entitled to qualified immunity in connection with their enforcement decisions. Given the uncertainty after *Engquist* regarding "class-of-one" claims, and the discretionary and individualized nature of decision-making in the context of enforcing Maryland's election laws, I am persuaded that plaintiff has failed to allege any right that, for a member of a "class of one," was "sufficiently clear" such that "'every reasonable official would [have understood] that" their enforcement actions "'violate[d] that right.'" *Reichle*, *supra*, 132 S. Ct. at 2093 (2012) (citation omitted). Accordingly, plaintiff's "class of one" equal protection claims raised in Counts I and III will be dismissed.

H.  Count IV

In Count IV, plaintiff raises a Fourteenth Amendment due process claim under § 1983 against Attorney General Gansler, based upon an alleged lack of jurisdiction to criminally prosecute plaintiff in State court. *See* Complaint ¶¶ 105-15. In particular, plaintiff insists that the Office of the State Prosecutor or a State's Attorney's Office, rather than the Office of the Attorney General, is authorized to prosecute alleged election law violations. *See id.* ¶¶ 107-08. In this regard, he cites several provision of the Election Law Article, § 602(c) and § 13-604(b), as well as the State Government Article, §§ 9-1203 to 1205. Complaint ¶ 107. Indeed, E.L. § 602(c) and § 13-604(b) refer to criminal and civil enforcement by the State Prosecutor and by a State's Attorney, but not by the Attorney General. As for the three State Government Article provisions, §§ 9-1203 to 1205, those provisions were repealed as of 2008 and replaced by

termination of the criminal proceeding . . . ." Because plaintiff does not allege that his State conviction was reversed, a malicious prosecution claim must fail.

Criminal Law Article, §§ 14-107 through 109, which address the authority of the Office of the State Prosecutor.

Also relevant is an exhibit attached to plaintiff's Opposition as Exhibit B (ECF 11-2), a letter dated September 7, 2010.  In that letter, the State's Attorney for Prince George's County, Glenn F. Ivey, wrote to Attorney General Gansler under the subject line, "Fake Sample Ballots." In the letter, Ivey advised:  "While my office handles criminal prosecutions, I believe that your office [that is, the Attorney General's Office] is best suited to pursue the possible prosecution of" individuals involved with the "[f]ake sample ballots."  *Id.*  Further, Ivey stated: "Since I am active in [Prince George's] County politics and candidates whom I have endorsed may be affected, my recusal from the investigation and possible prosecution in this matter is appropriate."  *Id.*

In the Motion, defendants argue that Count IV amounts to an effort by plaintiff to challenge and "relitigate" his State criminal case.  Mem. at 21.  Defendants observe that plaintiff does not allege any procedural violation that occurred in the course of his criminal trial and, further, that plaintiff "acknowledges that the State's Attorney or Office of the State Prosecutor could have prosecuted him for the same conduct."  Mem. at 22 (citing Complaint ¶ 107).  If plaintiff believed jurisdiction was lacking, defendants say, the "proper forum for bringing this jurisdictional challenge was in the State court proceedings."  Mem. at 22.  According to defendants, because plaintiff has, at most, alleged a violation of *state* law by Gansler, he fails to identify any *federal* right of which he has been deprived.  *See id.*

In neither the Opposition nor the Surreply does plaintiff offer any argument in response to defendants' well stated contentions.  Count IV will be dismissed.  *See Ferdinand-Davenport*, *supra*, 742 F. Supp. 2d at 777; *Mentch*, *supra*, 949 F. Supp. at 1247.

I.  With or without prejudice

The only remaining question is whether the Complaint should be dismissed with or without prejudice.  Defendants seek dismissal of the Complaint in its entirety, with prejudice.  Mem. at 22; Reply at 14.  Plaintiff does not address this question in either the Opposition or the Surreply.

Denial of leave to amend is appropriate where "'the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile.'"  *Edwards*, *supra*, 178 F.3d at 242 (quoting *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986)).  *See Anand*, *supra*, 2014 WL 2535405, at *4; *Balas v. Huntington Ingalls Industries, Inc.*, 711 F.3d 401, 409 (4th Cir. 2013); *Green v. Wells Fargo Bank, N.A.*, 927 F. Supp. 2d 244, 257 (D. Md. 2013).

With respect to Count II and Count IV, plaintiff has effectively abandoned his claims.  Because plaintiff has failed to pursue those counts at this stage, dismissal with prejudice undoubtedly is appropriate.  As for plaintiff's conspiracy allegations, raised primarily in Count II and Count III, plaintiff has failed, despite supplementing his allegations through the Opposition and Surreply, to allege the elements of any actual conspiracy.  Dismissal of his conspiracy claims under 42 U.S.C. § 1983 and 1985(3), with prejudice, is warranted.  Nor is it apparent how plaintiff could cure the defects found in his claims in Count I pertaining to the TRO Motion or in

his "class of one" claims in Counts I and III pertaining to selective enforcement, particularly given the protections afforded by absolute and qualified immunity.

Plaintiff's allegations in Count I concerning Senator Muse and Deputy Berryman present a closer question.  In my view, it is not certain that amendment would prove futile, and thus dismissal with prejudice is premature.  In the event plaintiff wishes to amend that aspect of Count I, he must file an amended complaint within 21 days of the date of this Memorandum Opinion.  If no amended complaint is filed by that time, the claims in Count I against Senator Muse and Deputy Berryman will be dismissed, with prejudice.

### IV.  Conclusion

For the foregoing reasons, defendants' Motion (ECF 9) will be granted.  A separate Order follows, consistent with this Memorandum Opinion.


Date:   August 7, 2014                                _____/s/_____
                                                      Ellen Lipton Hollander
                                                      United States District Judge