IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JERRY J. MATHIS,

*Plaintiff,*

v.                                                    Civil Action No. ELH-13-2597

JOHN P. MCDONOUGH, *et al.*,

*Defendants.*

**MEMORANDUM OPINION**

Plaintiff Jerry J. Mathis, who is self-represented, filed suit individually and "as a representative of the Organization, 'Citizens for Change,'" against various Maryland public officials and employees.[1]  *See* ECF 1 at 1 ("Complaint").  In his Amended Complaint (ECF 18, "Amended Complaint" or "Am. Complaint"), plaintiff raises claims pursuant to 42 U.S.C. § 1983 against Maryland State Senator C. Anthony Muse and Prince George's County Deputy Sheriff L. Berryman, in their individual and official capacities.  ECF 18 at 1, Am. Complaint.  In particular, Mathis alleges "Deprivation of Constitutional Rights Guaranteed by the 1st, 4th and 14th Amendments to the United States Constitution Under Color of State Law."  *Id.* at 3.  Plaintiff seeks an award of both compensatory and punitive damages.  *Id.* at 8 ¶¶ 1, 2 (Prayer for Relief).

Plaintiff's suit arises from his candidacy for the Prince George's[2] County Council during

---

[1] Defendants have not challenged plaintiff's right, as a self-represented litigant, to bring claims "as a representative of" an organization, "Citizens for Change."  ECF 18 at 1, Am. Complaint.  Given the disposition here, I need not address whether plaintiff may bring claims on behalf of "Citizens for Change."

[2] Throughout the record in this case, Prince George's County is also spelled as "Prince Georges County," without an apostrophe.

the 2010 Democratic primary election.  The primary was held on September 14, 2010, but also

included a period of early voting that began on September 6, 2010.  *Id.* ¶¶ 7-8, 10.  According to

Mathis, defendants violated his constitutional rights by interfering with his distribution of his

sample ballot ("Sample Ballot") on the first day of early voting.  *Id.* ¶¶ 19, 21.[3]

Two motions are pending.    First, Berryman and Muse have moved to dismiss the

Amended Complaint (ECF 21), supported by a memorandum of law (ECF 21-2, "Memorandum"

or "Def. Memo.") (collectively with ECF 21, the "Motion" or "Motion to Dismiss").  Plaintiff

opposes the Motion (ECF 25, "Opposition"), and appended five exhibits to the Opposition.  *See*

ECF 25-1 through ECF 25-5.[4]  Defendants have replied (ECF 26, "Reply").  Second, plaintiff

has filed a "Motion for Leave to Amend Complaint (Second Amended Complaint)" (ECF 27,

_____

[3] Subject matter jurisdiction is founded on 28 U.S.C. § 1331.  With his original
Complaint, plaintiff submitted sixteen exhibits, including several news articles about the events
of September 6, 2010, which gave rise to this suit, and several state court documents.  These
include the Temporary Restraining Order issued by Judge Martin in *McDonough v. Citizens for
Change, Inc.*, No. CAL10-29052, Circuit Court for Prince George's County (Sept. 7, 2010)
(prohibiting the distribution of Mathis's Sample Ballot that is the subject of this suit), ECF 1-2;
Criminal Information, *State of Maryland v. Mathis*, No. CT101224X, Circuit Court for Prince
George's County (Oct. 1, 2010) (setting forth charges against Mathis for violations of Maryland
election law), ECF 1-7.  The exhibits were not resubmitted with the Amended Complaint.

[4] The five exhibits submitted with the Opposition include a total of seven documents: a
*Gazette* article entitled "Muse investigates 'fake' campaign ballots," (Sept. 22, 2010), ECF 25-1;
the first page of Mathis's Sample Ballot, ECF 25-2; Memorandum dated September 21, 2010,
from Corporal Sha S. Brown to Dan Barnett, Assistant Attorney General, Chief of the Criminal
Division of the Office of the Attorney General, ECF 25-3; Memorandum dated September 22,
2010, from Corporal Sha S. Brown to Dan Barnett, Assistant Attorney General, Chief of the
Criminal Division of the Office of the Attorney General, ECF 25-4; Senator Muse's sample
ballot, ECF 25-5 at 2; a *Gazette* article entitled "Muse's allegations of campaign fraud mirror
own complaint, Board of Elections reviewing claim senator's slate not properly registered,"
(Sept. 16, 2010), *id.* at 3; Memorandum dated October 23, 2010, from Jared DeMarinis, Director
of the Maryland State Board of Elections ("MSBE"), Division of Candidacy and Campaign
Finance to Denise Tyler, MSBE Chairman, Sharon L. Brandon, MSBE Treasurer, and Senator
Muse.  *Id.* at 4.  Plaintiff submitted the last three documents together as ECF 25-5.

"Motion to Amend"), supported by four exhibits.[5]   *See* ECF 27-1 and ECF 27-3 through ECF 27-5.   The Motion to Amend was filed after the briefing of the Motion to Dismiss.   *See* ECF 21, Motion; ECF 27, Motion to Amend.   Defendant opposes the Motion to Amend.   ECF 28.

No hearing is necessary to resolve the motions.   *See* Local Rule 105.6.   For the reasons that follow, I will grant in part and deny in part defendants' Motion to Dismiss (ECF 21), and deny plaintiff's Motion to Amend (ECF 27).

## I.   Procedural Background

In his initial Complaint, plaintiff sued several defendants in their individual and official capacities: Secretary of State John P. McDonough; Assistant Attorney General Kathleen E. Wherthey; Attorney General Douglas F. Gansler; State Senator Muse; Deputy L. Berryman; Jared DeMarinis, a Director of the Maryland State Board of Elections; and Prince George's County Circuit Court Judge Larnzell Martin, Jr.   *See* ECF 1 at 1, Complaint.   The original Complaint contained four counts.   Count I, brought pursuant to 42 U.S.C. § 1983, alleged "Deprivation of Constitutional Rights under Color of State Law," including plaintiff's rights under the First, Fourth, Sixth, and Fourteenth Amendments of the Constitution, and cited alleged acts of defendants McDonough, Wherthey, Gansler, Muse, Berryman, and Judge Martin.   *Id.* at 4.   Count II, brought pursuant to "42 U.S.C. § 1983-1996," alleged "Civil Conspiracy to Interfere with Constitutional Rights under color of state law in violation of Plaintiff's rights [under the] 1st, 6th and 14th Amendment," and cited acts of defendant Gansler.   *Id.* at 16.   Count III, brought

---

[5]   The four exhibits are as follows: "Notice of Constitutional Question," ECF 27-1; Excerpt from Legal Opinion of J. Joseph Curran, Jr., Attorney General, and Jack Schwartz, Chief Counsel, dated May 16, 1995, ECF 27-3; *Supplemental Summary Guide, Maryland Candidacy & Campaign Finance Laws*, Linda H. Lamone, MSBE Administrator (Nov. 2005), ECF 27-4; "Notice of Constitutional Question," ECF 27-5.   Plaintiff submitted the "Notice of Constitutional Question" twice.   ECF 27-1; ECF 27-5.

pursuant to 42 U.S.C. § 1983, alleged "Selective Treatment under Color of State Law and Equal Protection of the Law, 14th Amendment to the United States Constitution guaranteeing Equal Protection of the Law," and cited acts of defendants DeMarinis and Gansler.  *Id.* at 20.  Count IV, brought pursuant to 42 U.S.C. § 1983, alleged "Violation of 14th Amendment to the United States Constitution guaranteeing DUE PROCESS OF LAW," based upon a "Lack of Jurisdiction to Prosecute – Administrative and Investigative Misconduct," and cited acts of defendant Gansler.  *Id.* at 27.  Plaintiff's Sample Ballot, which is central to the parties' dispute, was submitted as an exhibit to the Complaint.  ECF 1-4.[6]  And, the first page of the Sample Ballot is appended to the Opposition.  ECF 25-2.

By Order dated September 11, 2013 (ECF 2), Judge Alexander Williams, to whom this case was initially assigned, dismissed Judge Martin as a defendant, *sua sponte*, on the ground that Judge Martin was entitled to judicial immunity, ECF 2 at 1-2, in connection with "actions taken in his capacity as a state court judge."  *Id.* at 1 n.1 (citing *Stump v. Sparkman*, 435 U.S. 349, 356-57 (1978)).  In a Memorandum Opinion (ECF 16) and Order (ECF 17) dated August 7, 2014, I dismissed all counts against all defendants with prejudice, except for Count I as to Deputy Berryman and Senator Muse, which was dismissed without prejudice.  ECF 16 at 59-60, Memorandum Opinion; ECF 17, Order.  As to the two remaining defendants, I granted plaintiff leave to amend Count I.  ECF 17 ¶ 3, Order.  Plaintiff timely filed his Amended Complaint.  ECF 18, Am. Complaint.

---

[6] Although the Sample Ballot was not attached to the Amended Complaint, it remains part of the record in this case.  ECF 1-4; ECF 25-2.

## II.    Factual Background[7]

As noted, in 2010, Mathis sought the Democratic nomination for a seat on the Prince George's County Council.  ECF 18 ¶¶ 7, 9, Am. Complaint.  Muse also ran for reelection in 2010.  *Id.* ¶ 5.  Although Mathis describes himself as "one of the top candidates" for the office he sought, he was defeated in the Democratic primary election by Obie Patterson.  *Id.* ¶ 9.  Mathis characterizes Patterson as "[t]he preferred candidate of the Democratic machine and Senator C. Anthony Muse  . . . ."  *Id.*

During the primary campaign, Mathis, in his capacity "as a representative of the community group, Citizens for Change, participated in the production and distribution" of a Sample Ballot.  *Id.* ¶ 7.  The Sample Ballot purports to be the "Official Democratic Ballot" for the "26th District [of] Prince Georges County," with a photograph of then Governor Martin O'Malley and then Lieutenant Governor Anthony Brown, among others.  ECF 1-4 at 1, Sample Ballot.  It contains the names of various candidates, with certain boxes checked.  *Id.* at 3-4.  For example, for the office of State Senator, both Albert Chatmon and C. Anthony Muse are listed.  *Id.* at 3.  But, there is an "X" in the checkbox for Chatmon.  Seven candidates are listed for Councilman in District 8, and plaintiff's name is the only one with a check mark.  *Id.*

On the back page, the Sample Ballot states, in small type: "By Authority, Citizens for Change, Charles Summers, Treasurer."  *Id.* at 1.  On the same page, the document also contains the following address:

Democrats 2010

---

[7] The Factual Background is drawn largely from the Amended Complaint.  To the extent relevant, I have also incorporated parts of the factual summary set forth in my Memorandum Opinion of August 7, 2014.  ECF 16.

26th District
1300 Mercantile Lane
Largo, MD 20774

Mathis asserts that the Sample Ballot "presented a direct challenge to Defendant Muse's slate of candidates . . . ."  ECF 18 ¶ 17, Am. Complaint.  As to the purpose behind the Sample Ballot, plaintiff explains, *id.* ¶ 7:

> Plaintiff has been an outspoken critic of slate and sample ballot tactics used by the Democratic political machine as a tool to mislead voters and ensure their odds of winning elections.  Plaintiff's production of the sample ballot with alternative candidates for office was purposely designed to change the dynamics of how the Democratic machine intentionally misled voters for the machine's preferred candidates.

Plaintiff's allegations focus on an incident concerning the distribution of his Sample Ballot that occurred on September 6, 2010, at the Oxon Hill Library, a public library in Prince George's County, on the first day of early voting for the primary election.  *Id.* ¶¶ 12, 18.  One news article characterized the events in question as a "heated confrontation" involving several candidates and their supporters.  ECF 1-5 at 2, "Muse investigates 'fake' campaign ballots," *Gazette* (Sept. 22, 2010).[8]

As to defendants' particular role in these events, plaintiff alleges that Senator Muse "objected to Plaintiff's sample ballot . . . ."  ECF 18 ¶ 11, Am. Complaint.  Further, he avers that Senator Muse "falsely stated that only he as the Senator was authorized to produce and distribute a sample ballot."  *Id.*  Plaintiff contends that, in an effort to prevent Mathis from distributing the Sample Ballots, Senator Muse, "under color of law, summoned the Prince George's County

---

[8] This online news article from *Gazette* is attached to the Complaint (ECF 1-5) and the Opposition (ECF 25-1) but not to the Amended Complaint.  The hyperlink for the article is not legible.

Police Department and the Sheriff's Department and under his direction [Senator Muse] ordered the Sheriff deputies led by Deputy Berryman to intimidate Plaintiff and his supporters by confiscating Plaintiff's political literature." *Id.* ¶ 13 (alteration in Am. Complaint).  According to plaintiff, Senator Muse also directed Deputy Berryman and the other deputies to "intimidate Plaintiff's supporters under threat of arrest to cease and desist distribution of Plaintiff's sample ballot." *Id.* ¶ 14.

In plaintiff's view, Senator Muses's orders "resulted in Deputy Berryman and other Sheriff's deputies confiscating Plaintiff's political literature [on September 6, 2010,] and intimidating him . . . ." *Id.* ¶ 15.  In particular, plaintiff alleges that Deputy Berryman "detained Plaintiff, ordered him to cease distribution of his political literature, confiscated the political literature and threatened him with arrest if he failed to obey . . . ." *Id.* ¶ 24.[9]  Mathis asserts, *id.* ¶ 17:

> Plaintiff's political sample ballots presented a direct challenge to Defendant Muse's slate of candidates, in addition to his belief and perceived right to disseminate sample ballots exclusively.  Defendant Muse's actions of ordering Deputy Berryman and other deputies to confiscate Plaintiff's sample ballots and intimidate Plaintiff and his supporters violated Plaintiff's 1st Amendment right to disseminate core political speech and press to the electorate.

In addition, Mathis contends:  "It is clear from the events as they occurred that Plaintiff was not free to disregard Defendant Berryman's order [to cease distribution of the ballots] except under threat of arrest."   ECF 18 ¶ 24, Am. Complaint.  Plaintiff also notes that Deputy Berryman's supervisor, Colonel Marc Givens, "admitted in a media interview that Deputy Berryman had participated in actions described by Plaintiff as violating his constitutional rights."

---

[9] Defendants note in their Memorandum that the allegation that Deputy Berryman "confiscated the non-compliant Sample Ballots" is a new fact not included in the original Complaint.  ECF 21-2 at 8.

*Id.* ¶ 26.

In his Opposition, plaintiff alleges for the first time that because Prince George's County police officers declined to confiscate Mr. Mathis's sample ballots, Senator Muse "then summoned the Sheriff's department . . . under the false pretense that an altercation was taking place." ECF 25 at 5, Opposition.[10]   And, another candidate for County Council reported to the press that "in his opinion Defendant Muse was using the Sheriff's Department deputies at the scene as 'his personal army.'"  *Id.* at 6.  Mathis also includes an allegation that Senator Muse was acting deceptively by falsely alleging that the Sample Ballot was fraudulent. *Id.* at 7. Plaintiff explains, in part, *id.*:

> Once Deputy Berryman arrived on the scene, she consulted with Defendant Muse, who then informed her that Plaintiff's political literature was allegedly illegal. Defendant Muse's allegations were not made because the literature allegedly didn't contain the proper by authority line, but because of his false allegation that it constituted mail fraud, was fraudulent and that only he as Senator had the right to distribute such political literature. None of these accusations proved to be true, nor was Plaintiff charged with any of the felonies that Defendant Muse deceptively used to convince Deputy Berryman to perpetrate her unconstitutional

---

[10] A plaintiff may not cure the deficiencies of a complaint through subsequent briefs. *Zachair, Ltd. v. Driggs,* 965 F.Supp. 741, 748 n.4 (D. Md. 1997), *aff'd*, 141 F.3d 1162 (4th Cir. 1998); *Mylan Labs., Inc. v. Akzo, N.V.*, 770 F.Supp. 1053, 1068 (D. Md. 1991) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.") (internal quotations omitted).

Defendants maintain that the amendments to the facts, contained in the Opposition, should not be permitted or considered because they would be "futile."   ECF 26 at 4, Def. Reply. They explain, *id.* at 4-5:

> None of these allegations could state a claim for relief given the indisputable facts that Senator Muse had the right to summon law enforcement to the scene of unlawful activity, that he correctly reported that Mr. Mathis's sample ballots were out of compliance with State law, that Mr. Mathis was convicted of three elections law violations for distributing the very sample ballot that Senator Muse sought to stop him from distributing, and that Mr. Mathis was not arrested for any alleged altercation.

acts against Plaintiff. Plaintiff's political literature was not apparent on its face that it violated any of the laws that Defendant Muse characterized, nor was it apparent that it violated any election laws. Plaintiff did not act suspicious, answered Deputy Berryman's questions, was not belligerent, and complied with Defendant's order to cease and desist distribution of his political literature.

After the incident of September 6, 2010, Mathis "was accused of fraud, mail fraud, and misleading the voters, however he was never charged with fraud or anything related to the false accusations of fraud."  ECF 18 ¶ 8, Am. Complaint.  In particular, Mathis alleges that Senator Muse "publically accused Plaintiff in the press and other news media of fraud and other violations of the law."  *Id.* ¶ 11.

On September 7, 2010, Judge Martin issued a Temporary Restraining Order ("TRO") prohibiting Citizens For Change, Inc. from distributing the Sample Ballot.  *Id.* ¶ 9; *see also* ECF 1 ¶ 15, Complaint; ECF 1-2, TRO.  The TRO was sought by John McDonough, then the Maryland Secretary of State.  Judge Martin found that "a sufficient showing [was] made" as to violations of §§ 13-401 and 13-602 of the Election Law Article ("E.L.") of the Maryland Code (2010 Repl. Vol.), by way of "circulation of fraudulent and legally non-compliant campaign materials," so as to justify relief under E.L. § 13-605.  ECF 1-2 at 2, TRO.[11]  The TRO expired by its terms on September 17, 2010, but it also provided for modification or dissolution on two days' notice.  *Id.* at 3.  The record does not reflect that it was ever modified or dissolved before it expired by its terms.

In November 2010, Mathis was charged with violations of the Maryland election law.  In his Amended Complaint, plaintiff insists the allegations of fraud lodged against him were part of a larger "conspiracy" to "derail[ ] Plaintiff's campaign" in favor of the "preferred candidate of

---

[11] Title 13 of the Election Law Article is called "Campaign Finance."

- 9 -

the Democratic machine," Obie Patterson.  ECF 18 ¶ 9, Am. Complaint.  Mathis avers, *id.*:

> The possibility that Plaintiff would be elected was the catalyst that initiated the conspiracy by certain officials including the Defendants to smear the good reputation of Plaintiff.  The public allegations of fraud by Attorney General Doug Gansler, State's Attorney Glenn Ivey, Senator C. Anthony Muse and current State's Attorney Angela Alsobrooks and the issuance of the restraining order [issued by Judge Martin on September 7, 2010, barring plaintiff from distributing the Sample Ballot, ECF 1 ¶ 15] effectively derailed Plaintiff's campaign.  As a result of the false, unsubstantiated and malicious allegations against Plaintiff and his inability to distribute his campaign materials to voters at the polls, he went from a possible winner to finishing near the bottom of a field of eight candidates.

The election law charges against Mathis were tried to a Maryland jury in April 2011.

Mathis "was convicted of three counts of election violations pertaining to distribution of campaign material without the proper authority line."  ECF 1 ¶ 13, Complaint; *see also* Maryland Judiciary Case Search, available at http://casesearch.courts.state.md.us/ (last accessed June 18, 2015), Case No. CT101380X (indicating that Mathis was convicted of three charges under E.L. § 13-401(a)(1)(i) and acquitted of one under E.L. § 13–601(a)).

Plaintiff asserts in his Opposition, ECF 25 at 8: "Defendant Muse's sample ballot was later declared to be non-compliant with Maryland Election Law § 13-40l(a)."  In particular, plaintiff was convicted of three violations of E.L. § 13-401.  It states, in part:

> (a)(1) Except as otherwise provided in this section, each item of campaign material shall contain, set apart from any other message, an authority line that states:
>
> > (i) as to campaign material published or distributed by a campaign finance entity:
> >
> > > 1. the name and address of the treasurer of each campaign finance entity responsible for the campaign material; and
> > >
> > > 2. as to each treasurer named under item 1 of this item, the name of each campaign finance entity for which the treasurer is acting; and

(ii) as to campaign material published or distributed by any other person, the name and address of the person responsible for the campaign material.

(2) The authority line may omit an address that is on file with the State Board or a local board.

(3) If the campaign material is too small to include all the information specified in paragraph (1) of this subsection in a legible manner, the authority line need only contain the name and title of the treasurer or other person responsible for it.

(4) The authority line for campaign material that is a commercial advertisement need only contain the information specified in paragraphs (1) and (2) of this subsection for one campaign finance entity or other person responsible for the advertisement.

Notably, as happened here, "[t]he Secretary of State may seek an immediate injunction against any violation of" Maryland Election Law.  E.L. § 13-605(a).  And, except as otherwise provided in the statute, "a person who knowingly and willfully violates a provision of [Title 13] is guilty of a misdemeanor and on conviction is subject to a fine not exceeding $25,000 or imprisonment not exceeding 1 year or both."  E.L. § 13-603.[12]  Thus, a violation of E.L. § 13-401(a) is an arrestable offense.  *See* E.L. § 13-403 (stating "a person who knowingly and willfully violates a provision of [Title 13] is guilty of a misdemeanor and on conviction is subject to a fine not exceeding $25,000 or imprisonment not exceeding 1 year or both").

Mathis asserts in his Amended Complaint, ECF 18 ¶ 9:  "At sentencing the Judge offered Plaintiff probation before judgment (PBJ) however, Plaintiff respectfully declined to accept the PBJ, in order to prove his innocence on appeal.  Plaintiff was consequently sentenced to three months unsupervised probation and one hundred community hours at a venue of his choice."

---

[12] In the Amended Complaint, plaintiff does not directly challenge the constitutionality of any provision of Title 13 of the Maryland Code.  Instead, without explicitly mentioning Title 13, Mathis alleges that the confiscation of his Sample Ballots was an "unconstitutional prior restraint."  ECF 18 ¶ 18, Am. Complaint.

Mathis appealed his convictions to the Maryland Court of Special Appeals, which affirmed. *See Mathis v. State,* No. 1165 (Md. Ct. Sp. App. Mar. 14, 2013) (unpublished), referenced at http://www.courts.state.md.us/appellate/unreportedopinions/201303unreported. html (last accessed June 18, 2015). On July 5, 2013, the Maryland Court of Appeals denied Mathis's petition for certiorari. *See Mathis v. State*, Pet. Docket No. 167, referenced at http://www.courts.state.md.us/coappeals/petitions/201307petitions.html (last accessed June 18, 2015).

Additional facts are included in the Discussion.

## III.    Standard of Review

Plaintiff alleges that, "under color of law in concert with the Prince George's County Sheriff Department, selectively without due process[, Senator Muse] prohibited Plaintiff's sample ballot from reaching the public." ECF 18 ¶ 20, Am. Complaint. In plaintiff's view, Senator Muse's "actions violated Plaintiff's constitutional rights guaranteed by the 1st, 4th, 6th and 14th Amendments to the United States Constitution."[13] *Id.* Specifically, plaintiff refers to his rights to "free speech and free press, due process of law, and [protection] against unreasonable search and seizures . . . ." *Id.* ¶ 10.

As to Deputy Berryman, plaintiff avers, ECF 18 ¶ 25, Am. Complaint:

Deputy Berryman's actions of seizing and/or confiscating Plaintiff's sample ballot without a full trial on the merits constitutes an unconstitutional prior restraint, in violation of Plaintiff's 1st, 4th and 14th Amendment constitutional rights. Defendant Berryman's actions preventing Plaintiff from exercising his 1st, 4th and 14th Amendment rights violated those very rights guaranteed [to] Plaintiff by the United States Constitution.

---

[13] This is the sole reference in the Amended Complaint to the Sixth Amendment. Because plaintiff's allegations do not pertain to the Sixth Amendment, I assume this reference was made in error.

With respect to plaintiff's free speech claims, he emphasizes the "special importance" of political speech under First Amendment jurisprudence. *Id.* ¶ 15; *see id.* ¶¶ 16-17. Plaintiff's core claim against both defendants is that the Sample Ballot was legal as of September 6, 2010, yet he was "detained" and his Sample Ballots were confiscated. *Id.* ¶ 24; *see id.* ¶ 13.

In sum, defendants advance three primary arguments in seeking dismissal of plaintiff's claims: (1) plaintiff "has failed to make 'any plausible allegation'" that defendants violated his constitutional rights, ECF 21-2 at 6, Def. Memo.; (2) plaintiff has not and cannot allege that Muse had any supervisory authority over Deputy Berryman, *id.*; and (3) Deputy Berryman is entitled to qualified immunity for her alleged actions in enforcing valid Maryland election law on September 6, 2010, when she ordered plaintiff to cease his violation of the law and confiscated the evidence. *Id.* at 7.

Defendants' Motion is predicated on Fed. R. Civ. P. 12(b)(6). A defendant may test the sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). Rule 8 provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendant with "fair notice" of the claim and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 n.3 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

A plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, —— U.S. ——, 135 S. Ct. 346, 346 (2014) (per curiam). But, the rule demands more than bald accusations or mere speculation. *Twombly,* 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). To satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotations omitted). In other words, the complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Id.* at 570; *see Iqbal*, 556 U.S. at 684; *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011).

In reviewing a Rule 12(b)(6) motion, a court "'must accept as true all of the factual allegations contained in the complaint,'" and must "'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citation omitted); *see Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir.), *cert. denied*, —— U.S. ——, 132 S. Ct. 402 (2011); *Monroe v. City of Charlottesville,* 579 F.3d 380, 385-86 (4th Cir. 2009), *cert. denied*, 559 U.S. 991 (2010). However, a complaint that provides no more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action," is insufficient. *Twombly*, 550 U.S. at 555. Moreover, the court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Monroe*, 579 F.3d at 385-86.

- 14 -

A Rule 12(b)(6) motion will be granted if the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct . . . ." *Iqbal*, 556 U.S. at 679.  "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought.  *A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert. denied*, —— U.S. ——, 132 S. Ct. 1960 (2012).

A motion asserting failure to state a claim typically "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses," *Edwards*, 178 F.3d at 243 (quotation marks omitted), unless such a defense can be resolved on the basis of the facts alleged in the complaint.  *See Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc).  "This principle only applies, however, if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint*,'" or in other documents that are proper subjects of consideration under Rule 12(b)(6).  *Id.* (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)) (alteration and emphasis in *Goodman*).

Generally, a court's consideration of a Rule 12(b)(6) motion is confined to facts alleged in the operative pleading.  Therefore, a court ordinarily "may not consider any documents that are outside of the complaint, or not expressly incorporated therein . . . ."  *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013).  However, a court may properly consider documents attached or incorporated into the complaint, as well as documents attached to the defendant's motion, "'so long as they are integral to the complaint and authentic.'"  *U.S. ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014)

(quoting *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *see also Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains,* gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in *Chesapeake*).

No documents were attached to the Amended Complaint or the Motion to Dismiss. But, as noted, plaintiff submitted seven documents with his Opposition, including the first page of plaintiff's Sample Ballot, ECF 25-2, as well as Muse's sample ballot. ECF 25-5 at 2. As noted, plaintiff's entire Sample Ballot was submitted as an exhibit to the original Complaint, ECF 1-4, and it is integral to the Amended Complaint. Therefore, I shall consider it in regard to the Motion to Dismiss, although it was not resubmitted with the operative pleading. The other documents attached to the Opposition are not integral to the Complaint, and therefore may not be considered. In any event, even if I did consider them, they would not alter my disposition of this case.

Because plaintiff is a self-represented litigant, his pleadings are "'liberally construed'" and "'held to less stringent standards than formal pleadings drafted by lawyers.'" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citation omitted). "However, liberal construction does not absolve Plaintiff from pleading a plausible claim." *Bey v. Shapiro Brown & Alt, LLP*, 997 F. Supp. 2d 310, 314 (D. Md.) *aff'd*, 584 F. App'x 135 (4th Cir. 2014) (citation omitted); *see also Coulibaly v. J.P. Morgan Chase Bank, N.A.*, 2011 WL 3476994, at *6 (D. Md. Aug. 8, 2011) ("[E]ven when pro se litigants are involved, the court cannot ignore a clear failure to allege facts that support a viable claim."), *aff'd*, 526 F. App'x 255 (4th Cir. 2013).

## IV.    Plaintiff's Claims

### A.  Official Capacity

Plaintiff has sued defendants in their personal and official capacities. ECF 18 at 1, Am. Complaint. As the Supreme Court explained in *Kentucky v. Graham*, 473 U.S. 159, 165 (1985), "Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. Official-capacity suits, in contrast, 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" (Quoting *Monell v. N.Y.C. Dept. of Soc. Servs.*, 436 U.S. 658, 690 (1978)) (citations omitted); *see also, e.g., Huggins v. Prince George's Cnty.*, 683 F.3d 525, 532 (4th Cir. 2012) (treating suit against individuals in official capacity as suit against County). Thus, official capacity claims are subject to the same immunities the employing entity itself enjoys, such as sovereign immunity under the Eleventh Amendment. *Graham*, 473 U.S. at 167; *accord Hafer v. Melo*, 502 U.S. 21, 25 (1991).

### B.  Section 1983

Mathis contends that, upon the order of Senator Muse, Deputy Berryman detained Mathis, threatened him with arrest if he failed to comply with her orders, and confiscated his Sample Ballots.  ECF 18 ¶ 13, Am. Complaint.  According to plaintiff, the actions of the defendants violated his First, Fourth, and Fourteenth Amendment rights.  *Id.* ¶ 25.

Plaintiff's claims are predicated on 42 U.S.C. § 1983.  *Id.* ¶ 1.  Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'"  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).  Under § 1983, a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of

the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  42 U.S.C. § 1983; *see also, e.g.*, *Filarsky v. Delia*, ⸺ U.S. ⸺, 132 S. Ct. 1657, 1660 (2012).

To state a claim under § 1983, "a plaintiff must aver that a person acting under color of state law deprived him of a constitutional right or a right conferred by a law of the United States."  *Wahi v. Charleston Area Medical Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *see Filarsky*, 132 S. Ct. at 1661; *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997).  The phrase "under color of state law" is an element that "is synonymous with the more familiar state-action requirement—and the analysis for each is identical."  *Philips*, *supra*, 572 F.3d at 180.

### C.  The First Amendment

Plaintiff alleges that defendants' conduct violated his rights under the First Amendment. In the light most favorable to Mathis, he seems to allege retaliation against him for the exercise of his First Amendment rights, as well as a claim that the seizure of his Sample Ballots was an "unconstitutional prior restraint."  ECF 18 ¶ 18, Am. Complaint.

In particular, Mathis alleges that, while acting under color of law, Senator Muse was driven by a desire to derail Mathis's campaign.  He suggests that Muse effectively prevented Mathis from distributing the Sample Ballots, "under threat of arrest or retribution."  ECF 18 ¶ 22, Am. Complaint; *see id.* ¶ 9.

### D.  The Fourth Amendment

Plaintiff alleges that defendants violated his rights under the Fourth Amendment.  This issue arises in the context of Mathis's encounter with law enforcement.  Section 1983 provides a damages remedy for violations of the Fourth Amendment.  *See, e.g.*, *Wilson v. Layne*, 526 U.S.

603, 609 (1999) ("§ 1983 allow[s] a plaintiff to seek money damages from government officials who have violated his Fourth Amendment rights.").

According to plaintiff, he was unlawfully seized by Deputy Berryman.  In addition, plaintiff maintains that Berryman unlawfully confiscated his political literature, on the instruction of Muse.  Mathis asserts, ECF 18 ¶ 24, Am. Complaint (emphasis in Am. Complaint):

> It is clear from the events as they occurred that Plaintiff was not free to disregard Defendant Berryman's order and questions except under threat of arrest.  In the Supreme Court case of *United States v. Mendenhall, 446 U.S. 544 (1980),* the Court held that "a person has been seized" within the meaning of the 4th Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.  "Examples of circumstances that might include a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer... **or the use of language or tone of voice indicating that compliance with the officer's request might be compelled."**  See *Terry v. Ohio, supra, at 19, n.l6; Dunaway v. New York, 442 U.S. 200, 207* and *n.6; 3 W LaFaue, Search and Seizure 53-55 (1978).*  Plaintiff believed that he would have been arrested and that he was not free to leave Deputy Berryman's detainment. Plaintiff under threat of arrest, watched helplessly as Defendant Berryman confiscated his political literature from him and his supporters. Defendant Berryman's actions constituted [an] illegal seizure in violation of Plaintiff's 1st and 4th Amendment Constitutional rights.

### E.  Due Process

Plaintiff contends that his rights as guaranteed by the Due Process Clause of the Fourteenth Amendment were contravened when Deputy Berryman "seiz[ed] and/or confiscate[ed] Plaintiff's sample ballot without a full trial on the merits . . . ."  ECF 18 ¶ 25, Am. Complaint.  The Due Process Clause of the Fourteenth Amendment provides, in part: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.

The Due Process Clause "imposes constraints on governmental decisions which deprive

individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).  In terms of procedural due process, courts have long recognized that "[t]he fundamental requisite of due process of law is [notice and] the opportunity to be heard." *Grannis v. Ordean*, 234 U.S. 385, 394 (1914); *see Kaley v. United States*, ⸺ U.S. ⸺, 134 S. Ct. 1090, 1114 (2014) ("The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.") (internal quotations omitted); *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (observing that procedural due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections"); *Snider Int'l Corp. v. Town of Forest Heights, Md.*, 739 F.3d 140, 146 (4th Cir.) ("At bottom, procedural due process requires fair notice of impending state action and an opportunity to be heard."), *cert. denied*, ⸺ U.S. ⸺, 134 S. Ct. 2667 (2014). Yet, "'due process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.'" *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (quoting *Cafeteria & Restaurant Workers v. McElroy*, 367 U.S. 886, 895 (1961)).

In general, in order to succeed on a due process claim, whether substantive or procedural, the plaintiff must show (1) that he "has a constitutionally protected liberty or property interest"; and (2) that he "has been deprived of that protected interest by some form of state action . . . ." *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 172 (4th Cir. 1988) (internal quotations omitted); *accord Miller v. Hamm*, Case No. CCB-10-243, 2011 WL 9185, at *7 (D. Md. Jan. 3, 2011).

## V.   Discussion

Plaintiff complains about the conduct of both Muse and Berryman.   He has sued defendants in their personal and official capacities.

As stated in my earlier Memorandum Opinion, defendants are entitled to Eleventh Amendment immunity for actions allegedly committed in their official capacities.   ECF 16 at 15-16, Memorandum Opinion (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (stating that Eleventh Amendment bars claims for damages brought against state officials in their official capacities)); *see Nivens v. Gilchrist*, 444 F.3d 237, 249 (4th Cir.) (same), *cert. dismissed sub nom. Stork v. Gilchrist*, 548 U.S. 939 (2006); *Cromer v. Brown*, 88 F.3d 1315, 1332 (4th Cir. 1996) (same).   Significantly, plaintiff does not challenge defendants' entitlement to Eleventh Amendment immunity.   Nor does the Amended Complaint specifically request injunctive relief or other equitable remedies as to the remaining defendants, which might survive the bar of Eleventh Amendment immunity.   Accordingly, I will dismiss with prejudice plaintiff's claims against defendants in their official capacities.

I turn to the contention that Berryman unlawfully seized plaintiff by stopping him and questioning him.   The discussion is framed by E.L. § 13–401(a)(1), which mandates that the "authority line" of the Sample Ballot in issue include "the name and address of the treasurer of each campaign finance entity responsible for the campaign material[.]"   However, the statute also includes an exception to this requirement, at E.L. § 13–401(a)(2).   It states: "The authority line may omit an address that is on file with the State Board or a local board."

The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures, and is made applicable to the states through the Fourteenth Amendment.

*Mapp v.* Ohio, 367 U.S. 643, 655 (1961).  In *Santos v. Frederick County Bd. of Com'rs*, 725 F.3d

451 (4th Cir. 2013), the Fourth Circuit summarized "three categories of police-citizen

encounters," *id.* at 460-61:

> First, "consensual" encounters, the least intrusive type of police-citizen interaction, do not constitute seizures and, therefore, do not implicate Fourth Amendment protections.  *Florida v. Bostick*, 501 U.S. 429, 434[] (1991).  Second, brief investigative detentions—commonly referred to as "*Terry* stops"—require reasonable, articulable suspicion of criminal activity.  *Terry* [*v. Ohio*, 392 U.S. 1, 21 (1968)].  Finally, arrests, the most intrusive type of police-citizen encounter, must be supported by probable cause.  *Devenpeck v. Alford*, 543 U.S. 146, 152[] (2006).
>
> A police-citizen encounter rises to the level of a Fourth Amendment seizure when "the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen . . . ."  *United States v. Jones*, 678 F.3d 293, 299 (4th Cir. 2012) (quoting *Terry*, 392 U.S. at 19 n.16 [ ]).  This inquiry is objective, [*United States v. Weaver*, 282 F.3d 302, 309 (4th Cir. 2002)], asking whether "'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'"  *Jones*, 678 F.3d at 299 (quoting [*United States v. Mendenhall*, 446 U.S. 544, 554 (1980)]).  An encounter generally remains consensual when, for example, police officers engage an individual in routine questioning in a public place.  *United States v. Gray*, 883 F.2d 320, 323 (1989); *see also Bostick*, 501 U.S. at 434[ ] ("[M]ere police questioning does not constitute a seizure.").

"'[T]he ultimate touchstone of the Fourth Amendment is reasonableness.'"  *Riley v.*

*California*, ⸺ U.S. ⸺, 134 S. Ct. 2473, 2482 (2014) (citations and some quotation marks

omitted); *see Florida v. Jimeno*, 500 U.S. 248, 250 (1991).  The "test of reasonableness under the

Fourth Amendment is an objective one."  *Los Angeles County v. Rettele*, 550 U.S. 609, 614

(2007) (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)).  Reasonableness is determined by

balancing "the intrusion on the individual's Fourth Amendment interests against [the] promotion

of legitimate governmental interests."  *Maryland v. Buie*, 494 U.S. 325, 331 (1990).

Warrantless searches and seizures are *per se* unreasonable, subject only to a few well established exceptions. *Katz v. United States*, 389 U.S. 347, 357 (1967).   What has become known as the "*Terry* stop and frisk" is one of the limited exceptions to the warrant requirement. *Terry v. Ohio*, 392 U.S. 1 (1968).  In *Terry*, 392 U.S. 1, and the companion case of *Sibron v. New York*, 392 U.S. 40 (1968), the Supreme Court ruled that police officers may stop persons when they have "specific and articulable facts which, taken together with rational inferences from those facts," create reasonable suspicion that the person has been or is about to engage in criminal activity.  *Terry*, 392 U.S. at 21; *see also United States v. Sokolow*, 490 U.S. 1, 7 (1989) ("[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause . . . .").

The purpose of a *Terry* stop is investigative—to verify or to dispel the officer's suspicion surrounding the suspect.  *Terry*, 392 U.S. at 22-23, 30.   When an officer has a "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,'" the officer may ordinarily detain an individual for a brief period of time.  *Sokolow*, 490 U.S. at 2 (1989) (quoting *Terry*, 392 U.S. at 30); *see Ornelas v. United States*, 517 U.S. 690, 696 (1996) (describing reasonable suspicion as "'a particularized and objective basis' for suspecting the person stopped of criminal activity") (quoting *United States v. Cortez*, 449 U.S. 411, 417-418 (1981)) .  But, the stop must be "justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."  *Cortez*, 449 U.S. at 417.  The brief detention and limited intrusion permitted under the *Terry* exception are not deemed unreasonable when weighed

against the governmental interests served. These include effective crime prevention and detection as well as the safety of the police officer and others nearby. *Terry*, 392 U.S. at 16-27.

Difficulty sometimes arises in pinpointing exactly what is meant by the term "articulable suspicion." In *Ornelas*, the Court observed, 517 U.S. at 695-96 (citations omitted):

> Articulating precisely what "reasonable suspicion" and "probable cause" mean is not possible. They are commonsense, nontechnical conceptions that deal with "'the factual and practical consideration of everyday life on which reasonable and prudent men, not legal technicians, act.'" As such, the standards are "not readily, or even usefully, reduced to a neat set of legal rules."

To be sure, to justify a *Terry* stop, a law enforcement officer "must be able to articulate something more than an 'inchoate and unparticularized suspicion or 'hunch.''" *Sokolow*, 490 U.S. at 7 (quoting *Terry*, 392 U.S. at 27). But, the level of suspicion required to make such a stop is "considerably less than proof of wrongdoing by a preponderance of the evidence" and "obviously less demanding than that for probable cause . . . ." *Sokolow*, 490 U.S. at 7. The threshold of reasonable suspicion has been described as "some minimal level of objective justification for making the stop." *Id.* (internal quotations omitted). Moreover, "reasonable suspicion may exist even if each fact standing alone is susceptible to an innocent explanation." *United States v. McCoy*, 513 F.3d 405, 413-14 (4th Cir. 2008) (citing *United States v. Arvizu*, 534 U.S. 266, 277-78 (2002)).

Here, Muse reported a violation of Maryland election law that was allegedly ongoing in public. Notably, Muse was not an anonymous tipster. When the informant is known, his "reputation can be assessed" and he "can be held responsible if [his] allegations turn out to be fabricated . . . ." *Florida v. J.L.*, 529 U.S. 266, 270 (2000). This is in contrast to an anonymous tip, which is generally regarded as less reliable than a tip from a known informant. *Id.*; *see also*

*Alabama v. White*, 496 U.S. 325 (1990).  But, even an anonymous tip may, under the totality of circumstances, provide reasonable suspicion to justify an investigatory stop if there is independent corroboration of some "significant aspects" by police.  *White*, 496 U.S. at 332.

Based on Muse's complaint, Berryman responded to the scene.  The allegations suggest that she saw Mathis distributing ballots.  Notably, a police officer "typically" may ask a detainee "a moderate number of questions . . . to try to obtain information confirming or dispelling the officer's suspicions.  But the detainee is not obligated to respond."  *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984); *see also Muehler v. Mena*, 544 U.S. 93, 100-01 (2005).  There is no indication in the allegations that Mathis sought to dispel accusations of wrongdoing.[14]  In addition, Berryman had the opportunity to assess Muse's reliability.  In this regard, what I said in my initial Memorandum Opinion, ECF 16 at 40-41, remains pertinent:

> Because Senator Muse was present on the scene, defendants say, Deputy Berryman would have been able to assess his credibility, a factor that, in defendants' view, supports the reasonableness of the deputy's actions. *See* Reply at 10 (citing *United States v. Griffin*, 589 F.3d 148, 152 (4th Cir. 2009) (factors relevant to whether an informant's tip supports reasonable suspicion include whether "the officer had the opportunity to observe the informant's credibility and demeanor"; "whether the officer could later hold the informant accountable for making false accusations"; and "whether the informant reported to the police in public, exposing himself to retaliation from the suspect and increasing the informant's reliability"), *cert. denied*, —— U.S. ——, 131 S. Ct. 1599 (2011)). *See also, e.g.*, *United States v. Lawing,* 703 F.3d 229, 236 (4th Cir. 2012) (reasonable

---

[14]  In the Opposition, Mathis contends that during his confrontation with Deputy Berryman, he informed her that if the Citizens for Change Sample Ballot was illegal for lack of a proper authority line, Muse's sample ballot was similarly not in compliance with State election law.  ECF 25 at 8.  Mathis also alleges that to facilitate a comparison between the two documents, he showed Deputy Berryman a copy of Muse's sample ballot.  *Id.*  As noted, "it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Mylan Labs., Inc. v. Akzo, N.V.*, 770 F.Supp. 1053, 1068 (D. Md. 1991) (internal quotations omitted).  But, even if I were to consider these assertions, they are not a denial of illegality as to Mathis's ballots.  Moreover, the potential illegality of Muse's sample ballot does not establish Mathis's right to distribute political literature in violation of the Election Article.

suspicion existed where confidential informant "had relayed information to the police in a face-to-face setting thereby affording them the clear ability to judge his credibility and corroborate the information he provided"), *cert. denied*, —— U.S. – —, 133 S. Ct. 1851 (2013); *United States v. Perkins*, 363 F.3d 317, 323 (4th Cir. 2004) (in a face-to-face encounter with an informant, police can "judge the credibility of the tipster firsthand and thus confirm whether the tip is sufficiently reliable to support reasonable suspicion"), *cert. denied,* 543 U.S. 1056 (2005); *United States v. Miller*, 925 F.2d 695, 699 (4th Cir. 1991) (probable cause existed where police sufficiently corroborated a tip from an unknown informant), *cert. denied,* 502 U.S. 833 (1991).

Under Md. Code (2008 Repl. Vol., 2014 Supp.), § 2-202(a) of the Criminal Procedure Article ("C.P."), Deputy Berryman had the authority to arrest Mathis without a warrant if a misdemeanor crime was committed in her presence.   C.P. § 2-202(a) states:  "A police officer may arrest without a warrant a person who commits or attempts to commit a felony or misdemeanor in the presence or within the view of the police officer."  Yet, at most, Berryman detained Mathis for a few moments to question him and she did so based on reasonable, articulable suspicion.

Even if Deputy Berryman misconstrued Maryland law to mandate that a sample ballot must always list the address of the financing entity, such a mistake in law would not necessarily vitiate reasonable suspicion.  In  *Heien v. N.C.*, —— U.S. ——, 135 S. Ct. 530, 536 (2014), the Supreme Court determined that the Fourth Amendment is not violated when a police officer makes a mistake of law in regard to a traffic stop, so long as such an error is objectively reasonable.

In *Heien*, a sergeant in North Carolina stopped a vehicle with two occupants, after observing that one of the vehicle's two brake lights was not working properly.  *Id.* at 534. During a consent search of the vehicle, a bag of cocaine was recovered.  *Id.*  The vehicle's owner was charged under North Carolina law with attempted cocaine trafficking.  *Id.* at 535.  The

owner moved to suppress the evidence seized from the car, contending that the stop violated the

Fourth Amendment.   *Id.*   After a hearing, the trial court denied the suppression motion,

concluding that the faulty brake light had given the officer reasonable suspicion to initiate the

stop.   *Id.*   The car owner then pleaded guilty but reserved his right to appeal the denial of his

motion to suppress the evidence seized from the car.   *Id.*

On appeal, the North Carolina Court of Appeals determined that driving with a single

brake light was not illegal under North Carolina law.  *Id.* Therefore, it concluded that the officer

lacked reasonable suspicion to initiate the stop.   *Id.*   Thus, it ruled that the stop violated the

Fourth Amendment.  *Id.*  The North Carolina Supreme Court reversed.  *Id.*  It concluded that the

officer who initiated the stop "could have reasonably, even if mistakenly," interpreted the statute

to require that both brake lights be operational.  *Id.*

The United States Supreme Court granted certiorari to consider "whether [an officer's]

mistake of law can nonetheless give rise to the reasonable suspicion necessary to [stop a vehicle

and] uphold the seizure under the Fourth Amendment."  *Id.* at 534.   The Court held that just as

mistakes of fact can establish reasonable suspicion, so too can mistakes of law.   It explained, *id.*

at 536:

> [R]easonable men make mistakes of law, too, and such mistakes are no less
> compatible with the concept of reasonable suspicion. Reasonable suspicion arises
> from the combination of an officer's understanding of the facts and his
> understanding of the relevant law. The officer may be reasonably mistaken on
> either ground. Whether the facts turn out to be not what was thought, or the law
> turns out to be not what was thought, the result is the same: the facts are outside
> the scope of the law. There is no reason, under the text of the Fourth Amendment
> or our precedents, why this same result should be acceptable when reached by
> way of a reasonable mistake of fact, but not when reached by way of a similarly
> reasonable mistake of law.

Moreover, the Court highlighted "the reality that an officer may suddenly confront a situation in the field as to which the application of a statute is unclear—however clear it may later become." *Id.* at 539 (internal quotation marks omitted).  Indeed, the Court noted an officer may "have to make a quick decision on the law . . . ." *Id.*    Accordingly, the *Heien* Court concluded that so long as such a decision is objectively reasonable, it may give rise to reasonable suspicion. *Id.* at 540.

The reasoning in *Heien* seems apt here.  Even if Deputy Berryman incorrectly believed that, under Maryland law, the Sample Ballot had to include an address for the Treasurer under any circumstance, the totality of the facts gave rise to a reasonable, articulable suspicion of wrongdoing by Mathis.  These include that Muse, who was not an anonymous tipster, complained that the Sample Ballot was illegal; Deputy Berryman was on the scene and apparently observed Mathis distributing the Sample Ballot; on its face, the Sample Ballot lacked an address for the Treasurer; and, even if Mathis had no duty to refute Muse's accusation, Berryman could have considered that Mathis never denied the accusation.

In the Amended Complaint, Mathis also complains about Berryman's seizure of the Sample Ballots.  Defendants assert:  "As a State official responsible for enforcing State law, Deputy Berryman was within her authority to confiscate the materials."  ECF 21-2 at 8, Def. Memo.

The Fourth Amendment guarantees, *inter alia*, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ."  By its plain text, the Fourth Amendment "does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable."  *Jimeno*, 500 U.S. at 250; *see Illinois v.*

*Rodriguez,* 497 U.S. 177, 183-84 (1990); *United States v. Sharpe*, 470 U.S. 675, 682 (1985); *United States v. Mendenhall*, 446 U.S. 544, 551 (1980). As indicated, "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).

A lawful *Terry* stop may yield probable cause to arrest or to conduct a search.  *Terry*, 392 U.S. at 10.  In *Maryland v. Pringle*, 540 U.S. 366 (2003), the Supreme Court reviewed the concept of probable cause and stated, *id.* at 370-71 (citations and quotations marks omitted):

> [T]he probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.  Probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.
>
> The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances.  We have stated, however, that [t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that the belief of guilt must be particularized with respect to the person to be searched or seized[.]

*See also Illinois v. Gates*, 462 U.S. 213 (1983); *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949).

Notwithstanding Mathis's contention that his "political sample ballots presented a direct challenge to Defendant Muse's slate of candidates," ECF 18 ¶ 17, Am. Complaint, and that Muse was driven by animus and a desire to "derail" Mathis's campaign, *id.* ¶ 9, Muse's subjective motivation in reporting alleged misconduct is not relevant to the analysis of the legality of the seizure *by Berryman*.  Nor is Berryman's motivation for her seizure of the Sample Ballots a factor in determining whether a violation of the Fourth Amendment occurred.

The subjective motivation, pretext, or intention of the officer in conducting a search is of no moment.  *Whren*, 517 U.S. at 813 ("Subjective intentions play no role in ordinary, probable-

cause Fourth Amendment analysis"); *United States v. Bullock*, 94 F.3d 896, 899 (4th Cir. 1996) ("[An officer's] subjective motives are irrelevant to a proper Fourth Amendment analysis."). The validity of a seizure is "assess[ed], on the one hand, [by] the degree to which it intrudes upon an individual's privacy and, on the other, [by] the degree to which it is needed for the promotion of legitimate governmental interests." *Virginia v. Moore*, 553 U.S. 164, 171 (2008) (internal quotation marks omitted).

*Whren v. United States*, *supra*, 517 U.S. 806, provides guidance.  There, petitioners Whren and Brown appealed their convictions for federal drug offenses. *Id.* at 806, 809.  On the night of their arrest, "[p]lainclothes policemen patrolling a 'high drug area' in an unmarked vehicle observed a truck driven by petitioner Brown waiting at a stop sign at an intersection for an unusually long time; the truck then turned suddenly, without signaling, and sped off at an 'unreasonable' speed." *Id.* at 806.  After observing the truck speed off, "the officers stopped the vehicle, assertedly to warn the driver about traffic violations, and upon approaching the truck observed plastic bags of crack cocaine in petitioner Whren's hands." *Id.*  Petitioners were then arrested.  *Id.*  On appeal, petitioners argued that the "actual motivations of the individual officers" should be considered when determining if a Fourth Amendment violation had occurred. *Id.* at 813.  They contended: "[B]ecause the police may be tempted to use commonly occurring traffic violations as means of investigating violations of other laws, the Fourth Amendment test for traffic stops should be whether a reasonable officer would have stopped the car for the purpose of enforcing the traffic violation at issue." *Id.* at 806.  Thus, the Court considered whether evidence of a pretext could render a traffic stop unreasonable under the Fourth Amendment.

The Court concluded that the subjective intention of the officers was irrelevant under the Fourth Amendment.  *Id.*  It explained: "[T]his Court's cases foreclose the argument that ulterior motives can invalidate police conduct justified on the basis of probable cause. Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."  *Id.* (citations omitted).

The plain view doctrine is also pertinent here with regard to Berryman's conduct.  The Sample Ballots were readily visible to Berryman, as they were being disseminated to members of the public.  Indeed, that was their very purpose—distribution to prospective voters.  And, "under certain circumstances the police may seize evidence in plain view without a warrant." *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971) (plurality opinion); *see United States v. Williams*, 592 F.3d 511, 521 (4th Cir. 2010); *United States v. Wells*, 98 F.3d 808, 809-10 (4th Cir. 1996).

In order to justify a warrantless seizure pursuant to the plain view doctrine, three conditions must be satisfied. *Horton v. California*, 496 U.S. 128, 136-37 (1990). The first element is that the seizing officer must be lawfully present in the location from which the evidence can be plainly viewed. *Id.* at 136.  Second, the officer must "have a lawful right of access to the object itself." *Id.* at 137. And third, the object's "incriminating character must . . . be 'immediately apparent.'" *Id.* at 136 (quoting *Coolidge*, *supra*, 403 U.S. at 466); *see United States v. Legg*, 18 F.3d 240, 242 (4th Cir. 1994).  "The plain-view doctrine is grounded on the proposition that once police are lawfully in a position to observe an item first-hand, its owner's privacy interest in that item is lost; the owner may retain the incidents of title and possession *but not privacy.*" *Illinois v. Andreas*, 463 U.S. 765, 771 (1983) (emphasis added).  As explained by the Fourth Circuit in *Williams*, *supra*, 592 F.3d 511, 521 (emphasis in *Williams*):

The justification for the plain-view exception becomes evident when considering the difference between searches and seizures. "A search compromises the individual interest in privacy; a seizure deprives the individual of dominion over his or her person or property." *Horton*, 496 U.S. at 133 [ ]. "If an article is already in plain view, neither its observation nor its seizure would involve any invasion of *privacy*. A seizure of the article, however, would obviously invade the owner's *possessory* interest." *Id.* at 133-34, [ ] (emphasis added) (internal citations omitted). Thus, the *mere observation* of an item in plain view during the course of a lawful search does not implicate any Fourth Amendment concerns and therefore does not need to be justified by any exception to the warrant requirement. And its *seizure* is justified by the fact that any ownership or possessory interest in the item is defeated by its illegality.

Plaintiff challenges the application of the plain view doctrine to the seizure of his political literature because, in his view, the illegality of the Sample Ballot was not immediately apparent.   ECF 25 at 11-12, Opposition.   Plaintiff insists it would not have been possible for Berryman to ascertain the incriminating nature of the Sample Ballot merely by looking at it.   *Id.* at 12.

The Sample Ballot did not contain address information for the financing entity.   On the back, in small type at the bottom right hand corner, it said: "By Authority, Citizens for Change, Charles Summers, Treasurer."   ECF 1-4 at 1, Sample Ballot.   The back of the Sample Ballot, at the top left, contained an address for an organization called "Democrats 2010."   *Id.*   The absence of an address for the Treasurer did not necessarily reflect a violation of Maryland law, because under E.L. § 13-401(a)(2) an address for the financing entity may be omitted from the campaign material if it is on file with the State Board or a local board of election.   Nevertheless, there was no indication on the face of the literature that readily showed it complied with Maryland law.   The allegations also suggest that Berryman personally observed the distribution of the disputed campaign material, without any assertion by Muse that the required address was properly on file.

Under the plain view doctrine, although the seized item need not be contraband itself, there must be probable cause of its incriminating nature. *See United States v. Davis*, 690 F.3d 226, 237 (4th Cir. 2012); *Williams*, *supra*, 592 F.3d at 524; *see also United States v. Wells*, 98 F.3d 808, 810 (4th Cir. 1996) (holding that the incriminating nature of the object to be seized depends on whether "the agents collectively had probable cause to believe the [object] was evidence of a crime at the time of the seizure"). And, to be considered within the purview of the plain view doctrine the illegality of the object seized must be immediately apparent. Contrary to the contentions of plaintiff, however, due process does not require a "full trial on the merits" prior to the seizure of the object. ECF 18 ¶ 25, Am. Complaint. Rather, Berryman needed probable cause to justify the seizure.

Probable cause is "'a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.'" *Florida v. Harris*, —— U.S. ——, 133 S. Ct. 1050 (2013) (citation omitted). The probable cause standard requires "less of a showing than does the formal preponderance-of-the-evidence standard." *United States v. Ortiz*, 669 F.3d 439, 444-45 (4th Cir. 2012). Indeed, probable cause "simply requires a 'reasonable ground for belief of guilt' and 'more than bare suspicion.'" *Id.* at 444 (quoting *Brinegar*, *supra*, 338 U.S. at 175). But, probable cause "does not require that the officer's belief be more likely true than false." *United States v. Humphries*, 372 F.3d 653, 660 (4th Cir. 2004) (citing *United States v. Jones*, 31 F.3d 1304, 1313 (4th Cir. 1994)).

Indeed, "officers may have probable cause to seize an ordinarily innocuous object when the context of an investigation casts that item in a suspicious light . . . ." *United States v. Cellitti*, 387 F.3d 618, 624 (7th Cir. 2004) (citation omitted); *see also United States v. Cooper*, 19 F.3d

1154, 1163-64 (7th Cir. 1994) (finding probable cause to seize an empty ammunition box although "incriminating character of an empty ammunition box is not immediately evident"); *United States v. Cervantes*, 19 F.3d 1151, 1153 (7th Cir. 1994) ("[A]lthough a wad of cash is not in itself a suspicious object, a wad of cash in the hands of a person who the police have good reason to believe just received it in exchange for a delivery of illegal drugs *is* suspicious and indeed enough so to give the police probable cause to believe it evidence of criminal activity, empowering them to seize it . . . .") (emphasis in *Cervantes*); *cf. United States v. Dawson*, 305 F. App'x 149, 159 (4th Cir. 2008) (stating that " in light of all surrounding circumstances, even seemingly innocent activity may provide a basis for finding probable cause") (quotations omitted).

A reasonable law enforcement officer looking at the Sample Ballot was entitled to conclude that the Largo address for "Democrats 2010" in the top left hand corner was not the address of Charles Summers, the Treasurer of "Citizens for Change," listed on the bottom right hand corner of the same page.  And, it is obvious that no address was included for "Citizens For Change."  Moreover, as noted, plaintiff does not suggest that he or anyone else ever told Berryman that the address of the Treasurer was on file with the State Board or a local board. Deputy Berryman was also informed by Muse of the alleged illegality of the Sample Ballot, and Berryman was entitled to assess Muse's reliability.  Furthermore, it appears that Berryman observed the distribution of the political literature.  Based on the totality of circumstances, Berryman did not contravene Mathis's constitutional rights under the Fourth Amendment or the Due Process Clause of the Fourteenth Amendment, because she had a legal basis to confiscate

the Sample Ballots.[15]

Moreover, plaintiff has not stated a First Amendment claim against Berryman.   The

Amended Complaint does not challenge the constitutionality of E.L. § 13-401(a).[16]   And, as

discussed, *infra*, under the circumstances alleged here, Berryman "did not run afoul of the First

Amendment by confiscating materials" that did not comply with Maryland law.   ECF 21-2 at 8,

Def. Memo.

---

[15] As indicated, one day after Berryman's seizure of the ballots, Judge Martin issued a TRO enjoining their distribution.   And, based on the failure of the Sample Ballot to comply with E.L. § 13–401, plaintiff was subsequently convicted of a criminal offense.   ECF 18 ¶ 9, Am. Complaint.   That conviction was affirmed on appeal.   ECF 21-2 at 1, Def. Memo; *see Mathis v. State,* No. 1165 (Md. Ct. Sp. App. Mar. 14, 2013) (unpublished), referenced at http://www.courts.state.md.us/appellate/unreportedopinions/201303unreported.html   (last accessed June 18, 2015).

[16] Plaintiff seeks to add this claim to a proposed second amended complaint.   *See* page 57, *infra*.

Even assuming that Berryman lacked a legal basis to order Mathis to cease distribution of the ballots or to seize the ballots, defendants contend that she is protected by qualified immunity as to all constitutional claims against her.   They assert, ECF 21-2 at 11-12, Def. Memo (alterations in Def. Memo.):

> . . . Deputy Berryman would be entitled to qualified immunity because she "did not transgress a bright line" when, in response to a credible complaint about the illegality of the Sample Ballot, the missing address information, and her own observations on the scene, she ordered Mr. Mathis to cease distributing the Sample Ballot and confiscated the non-compliant Sample Ballots. *See Waterman v. Batton*, 393 F.3d 471, 476 (4th Cir. 2005) (explaining that qualified immunity safeguards "law enforcement officers from bad guesses in gray areas," by "ensur[ing] that they are liable only for transgressing bright lines" (citations and quotation marks omitted)). Under the circumstances, it was objectively reasonable for Deputy Berryman to believe that Mr. Mathis was violating the law and would continue to do so absent her efforts to enforce the law. *See Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994) (holding an officer is entitled to qualified immunity even if probable cause did not exist if it were objectively reasonable for him to believe that probable cause existed).

"Qualified immunity shields government officials who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Hunter v. Town of Mocksville, N.C.*, ____ F.3d ____, 2015 WL 3651646 at *9 (4th Cir. June 15, 2015) (internal quotations omitted).   In *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 395 (4th Cir. 2014), *cert. denied sub nom. Baltimore City Police Dep't v. Owens*, ⎯⎯ U.S. ⎯⎯, 135 S. Ct. 1983 (2015), the Court said:   "Qualified immunity protects government officials from liability for 'civil damages insofar as their conduct does not violate clearly established . . . rights of which a reasonable person would have known.'"   (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).   *See also Saucier v. Katz*, 533 U.S. 194, 206 (2001); *Occupy Columbia v. Haley*, 738 F.3d 107, 118 (4th Cir. 2013); *Bland v. Roberts*, 730 F.3d 368, 391 (4th Cir. 2013); *Merchant v. Bauer*, 677 F.3d 656, 661 (4th Cir.), *cert. denied*, ⎯⎯

U.S. ——, 133 S. Ct. 789 (2012).  Thus, "a government official who is sued in his individual capacity may invoke qualified immunity." *Bland*, 730 F.3d at 391; *see Harlow*, 457 U.S. at 818.[17]

Qualified immunity is an "'*immunity from suit* rather than a mere defense to liability' . . . ." *Ussery v. Mansfield*, ____ F.3d ____, 2015 WL 2372914, at *4 (4th Cir. May 19, 2015) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)) (emphasis in *Mitchell*). Accordingly, the immunity is "'effectively lost if a case is erroneously permitted to go to trial.'" *Ussery*,  at *4 (quoting *Mitchell*, 472 U.S. at 526).

 "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *accord Stanton v. Sims*, —— U.S. ——, 134 S. Ct. 3, at *5 (2013) (Westlaw).  Moreover, "[t]he protection of qualified immunity applies regardless of whether the

---

[17] The defense of qualified immunity does not apply to claims for injunctive relief.  *See Pearson v. Callahan*, 555 U.S. 223, 242-43 (2009) (affirming that defendants may not seek qualified immunity "in cases in which that defense is not available, such as … § 1983 cases against individuals where injunctive relief is sought instead of or in addition to damages"); *Lefemine v. Wideman*, 672 F.3d 292, 303-04 (4th Cir.) ("Claims for declaratory and injunctive relief are not affected by qualified immunity."), *rev'd on other grounds*, —— U.S. ——, 133 S. Ct. 9 (2012) (reversing holding that plaintiff was not entitled to attorney's fees); *accord Vollette v. Watson*, 937 F. Supp. 2d 706, 720 (E.D. Va. 2013).

government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson*, 555 U.S. at 231.

"Because an official 'who performs an act clearly established to be beyond the scope of his discretionary authority is not entitled to claim qualified immunity,' the defendant bears the initial burden 'of demonstrating that the conduct of which the plaintiff complains falls within the scope of the defendant's duties.'" *Henry v. Purnell*, 501 F.3d 374, 377 n.2 (4th Cir. 2007) (quoting *In re Allen*, 106 F.3d 582, 593, 594 (4th Cir. 1997), *cert. denied sub nom. McGraw v. Better Government Bureau, Inc.*, 522 U.S. 1047 (1998)); *see also, e.g., Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265-66 (11th Cir. 2004). There is no contention here that Berryman acted outside the scope of her authority.

Notably, qualified immunity only shields government officers from liability for conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818. Because qualified immunity turns on the "objective reasonableness of an official's conduct, as measured by reference to clearly established law," *id.*, an officer who makes an honest but objectively unreasonable mistake is not protected by qualified immunity. On the other hand, it protects officials "'who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful.'" *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013) (quoting *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir.) (en banc), *cert. denied*, —— U.S. ——, 132 S. Ct. 781 (2011)); *accord Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012). In other words, qualified immunity "'gives government officials breathing room to make reasonable but

mistaken judgments about open legal questions.'" *Lane v. Franks*, —— U.S. ——, 134 S. Ct. 2369, 2381 (2014) (quoting *Ashcroft v. al-Kidd*, —— U.S. ——, 131 S. Ct. 2074, 2085 (2011)).

The qualified immunity analysis involves two inquiries: (1) whether the facts alleged, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a constitutional right," *Saucier*, *supra*, 533 U.S. at 201; and (2) whether the right at issue "'was clearly established in the specific context of the case—that is, [whether] it was clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted.'" *Merchant*, *supra*, 677 F.3d at 662 (quoting *Figg v. Schroeder*, 312 F.3d 625, 635 (4th Cir. 2002); *see Owens*, *supra*, 767 F.3d at 395-96. The "two inquiries . . . may be assessed in either sequence." *Merchant*, 677 F.3d at 661-62; *accord Pearson*, 555 U.S. at 236 (stating that judges are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand").

The second inquiry "turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Messerschmidt v. Millender*, —— U.S. ——, 132 S. Ct. 1235, 1245 (2012) (citing *Anderson v. Creighton*, 483 U.S. 635, 639). If the law at the time of the alleged violation was not "clearly established," the official will be entitled to qualified immunity, because "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, *supra*, 457 U.S. at 818. On the other hand, "[i]f the law was clearly established, the immunity defense ordinarily should

fail, since a reasonably competent public official should know the law governing his conduct." *Id*. at 818-19.

"A right is clearly established only if its contours are sufficiently clear that 'a reasonable official would understand that what he is doing violates that right.'" *Carroll v. Carman*, —— U.S. ——, 135 S. Ct. 348, 350 (2014) (quoting *Creighton*, 483 U.S. at 640). "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Carroll*, 135 S. Ct. at 350 (quoting *Ashcroft*, *supra*, 131 S. Ct. 2074, 2080); *see also Reichle v. Howards*, —— U.S. ——, 132 S. Ct. 2088, 2093 (2012) ("To be clearly established, a right must be sufficiently clear that 'every reasonable official would [have understood] that what he is doing violates that right'") (quoting *Ashcroft*, *supra*, 131 S. Ct. at 2078) (some quotation marks and citations omitted); *accord Plumhoff v. Rickard*, —— U.S. ——, 134 S. Ct. 2012, 2023 (2014). "This exacting standard gives government officials breathing room to make reasonable but mistaken judgments by protect[ing] all but the plainly incompetent or those who knowingly violate the law." *City & Cnty. of San Francisco, Calif. v. Sheehan*, —— U.S. ——, 135 S. Ct. 1765, 1774 (2015).

In determining whether a right was clearly established, courts in this Circuit "'ordinarily need not look beyond the decisions of the Supreme Court, [the Fourth Circuit], and the highest court of the state in which the case arose,'" as of the date of the conduct at issue. *Doe ex rel. Johnson v. S.C. Dept. of Soc. Servs.*, 597 F.3d 163, 176 (4th Cir.) (citations omitted), *cert. denied*, —— U.S. ——, 131 S. Ct. 392 (2010). "[A] right may be clearly established by any number of sources, including a criminal case, a statute, or the Constitution itself." *Owens*, *supra*, 767 F.3d at 399.

The question is "whether it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted." *See Raub v. Campbell*, 785 F.3d 876, 882 (4th Cir. 2015). To defeat qualified immunity, "'the existing authority must be such that the unlawfulness of the conduct is manifest.'" *Merchant*, 677 F.3d at 665 (quoting *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998)); *see Bland*, *supra*, 730 F.3d at 391 (stating that "[f]or a plaintiff to defeat a claim of qualified immunity, the contours of the constitutional right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right") (internal quotations omitted).

In my view, Deputy Berryman is entitled to qualified immunity concerning her conduct. No "existing precedent" recognized as "beyond debate" Mathis's right to distribute political literature in violation of E.L. § 13-401. *Carroll*, *supra*, 135 S. Ct. at 350 (internal quotations omitted). Construing the facts in the light most favorable to Mathis, his right to distribute the Sample Ballot was not clearly established, in light of E.L. § 13-401. As noted, the address on the Sample Ballot appears to be for an organization called "Democrats 2010," not for the treasurer of "Citizens for Change," as required by E.L. § 13-401. It was not known whether the treasurer's address was on file. Without an address on the Sample Ballot for the financing entity, a reasonable deputy, in Berryman's shoes, could have believed that the Sample Ballots violated State election laws; their distribution was not protected by the First Amendment; distribution of the ballots was evidence of an ongoing crime. Indeed, Mathis was subsequently convicted for violations of State election laws based on his conduct in distributing the ballots. As a result, the claims against Deputy Berryman are subject to dismissal.

I turn next to the claims lodged against Senator Muse. As noted, plaintiff contends that

Muse, acting "under the color of law, summoned the Prince George's County Police Department and the Sheriff's Department and under his direction [Senator Muse] ordered the Sheriff deputies led by Deputy Berryman to intimidate Plaintiff and his supporters by confiscating Plaintiff's political literature," ECF 18 ¶ 13, Am. Complaint (alteration in Am. Complaint), in violation of the Fourth Amendment and due process of law.   *Id.* ¶ 20.  Plaintiff also contends that "Muse's actions of ordering Deputy Berryman and other deputies to confiscate Plaintiff's sample ballots and intimidate Plaintiff and his supporters violated Plaintiff's 1st Amendment right to disseminate core political speech and press to the electorate."  *Id.* ¶ 17.

I will quickly dispose of Mathis's Fourth Amendment and due process claims against Muse.  According to plaintiff, Muse wrongfully reported illegal activity to local authorities, *i.e.*, Mathis's distribution of Sample Ballots that allegedly were not compliant with State law.  Even assuming, as plaintiff suggests, that Senator Muse was driven by a desire to "derail" Mathis's campaign, ECF 18 ¶ 9, Am. Complaint, Muse's motive in allegedly ordering Deputy Berryman to act is not determinative of a Fourth Amendment violation.  *Cf. Whren*, *supra*, 517 U.S. 806. Notably, it was Deputy Berryman, not Senator Muse, who allegedly stopped Mathis and confiscated the Sample Ballots.  Also of significance, there are no allegations that Muse had any supervisory authority over Berryman in regard to any of Berryman's actions.  And, because Deputy Berryman had a legal basis to approach Mathis and to seize the Sample Ballots, plaintiff's Fourth Amendment rights and due process rights were not infringed by Muse.

I turn next to the First Amendment claims against Muse.

As indicated, to state a claim under § 1983, "a plaintiff must aver that a person *acting under color of state law* deprived him of a constitutional right or a right conferred by a law of the

United States." *Wahi*, 562 F.3d at 615 (emphasis added).   The Fourth Circuit has equated acting

under color of law to the state-action doctrine under the Fourteenth Amendment.   *See Philips*,

*supra*, 572 F.3d at 180 (stating that the under color of law inquiry "is synonymous with the more

familiar state-action requirement—and the analysis for each is identical").   In *Rossignol v.*

*Voorhaar*, 316 F.3d 516, 523 n.1 (4th Cir. 2003), the Court explained, *id*:

> [I]f a defendant's conduct satisfies the state-action requirement of the Fourteenth
> Amendment, it also constitutes action "under color of state law" for the purposes
> of § 1983. [*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S.
> 288, 295 n.2 (2001)] (citing *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 935, [ ]
> (1982)).   In the course of its state action inquiries, the Supreme Court has not
> opted for an objective or subjective test, but simply for a look at the totality of
> circumstances that might bear on the question of the nexus between the
> challenged action and the state.

Under the applicable standard, "private activity will generally not be deemed state action

unless the state has so dominated such activity as to convert it to state action."   *Philips*, 572 F.3d

at 181 (internal quotations and citation omitted).   However, private conduct may be considered

conduct under color of law when the conduct has a "'sufficiently close nexus' with the State to

be 'fairly treated as that of the State itself.'"   *Rossignol*, 316 F.3d at 523 (quoting *Jackson v.*

*Metro. Edison Co.*, 419 U.S. 345, 351 (1974)).   Determining whether a private person's conduct

is action under color of law "'is a matter of normative judgment, and the criteria lack rigid

simplicity.'"   *Rossignol*, 316 F.3d at 523 (quoting *Brentwood*, 531 U.S. at 295).   It is a fact-

intensive inquiry.   "Although [certain factual] allegations can be read as consistent with a purely

personal pursuit, outside the scope of § 1983, when read with a slightly different cast, they can

also be viewed as consistent with an officer's '[m]isuse of power . . . possessed by virtue of state

law,'" and thus within the ambit of acting under color of law.   *Revene v. Charles Cnty. Comm'rs*,

882 F.2d 870, 873-74 (4th Cir. 1989) (quoting *Monroe v. Pape*, 365 U.S. 167, 184 (1961),

*overruled on other grounds by Monell*, 436 U.S. 658).

In *Rossignol*, 316 F.3d at 518, plaintiffs brought a § 1983 suit against Richard Voorhaar, the Sheriff of St. Mary's County, Maryland, and several of his deputies, for their alleged efforts "to suppress the distribution of the election day issue" of a newspaper critical of local government and public officials. *Id.* at 519. The District Court granted summary judgment to defendants; the Fourth Circuit reversed. *Id.* at 524.

The *Rossignol* Court said that, "[a]s a threshold matter, there can be no question that, if the defendants acted under color of state law, that violated these plaintiffs' constitutional rights." *Id.* at 521. The case focused on the issue of whether the defendants acted under "color of law." In its analysis, the Court observed that § 1983 does not reach "'merely private conduct, no matter how discriminatory or wrongful.'" *Id.* at 523 (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999)) (alterations in *Rossignol*). And, "where the action arises out of purely personal circumstances, courts have not found state action even where a defendant took advantage of his position as a public officer in other ways." *Rossignol*, 316 F.3d at 524. But, "[w]here the sole intention of a public official is to suppress speech critical of his conduct of official duties or fitness for public office, his actions are more fairly attributable to the state" and have been considered to be taken under color of law. *Id.*

The Court concluded that the sheriff's deputies, who met several times while at work and elsewhere and formulated a plan to buy out all of the newspapers in vending machines, *id.* at 520, acted under color of state law when they purchased the newspapers, even though they were off duty, not in uniform, and drove their own cars. *Id.* at 523. It said, *id.*:

> We have no doubt that the seizure in this case was perpetrated under color of state law. The requisite nexus between defendants' public office and their

actions . . . arose initially out of their censorial motivation.  Defendants executed a systematic, carefully-organized plan to suppress the distribution of [the newspapers].  And they did so to retaliate against those who questioned their fitness for public office . . . .

The Court added:  "[T]he nexus between defendants' actions and the state arose from more than just defendants' desire to still criticism of their public performance.  Their status as sheriff's deputies enabled them to execute their scheme in a manner that private citizens never could have."  *Id.* at 526.  That the law enforcement officers had removed their badges did not "shield" them or "immunize" them.  *Id.* at 524.  In the view of the Court, the defendants' scheme was "a classic example of the kind of suppression of political criticism which the First Amendment was intended to prohibit."  *Id.* at 523.

Here, the issue of color of law is not presently before me.  In a footnote to defendants' Motion, they have reserved the right to argue that Senator Muse was not acting under color of law.  ECF 21-2 at 5 n.2, Def. Memo.  In particular, they state, *id.*:

The Defendants continue to assert that Senator Muse was not acting under the color of state law when he took any of the actions alleged in the complaint. *See* Defs.' Mem. in Support of Motion to Dismiss Complaint (ECF No. 9-2) at 9-10.  Because this Court rejected this argument on the same set of facts alleged in the original Complaint, the Defendants refrain from restating that argument in this memorandum.

Defendants did not further address the issue here because they were of the view that, in my prior Memorandum Opinion, I concluded that Senator Muse was acting under color of law, foreclosing further argument on the subject.  Defendants have misapprehended my earlier ruling.  In my prior Memorandum Opinion, I did not determine whether Senator Muse was acting under color of law.  Rather, I stated, ECF 16 at 33-34:

When viewed in isolation, certain aspects of Senator Muse's alleged conduct, including the mere fact that he reported unlawful activity to the police,

- 45 -

would fall short of occurring "under color of state law."  However, plaintiff alleges that Senator Muse did far more than merely report wrongdoing. According to plaintiff, Senator Muse "ordered deputies . . . to confiscate Plaintiff's sample ballot and intimidate Plaintiff's supporters under threat of arrest to cease and desist distribution of Plaintiff's sample ballot," and "[u]nder the direction of [Senator Muse], the Sheriff's deputies intimidated Plaintiff and his supporters . . . ."

In light of plaintiff's allegations, I concluded:  "[I]t would be premature to decide at this stage that Senator Muse did not act 'under color of state law' in connection with the Oxon Hill library incident."  *Id.* at 34.  Clearly, I did not hold that as a matter of law Senator Muse was acting under color of law.  To the contrary, I ruled only that any such decision as to that issue would be premature, given plaintiff's allegations and the procedural posture of the case.

Because defendants incorrectly assumed that I had foreclosed further argument on this issue, defendants have not challenged here the adequacy of plaintiff's allegations as to "color of law."  Muse may ultimately prove that he was not acting under color of law at the relevant time. But, for the purpose of this Motion, I will assume, *without deciding*, that at the relevant time Senator Muse was acting under color of law.

I turn to the merits.  In the light most favorable to Mathis, he seems to rely on two theories of First Amendment liability as to Muse.

First, Mathis complains that seizure of his Sample Ballots constituted an "unconstitutional prior restraint," in violation of his rights under the First Amendment.  ECF 18 ¶ 18, Am. Complaint.  In making this claim, plaintiff appears to conflate a prior restraint with subsequent punishment. Although prior restraints restricting speech before it has occurred are disfavored, *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130-31 (1992) (citation omitted), the Supreme Court has emphasized a "time-honored distinction between barring future

speech and penalizing past speech." *Alexander v. United States*, 509 U.S. 544, 545 (1993).  As

explained by the *Alexander* Court:  "The term 'prior restraint' describes orders *forbidding* certain

communications that are issued before the communications occur."  *Id.* at 544 (emphasis in

*Alexander*).  In *Rossignol*, *supra*, 316 F.3d 516, the Court noted that the defendants' "conduct

met the classic definition of a prior restraint" because the defendants suppressed "dissemination

of plaintiffs' political ideas" and did so "before the critical commentary ever reached the eyes of

readers . . . ." *Id.* at 522.

"While it is presumptively unlawful to bar speech before it occurs, First Amendment law

fully accepts the ability to penalize speech that occurred in the *past . . . ." Nat'l Fed'n of Blind v.

F.T.C.*, 303 F. Supp. 2d 707, 723 (D. Md. 2004), *aff'd*, 420 F.3d 331 (4th Cir. 2005) (emphasis in

*Nat'l Fed'n of Blind*).  Here, the Sample Ballots were seized in response to their distribution,

which was thought to violate Title 13 of Maryland's Election Law Article.  In this respect, the

speech had already occurred, making any allegation of a prior restraint implausible.

Plaintiff's second theory of liability under the First Amendment is that Muse retaliated

against Mathis for exercising his free speech rights to challenge Muse's preferred slate of

candidates.  ECF 18 ¶ 17, Am. Complaint.  Every governmental reaction made in response to an

individual's exercise of his First Amendment right to free speech does not amount to "actionable

retaliation."  *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000); *see DiMeglio v.

Haines*, 45 F.3d 790, 806 (4th Cir. 1995).  In a § 1983 retaliation claim, the plaintiff must

demonstrate that the government's actions had some adverse effect on the exercise of the

plaintiff's constitutional rights. *See Raub*, *supra*, 785 F.3d at 885; *ACLU v. Wicomico County*,

*Md.*, 999 F.2d 780, 785 (4th Cir. 1993) ("In order to state a retaliation claim, Appellees are

required to show that [defendant's] actions adversely impacted these First Amendment rights.").

In seeking dismissal, defendants do not specify how Mathis's allegations fall short of stating a First Amendment retaliation claim. In sum, defendants argue summarily that because plaintiff's Sample Ballots contravened Title 13 of the Election Law Article, plaintiff could not have suffered an infringement of his free speech rights upon the confiscation of the non-compliant political literature. ECF 26 at 4-5, Reply.

Mathis's conduct in distributing campaign literature fell under the umbrella of the First Amendment. *See Rossignol*, *supra*, 316 F.3d 516. An election campaign implicates the First Amendment rights of a candidate for office. Indeed, "[t]he First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office." *Citizens United v. Federal Election Commission*, 558 U.S. 310, 339 (2010) (internal quotation marks and citations omitted); *see McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 336 (1995); *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (per curiam). With respect to elections in particular, the Supreme Court explained in *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989) (internal quotations and citations omitted): "Free discussion about candidates for public office is no less critical before a primary than before a general election. In both instances, the election campaign is a means of disseminating ideas as well as attaining political office."

The Supreme Court has also recognized that "[d]iscussion of public issues and debate on the qualifications of candidates are integral to the operation of our system of government." *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, —— U.S. ——, 131 S. Ct. 2806, 2816-17 (2011) (internal quotations and citation omitted). "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a

major purpose of that Amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates . . . and all such matters relating to political processes." *Mills v. State of Ala.*, 384 U.S. 214, 218-19 (1966).  In addition, "the Supreme Court has emphasized the importance of providing the electorate with information about the source of campaign spending—even when these disclosure requirements burden election-related speech." *Ctr. for Individual Freedom, Inc. v. Tennant*, 706 F.3d 270, 275 (4th Cir. 2013) (citing *McConnell v. FEC*, 540 U.S. 93 (2003), *overruled on other grounds by Citizens United*, *supra*, 558 U.S. 310; *see Buckley v. Valeo*, 424 U.S. at 64, 66-67.

Significantly, the First Amendment right to free speech protects not only the affirmative right to speak, but also the right to be free from retaliation perpetrated by the government upon the exercise of that right.  *See Smith v. Gilchrist*, 749 F.3d 302, 308 (4th Cir. 2014); *Suarez*, 202 F.3d at 685; *Wicomico County, Md.*, 999 F.2d at 785 ("Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights."); *see also Pickering v. Board of Educ.*, 391 U.S. 563, 574 (1968) (noting that retaliatory acts are "a potent means of inhibiting speech").  By engaging in retaliation, public officials may place informal restraints on speech, "allow[ing] the government to produce a result which [it] could not command directly. Such interference with constitutional rights is impermissible." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (alterations in *Perry*) (quotations and citation omitted).

*Rossignol*, *supra*, 316 F.3d 516, is again pertinent.  There, the Fourth Circuit observed that the seizure of the newspapers critical of the performance of the Sheriff and his office "contravened the most elemental tenets of First Amendment law." *Id.* at 521.  The Court

observed that the newspaper was "targeted" for "suppression and retaliation" because defendants "disagreed with its viewpoint and intended to prevent its message from being disseminated." *Id.*

In *Raub*, 785 F.3d at 885, the Fourth Circuit cited *Suarez, supra,* 202 F.3d 676, in its review of the elements of a First Amendment retaliation claim.  It said, *id.* at 885:

> A plaintiff seeking to assert a § 1983 claim on the ground that he experienced government retaliation for his First Amendment-protected speech must establish three elements: (1) his speech was protected, (2) the "alleged retaliatory action adversely affected" his protected speech, and (3) a causal relationship between the protected speech and the retaliation. *Suarez Corp. Indus. v. McGraw,* 202 F.3d 676, 685–86 (4th Cir. 2000). Of note, our causal requirement is "rigorous." *Huang v. Bd. of Governors of the Univ. of N.C.,* 902 F.2d 1134, 1140 (4th Cir. 1990). "[I]t is not enough that the protected expression played a role or was a motivating factor in the retaliation; claimant must show that 'but for' the protected expression the [state actor] would not have taken the alleged retaliatory action." *Id.*

Mathis has adequately alleged all three elements of a First Amendment retaliation claim against Muse, as set forth in both *Raub* and *Suarez*.  In his Amended Complaint, Mathis alleges that his campaign speech generally, and in particular the speech contained in his Sample Ballot, was protected by the First Amendment.  ECF 18 ¶¶ 17-19, Am. Complaint.  Moreover, Mathis argues that he and Muse supported different candidates and both were themselves candidates for office.  Mathis's allegations suggest a causal nexus between the exercise of his free speech rights and Muse's actions, purportedly under color of law,[18] to "derail" Mathis's campaign by contacting law enforcement about his illegal Sample Ballots, and to silence Mathis's opposition to Muse's slate of candidates.  *Id.* ¶ 9.  These allegations are sufficient to plead the first and third elements of the *Suarez* test.

---

[18] As noted, I have not been asked in the Motion to determine the adequacy of the allegations as to whether Muse was acting "under color of law."

The question remains whether Mathis adequately alleged a retaliatory action adversely affecting his free speech rights—the second element under *Raub* and *Suarez*.  In considering whether an action adversely affected First Amendment rights, courts evaluate whether the conduct would "deter a person of ordinary firmness from the exercise of [his] First Amendment rights."  *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005) (internal quotations omitted); *see Benham v. City of Charlotte, N.C.*, 635 F.3d 129, 135 (4th Cir. 2011); *Smith v. Frye*, 488 F.3d 263, 272 (4th Cir.), *cert. denied*, 552 U.S. 1039 (2007). "The ordinary-firmness test . . . is designed to weed out trivial matters from those deserving the time of the courts as real and substantial violations of the First Amendment." *Garcia v. City of Trenton*, 348 F.3d 726, 728 (8th Cir. 2003).  The test is an objective one.  *Id.* at 729.  In applying the test of ordinary-firmness, Judge Posner has observed: "The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable."  *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982).

The Fourth Circuit has characterized the analysis as a "fact intensive inquiry that focuses on the status of the speaker, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts."  *Suarez*, 202 F.3d at 686.  In *Blankenship v. Manchin*, 471 F.3d 523 (4th Cir. 2006), the Fourth Circuit recognized that "activating the punitive machinery of the government" against an individual in retribution for his or her exercise of free speech may constitute an action adversely affecting First Amendment rights and satisfy the second element of the *Suarez* test.  *Id.* at 529 (internal quotations omitted).

In *Manchin*, Don Blankenship, the president of a large coal company, sued Joe Manchin III, the governor of West Virginia, alleging that the governor violated Blankenship's free speech rights by threatening at a press conference to increase regulation of his coal company, Massey Energy, in retaliation for Blankenship's public opposition to the governor's pension bond proposal. *Id.* at 525-27.   Soon after, the coal company was subject to increased regulatory oversight and a state investigation by the Department of Environmental Protection. *Id.* at 526-27.   Blankenship subsequently filed suit under 42 U.S.C. § 1983 against the governor, in his official and individual capacities, alleging unconstitutional retaliation, in violation of the First Amendment. *Id.* at 527.   Blankenship contended that the state investigation was launched "'not out of concern for the safety of residents, but instead, in retaliation for [his] campaign'" against the governor's bond proposal. *Id.* (quoting the complaint).   In response, the governor filed a motion to dismiss, alleging, *inter alia*, that the complaint failed to state a claim of retaliatory action in violation of the Constitution.   *Id.*   The district court denied the motion to dismiss. *Id.*

On appeal, the Court considered whether the governor was "entitled to qualified immunity for allegedly threatening a political rival and prominent businessman during a press conference" on a matter of public interest.   *Id.* at 525.   Speaking through Judge Gregory, the Court found that the facts as alleged established that the governor threatened "imminent adverse regulatory action and that a reasonable public official in his position would know that such a

threat is unlawful . . . ." *Id.*   The Court concluded that, at the motion-to-dismiss stage, the governor was not entitled to qualified immunity. *Id.* [19]

In its analysis, the Fourth Circuit considered, *inter alia*, whether the complaint adequately pleaded an adverse effect on the plaintiff's First Amendment rights—the second element of the *Suarez* test. *Id.* at 528-29.   In other words, it analyzed whether the governor's alleged threats of increased scrutiny of the coal company adversely affected the plaintiff's protected speech.   The Fourth Circuit was of the view that the allegations in the complaint were sufficient to survive dismissal. *Id.* at 530.   It explained, *id.*:

> [W]e can draw an inference in favor of the Appellee that [the chairman's company] is subject to near-constant regulatory oversight, and any "additional" scrutiny could be applied immediately. Indeed, the Appellee's complaint supports this conclusion by alleging the actual investigation ordered by the Governor a mere five days after voters rejected the bond amendment. Thus, rather than an opinion or prediction, [the governor's] remarks are reasonably construed as threats that, as a result of [the chairman's] speech, [the company] would be subject to greater regulation than prior to [chairman's] remarks, or than its competitors faced. Such a threat, directed towards an individual who is the head of a company in a highly regulated industry, constitutes an intimation of imminent adverse regulatory action and satisfies *Suarez*.

The Fourth Circuit then undertook an "objective inquiry into whether 'a similarly situated person of 'ordinary firmness" reasonably would be chilled by the government conduct . . . ." *Id.* at 530 (citing *Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 416 (4th Cir. 2006)).   The Court noted that the plaintiff claimed that "his speech has been chilled and until contrary evidence is presented, that claim must be accepted."   *Manchin*, 471 F.3d at 532.   The Court said:   "A chilling effect need not result in a total freeze of the targeted party's speech."   *Id.* Notably, the Fourth

---

[19] Notably, in resolving defendants' Motion to Dismiss, I have not been called upon to consider whether Senator Muse is entitled to qualified immunity.

Circuit also stated: "Appellant may demonstrate that [the plaintiff] has, as a matter of law, not been chilled in any respect; that opportunity, however, must be undertaken with the aid of discovery and not at the motion-to-dismiss stage." *Id.* at 533. Thus, the *Manchin* Court concluded that the lower court properly denied the motion to dismiss because the complaint sufficiently stated that the governor retaliated against the chairman for his exercise of free speech. *Id.*

The *Manchin* Court relied, *inter alia*, on *Garcia v. City of Trenton*, *supra*, 348 F.3d 726. Given defendants' repeated assertions here that, in general, liability cannot attach because Mathis violated Maryland's election law, *Garcia* is particularly pertinent.

In *Garcia*, a store owner, Garcia, complained to the mayor and other city officials about bicyclists riding on the sidewalk in front of her business. *Id.* at 727-28. A local ordinance precluded bicycle riding on the sidewalk, and Garcia wanted the city to enforce the ordinance. *Id.* at 728. At the time Garcia complained about the bicycle ordinance, "she regularly parked her car in front of her shop in violation of a two-hour time limit." *Id.* However, it was police practice not to ticket a car unless someone complained about the violation, and so the police "rarely" issued parking tickets. *Id.* Indeed, from the time Garcia opened her store in November 1999 until August 30, 2000, when Garcia had "a heated exchange with the mayor," she had never received a parking ticket for parking outside of her store in violation of the two-hour limitation. *Id.*

During the exchange between the mayor and Garcia about the bicycle ordinance, the mayor told Garcia that the two-hour time parking limitation outside of her store would soon be enforced against her. *Id.* Further, the mayor informed Garcia that he was taking this

enforcement action because of her complaints about the bicycling ordinance. *Id.* Several hours later, Garcia received a parking ticket for parking her car in violation of the two-hour limitation. *Id.* Over the next two months, she received three more parking tickets. *Id.* In contrast, an accountant whose office was located next door to Garcia's shop, and who regularly parked in violation of the two-hour limit, had not received any tickets for eight years. *Id.* When the accountant finally did receive a ticket, it "disappeared from police records after he spoke with Mayor Whitaker about it the following week." *Id.*

Garcia filed a § 1983 claim against the mayor for retaliation under the First Amendment. *Id.* at 727. At trial, the jury returned a verdict in the plaintiff's favor, but the district court set aside the verdict and granted judgment in favor of the mayor. *Id.* at 728. On appeal, Garcia argued that the district court erred in granting judgment as matter of law in favor of the mayor, because she presented sufficient evidence to support the jury's verdict that the retaliatory issuance of parking tickets "would chill the speech of a person of ordinary firmness." *Id.* at 727.

The Eighth Circuit determined that "the defendant's conduct went beyond mere speech . . . ." *Id.* at 729. Rather, in his official capacity, the mayor "engaged the punitive machinery of government in order to punish Ms. Garcia for her speaking out." *Id.* The court concluded: "Charges made by a parking ticket, to be sure, are typically only petty offenses, not even misdemeanors, but they have concrete consequences. We hold that the evidence in this case was sufficient to go to the jury." *Id.*

Although the procedural posture of this case distinguishes it from *Garcia*, the court's rationale is pertinent. It highlights that the conduct of a public official, acting in his official capacity, who engages law enforcement against an individual, in retaliation for the individual's

exercise of his First Amendment rights, may offend the First Amendment, despite the underlying violation of law committed by the one alleging a First Amendment violation. *Id*; *see also Richter v. Maryland*, 590 F. Supp. 2d 730, 734-35, 737 (D. Md. 2008) (Davis, J.) (characterizing issuance of violation notices as "transparently pretextual," and stating on summary judgment that ticketing of a legally parked automobile for a cracked windshield and issuance of a subsequent tow order, allegedly in response to offensive political messages displayed upon the vehicle, qualified as an adverse effect supporting vehicle owner's § 1983 First Amendment retaliation action), *aff'd sub nom. Richter v. Beatty*, 417 F. App'x 308 (4th Cir. 2011).

To be sure, Mathis was not entitled to distribute non-compliant political literature, and he was subsequently charged and convicted of misdemeanor violations under Maryland law.[20] But, in response to the events here, a person of ordinary firmness might refrain from disseminating political literature about alternative candidates, out of fear that he/she would suffer retaliation if there were an innocent error or minor omission in campaign literature, or because compliant literature might not appear facially compliant, and could thus lead to charges of wrongdoing. Such allegations are sufficient to plead the second element under *Raub* and *Suarez*. As to Muse, plaintiff has pleaded facts to support all three elements of the *Suarez* test to establish a violation of the First Amendment.

Although the core issue in *Rossignol* was whether the officers acted under color of law, the case highlights that actions taken by law enforcement officers to prevent the circulation of political literature may contravene the First Amendment. However, it also establishes that Mathis has not stated a claim against Berryman.

---

[20] At this stage, there is no indication of the frequency with which such violations have generally occurred in Maryland, or whether such offenses are typically prosecuted in Maryland.

The law enforcement officers in *Rossignol* schemed to purchase newspapers on the eve of election day, in order to suppress the information in the newspaper.  The officers initiated the purchase of these newspapers because they were the objects of criticism; their conduct was not taken in response to a report of illegal activity.   316 F. 3d at 520.  In contrast, Berryman was not the target of Mathis's campaign literature, nor was she involved in a scheme to suppress the distribution of the ballots.  Her involvement arose solely in response to a complaint from Muse.  At the scene, she was clearly carrying out her duties to enforce the law.  ECF 18 ¶¶ 23-24, Am. Complaint.   Moreover, as stated previously, Berryman is protected by qualified immunity, because she acted within the scope of her authority and Mathis did not have a clearly established right to distribute Sample Ballots in violation of State election law.

For the foregoing reasons, the First Amendment retaliation claim as to Muse shall survive defendants' Motion to Dismiss.  But, the First Amendment claim as to Deputy Berryman shall be dismissed.

### C.  Motion to Amend

At the conclusion of his Amended Complaint, plaintiff states:  "Should this Court award dismissal of any of the alleged counts to the complaint herein Plaintiff thereby request[s] that any dismissal be without prejudice."  ECF 18 at 9 ¶ 5, Am. Complaint (Prayer for Relief).  I will deny plaintiff's request because his proposed amendment to the claims dismissed with prejudice would be futile, for the reasons already discussed.

During the pendency of the defendants' Motion to Dismiss, plaintiff moved again to amend his complaint.  ECF 27, Motion to Amend.  Defendants challenge the Motion to Amend because, among other things, they argue that the proposed amendments would be futile and

prejudicial to the defendants.  ECF 28 at 2.

As a preliminary matter, I note that Local Rule 103.6(c) provides that the party seeking to amend a pleading through a motion must provide a clean copy of the amended pleading and "a copy of the amended pleading in which stricken material has been lined through or enclosed in brackets and new material has been underlined or set forth in bold-faced type." Although compliance with the Local Rule 103.6(c) does not speak to the merits of the request to amend, this rule facilitates the ability of the parties and the Court to ascertain what proposed changes have been made to the pleading.

Here, plaintiff did not submit a clean copy of his proposed second amended complaint. Rather, plaintiff only submitted a thirty-eight page redline comparing his proposed second amended complaint to the original Complaint (ECF 27-2, "Redline").  As a result, based on the Redline, it is not readily apparent what revisions plaintiff made to the Amended Complaint. Indeed, several of the redlined paragraphs are already included, word-for-word, in the Amended Complaint.  *Compare, e.g.*, ECF 18 ¶¶ 15-17, Am. Complaint *with* ECF 27-2 ¶¶ 61-63, Redline (appearing as new paragraphs in the Redline but already included in the Amended Complaint). Moreover, the bulk of the redlined paragraphs merely rephrase the description of how Deputy Berryman confiscated plaintiff's Sample Ballots at the directive of Muse.  *See* ECF 27-2 ¶¶ 66-67, 75, Redline.  This information, although re-phrased, is not new.  It was previously included in the Amended Complaint in ECF 18, paragraphs 18 and 23, and defendants have already responded to these allegations in their Motion to Dismiss.

Notwithstanding the lack of clarity as to which redlined paragraphs are material amendments, plaintiff does include in the Redline three allegations worth highlighting.  First,

plaintiff alleges:  "Defendant Berryman intimidated Plaintiff and his supporters by confiscating their ID's and questioning their citizenship.  Defendant Berryman threatened Plaintiff and his supporters who were primarily of Filipino decent with arrest if they violated the Deputies' order to cease and desist distribution of Plaintiff's sample ballot."  ECF 27-2 ¶ 73, Redline.   Second, he offers additional argument that the confiscation of his ballots without a warrant was only appropriate if Deputy Berryman had probable cause. *Id.* ¶¶ 77-79.   Third, plaintiff includes an additional count, Count V, calling into question the constitutionality of E.L. § 13-401.[21] *Id.* at 35; *see also id.* ¶¶ 81-86.

In challenging the Motion to Amend, defendants argue:  "Mr. Mathis, although pro se, should not be permitted to continue to amend his pleadings to add allegations that he had full knowledge of more than a year ago when he initially filed his complaint."  ECF 28 at 6.  They add:  "Continuing to add allegations that for the most part merely respond to legal arguments made by the Defendants is prejudicial to the Defendants, is a waste of judicial resources, and is not in the interest of justice."  *Id.*  Moreover, they contend that, even if allowed, the amendments are "futile."  *Id.* at 2.  I agree with defendants as to all three contentions.

Under Fed. R. Civ. P. 15(a)(2), "[a] court should freely give leave to amend when justice so requires."  *See Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 769 (4th Cir. 2011).   "Rule 15(a) grants the district court broad discretion concerning motions to amend pleadings, and leave should be granted absent some reason 'such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the

---

[21] The Redline includes only two counts, designated as Count I and Count V.

amendment or futility of the amendment.'" *Booth v. Maryland*, 337 F. App'x 301, 312 (4th Cir. 2009) (per curiam) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *see also Laber v. Harvey*, 438 F.3d 404, 426-29 (4th Cir. 2006) (en banc); *Equal Rights Center v. Niles Bolton Associates*, 602 F.2ed 597, 603 (4th Cir. 2010).   Here, plaintiff has had ample opportunity to amend his Complaint and the amendments he proposes cannot salvage his claims.

In particular, with respect to the added allegations that Deputy Berryman confiscated the identifications of Mathis's supporters and "question[ed] their citizenship," plaintiff included these allegations in his original Complaint, but did not include them in his Amended Complaint. ECF 1 ¶ 58, Complaint.   Curiously, they reappear in the proposed second amended complaint. ECF 27-2 ¶ 73, Redline.   In my initial Memorandum Opinion, I stated with respect to these allegations: "[I]n the Opposition, plaintiff fails to raise any argument in response to defendants' claim that such questioning [about the citizenship of Mathis's supporters] did not violate a constitutional right of Mathis. Rather, plaintiff merely reiterates his factual allegation found in the Complaint. *See* Opp. at 17, 19. As such, plaintiff has abandoned that aspect of his claim." My original ruling that the claims have been effectively abandoned stands, and I decline to re-consider these allegations at this time.

Plaintiff also argues in the Redline that Deputy Berryman needed probable cause prior to confiscating the Sample Ballots.   Although correct, these arguments cannot save plaintiff's claims because, as discussed, she is entitled to qualified immunity.

Finally, as noted, plaintiff includes a new count, Count V, ECF 27-2 at 35, in which he seeks to attack the constitutionality of E.L. § 13-401.   *Id.* ¶¶ 81-86.   In ruling on defendant's

"Motion to Strike Plaintiff's Purported Redlined Amended Complaint (ECF 20), I addressed the potential addition of this claim, stating, ECF 23 at 3:

> Plaintiff's case is brought pursuant to 42 U.S.C. § 1983. The allegations do not relate back to the filing of the Original Complaint. *See* Fed. R. Civ. P. 15(c). Because there is no federal statute of limitations for § 1983 claims, *Lewis v. Richmond City Police Dep't.*, 947 F.2d 733, 735 (4th Cir. 1991), the applicable state limitations period applies. *Id.* Under Maryland law, the general limitations period is the three years. *See* § 5-101 of the Courts and Judicial Proceedings Article of the Maryland Code (2013 Repl. Vol.). Plaintiff has advanced his new claim more than three years after his alleged injuries. Thus, his claim is barred under Maryland's three-year statute of limitations. *See Wilkins v. Montgomery*, 751 F.3d 214, 223 (4th Cir. 2014) ("There is no federal statute of limitations for § 1983 claims, so the state limitations period which governs personal injury actions is applied[.]") (Internal citation omitted). Accordingly, the amendment would be futile.

In sum, many of the redlined paragraphs plaintiff proposes do not provide new facts and, to the extent they do offer novel arguments, the amendments are futile or would result in undue prejudice to defendants. For these reasons, plaintiff's Motion to Amend the Complaint as proposed in the Redline (ECF 27) shall be denied.

## IV. Conclusion

For the foregoing reasons, defendants' Motion to Dismiss (ECF 21) will be granted in part and denied in part. Plaintiff's Motion to Amend (ECF 27) will be denied. A separate Order follows, consistent with this Memorandum Opinion.


Date:   June 19, 2015                    _____/s/_____
                                         Ellen Lipton Hollander
                                         United States District Judge